**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | Case No. _____ |
| *Ex rel.* **UNDER SEAL**, | § | |
| | § | |
| Plaintiffs, | § | RELATORS' COMPLAINT |
| | § | PURSUANT TO |
| vs. | § | 31 U.S.C §§ 3729-3732 |
| | § | (FEDERAL FALSE CLAIMS ACT) |
| **UNDER SEAL,** | § | |
| | § | JURY TRIAL DEMANDED |
| Defendants. | § | |
| | § | |
| | § | **FILED UNDER SEAL AND** |
| | § | **EX PARTE** |
| | § | |
| | § | **DO NOT PLACE IN PACER** |

**RELATORS' COMPLAINT PURSUANT TO 31 USC §§ 3729-3732**
**(FEDERAL CIVIL FALSE CLAIMS ACT)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | Case No. _____ |
| *Ex rel.* Jean-Marc Eichner and Brandon Loyd, and | § | |
| Jean-Marc Eichner and Brandon Loyd Individually, | § | |
| | § | |
| Plaintiffs, | § | RELATORS' COMPLAINT |
| | § | PURSUANT TO |
| vs. | § | 31 U.S.C §§ 3729-3732 |
| | § | (FEDERAL FALSE CLAIMS |
| Ocwen Loan Servicing, LLC; Ocwen Financial | § | ACT) |
| Corporation; U.S. Bank, National Association, *as* | § | |
| *Trustee*, on behalf of 457 Residential Mortgage Backed | § | JURY TRIAL DEMANDED |
| Securities Trust Defendants;[1] Deutsche Bank National | § | |
| Trust Company, *as Trustee*, on behalf of 617 | § | |
| Residential Mortgage Backed Securities Trust | § | **FILED UNDER SEAL AND** |
| Defendants;[2] The Bank of New York Mellon Trust | § | **EX PARTE** |
| Company, N.A. f/k/a The Bank of New York Trust | § | |
| Company, National Association, The Bank of New | § | **DO NOT PLACE IN PACER** |
| York Mellon f/k/a The Bank of New York, and The | § | |
| Bank of New York Mellon Corporation f/k/a The Bank | § | |
| of New York Company, Inc., *as Successor-Trustees* to | § | |
| J.P. Morgan Chase Bank, N.A., on behalf of 329 | § | |
| Residential Mortgage Backed Securities Trust | § | |
| Defendants;[3] Wells Fargo Bank, N.A., *as Trustee*, on | § | |
| behalf of 194 Residential Mortgage Backed Securities | § | |
| Trust Defendants,[4] | § | |

Defendants.

## RELATORS' COMPLAINT PURSUANT TO 31 USC §§ 3729-3732
### (FEDERAL CIVIL FALSE CLAIMS ACT)

---

[1] See **Exhibit 7,** attached hereto and incorporated herein by reference, for list of Defendant Trusts.
[2] See **Exhibit 8,** attached hereto and incorporated herein by reference, for list of Defendant Trusts.
[3] See **Exhibit 9,** attached hereto and incorporated herein by reference, for list of Defendant Trusts.
[4] See **Exhibit 10,** attached hereto and incorporated herein by reference, for list of Defendant Trusts.

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                    ii

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................1

    A.  The Trust Defendants are the Ocwen Defendants' principals and liable
        for its conduct as their agent.............................................................2
    B.  Ocwen's Admissions: 2014 Consent Order under New York Banking Law....5

II.   SUMMARY....................................................................................18

III.  PARTIES......................................................................................20

IV.   JURISDICTION AND VENUE................................................................27

V.    HOME AFFORDABLE MODIFICATION PROGRAM.............................27

VI.   FACTS.........................................................................................27

VII.  OLS LOAN MODIFICATIONS.............................................................32

VIII. LOYD'S DIRECTLY AND INDEPENDENTLY ACQUIRED KNOWLEDGE OF
      OCWEN VIOLATIONS.....................................................................36

    A.  Federal Housing Administration ("FHA") Violations............................36
            1. OLS Violations of FHA Loss Mitigation Requirements....................37
                a.  Failure To Engage in Loss Mitigation in a Timely Manner.........37
                b.  Failure To Engage in FHA-Specific Loss Mitigation Procedures..38
                c.  Failure To Properly Implement FHA-HAMP........................39
            2. OLS Violations of FHA Quality Control Requirements....................39
                a.  Failure To Implement an FHA-Compliant Quality Control
                    Program...............................................................39
                b.  Improperly Servicing FHA Loans Offshore.........................41
            3. Ocwen's False Certifications................................................45

    B.  UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES..............47
            1. UDAAP and UDAP Laws...................................................47
            2. Dodd-Frank Act.............................................................50
                 a.  Unfair.................................................................50
                 b.  Deceptive.............................................................52
                 c.  Abusive...............................................................53
            3. Additional Unfair, Deceptive or Abusive Acts and Practices.............55

       a.  Loss Mitigation – OLS's Modification Delays and Wrongful
          Denials……………………………………………………………….55
       b.  OLS's Violations of Loss Mitigation Requirements……………..60
       c.  Unlawful Failure to Suspend Foreclosure…………………………62
       d.  Unlawful Capitalization of Un-loaned Principal…………………63
       e.  Force-Placed Advance of Escrow……………………………….66
       f.  "In-Flight" Modifications………………………………………68
       g.  Manipulation of Modification Process……………………………69
       h.  Manipulation of Modification Documents………………………69
       i.  Violations of the CFPB's Continuity of Contact Requirement…...72
       j.  Imparting False, Misleading Information to Borrowers…………..75
       k.  Offshore Loan Review Resulting in Misunderstanding and
          Confusion………………………………………………………77
       l.  Forced In-House Modifications………………………………...79

    **C.  REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA)…………..81**
       1. Untimely Transferee/Transferor Letters to Borrowers…………………82
       2. Additional Violations of RESPA………………………………………83

    **D.  STATE LAWS AND REGULATIONS……………………………………...84**
       1. Texas Loan-to-Value Ratio………………………………………………85
       2. Texas Mandatory Closing Location………………………………………86
       3. Texas Notice of Right of Rescission………………………………………86
       4. Texas Full Amortization…………………………………………………87

    **E.  FAILURE BY OLS TO SELF-REPORT………………………………………88**

**IX.  EICHNER'S DIRECTLY AND INDEPENDENTLY ACQUIRED
      KNOWLEDGE OF OCWEN VIOLATIONS……………………………………89**

**X.  PRINCIPAL LIABILITY UNDER AGENCY LAW………………………100**

    **A. Trustee Defendant Specific Case Law………………………………...104**
       1. The Bank of New York………………………………………………...104
       2. U.S. Bank, National Association………………………………………106
       3. Deutsche Bank National Trust Company………………………………109
       4. Wells Fargo Bank, N.A………………………………………………...110

**XI.  FALSE CLAIMS ACT……………………………………………………113**

**XII.  CAUSES OF ACTION……………………………………………………118**

    **A. First Cause of Action -False Claims 31 U.S.C. § 3729(a)(1)(A)……………...118**

**B. Second Cause of Action-False Claims Arising from Implied False Certifications 31 U.S.C. § 3729(a)(1)(A)**……………………………………**118**

**C. Third Cause of Action - False Statements or Records 31 U.S.C. § 3729(a)(1)(B)**……………………………………………………………**119**

**D. Fourth Cause of Action -- False Claims by Fraudulent Inducement 31 U.S.C. § 3729(a)(1)(A)**……………………………………………**119**

**E. Fifth Cause of Action -- False Record, Statement, Concealment, Avoidance or Decreasing Obligation to Pay the United States 31 U.S.C. § 3729(a)(1)(G)**……………………………………………**121**

**XIII. PRAYER AND REQUEST FOR RELIEF**……………………………………**121**

## I.      INTRODUCTION

1.       Defendants Ocwen Financial Corporation ("OFC") and its subsidiary and alter ego Ocwen Loan Servicing ("OLS") (collectively "Ocwen" or "Ocwen Defendants") were and/or are mortgage loan servicing agents for hundreds of trusts, for which Defendants U.S. Bank, National Association, Trustee ("U.S. Bank");[5] Deutsche Bank National Trust Company, Trustee ("Deutsche");[6] Wells Fargo Bank, N.A.. Trustee ("Wells");[7] The Bank of New York Mellon Trust Company, N.A. f/k/a The Bank of New York Trust Company, National Association, The Bank of New York Mellon f/k/a The Bank of New York, and The Bank of New York Mellon Corporation f/k/a The Bank of New York Company, Inc., Successor-Trustees ("BONY")[8] to J.P. Morgan Chase Bank, N.A., ("Trustee Defendants") served as Trustees. The Trustee Defendants are sued in their capacities *as Trustees* (and legal owners of the Trust Assets) and on behalf of the Trusts (and their investor/certificate holders), which are the beneficial owners of the Trust Assets (collectively "Trust Defendants"[9]) (Trust Defendants, Trustee Defendants, and Ocwen Defendants collectively "Defendants") pursuant to Pooling and Servicing Agreements ("PSAs") described hereinafter, which gave Ocwen substantial authority and broad responsibility in servicing the pooled mortgage loans). The Trustee Defendants were and/or are Trustees under the PSAs for which the Ocwen Defendants were servicing agents for the securitized mortgage loans.

---

[5] U.S. Bank, National Association was Trustee for, at a minimum, the Trusts as to which Ocwen was a Servicer pursuant to the relevant PSAs, including, but not limited to, those listed in **Exhibit 7.**
[6] Deutsche Bank National Trust Company was Trustee for, at a minimum, the Trusts as to which Ocwen was a Servicer pursuant to the relevant PSAs, including, but not limited to, those listed in **Exhibit 8**.
[7] Wells Fargo Bank, N.A. was Trustee for, at a minimum, the Trusts as to which Ocwen was a Servicer pursuant to the relevant PSAs, including, but not limited to, those listed in **Exhibit 10**.
[8] In 2006, Bank of New York Company, Inc. acquired all of J.P. Morgan Chase Bank, N.A.'s corporate trust business. Bank of New York. is Trustee for, at a minimum, the Trusts as to which Ocwen was Servicer pursuant to the relevant PSAs, including, but not limited to, those in **Exhibit 9**.
[9] The Trust Defendants are listed in **Exhibits 7,** U.S. Bank Trusts; **8,** Deutsche Trusts; **10,** Wells Trusts, and **9,** BONY Trusts.

A.      **The Trust Defendants are the Ocwen Defendants' principals and liable for its conduct as their agent.**

2.      Pursuant to the PSAs, Ocwen serviced, at the individual loan level, the mortgages pooled under the PSAs, as agent of the Trusts, which held the investors' interests in the pooled mortgages. The Trustee Defendants were the formal, legal owners of the investors' interests in the Trusts' assets (the mortgages); the Trusts (and their investors) were the "beneficial owners" of the pooled mortgage assets. The Trustees thus stand in the shoes of the Trusts as an agent within the PSA limitations on their duties and powers and are fiduciaries to the Trusts in their administration and management of the Trusts. In their capacity as Trustees, the Trustee Defendants, which stand in the shoes of the Trust Defendants and are obligated to protect the assets of the trusts, are liable *as Trustees* on behalf of the Trusts and the Trusts' assets, for the conduct of ***their agent, Ocwen***. It is long and well established "[t]hat for acts done by the agents of a corporation, either *in contractu* or *in delicto*, in the course of its business and of their employment, the corporation is responsible as an individual is responsible under similar circumstances." *Washington Gas Light Co. v. Lansden*, 172 U.S. 534, 543-544 (1899) (quoting *Philadelphia, Wilmington & Baltimore Railroad v. Quigley*, 21 How. 202, 210). In fact, courts have specifically held that *Ocwen's* principals can be vicariously liable for Ocwen's acts as their mortgage servicer/agent. *See, e.g., Fogg v. Ocwen Loan Servicing, LLC,* No. 2:14-cv-454-GZS, 2015 U.S. Dist. LEXIS 45642, *32 (D. Me. Apr. 8, 2015) (Master Servicer Bank of America and Trustee Mellon Bank may be liable for unlawful acts of Subservicer Ocwen; Bank of America was acting under authority of and as agent for Trustee Mellon and *Ocwen as agent of both Master Servicer Bank of America and Trustee Mellon*) (citing *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998) (principal

may be **vicariously liable** for agent's tortious conduct, including credit reporting violations, under various theories); *In re Hart,* 246 B.R. 709, 736 (Bankr. D. Mass. 2000) (owner of residential note and mortgage found **vicariously liable** for servicing agent's alleged violation of Massachusetts Consumer Protection Act); *Dupuis v. Federal Home Loan Mortg. Corp*., 879 F. Supp. 139, 144 (D. Mass. 1995) (as a matter of Maine and federal common law, an owner of a residential note and mortgage who is an "undisclosed principal" is liable for the failures and excesses of a loan servicer who is its "*general agent*") (emphasis added)).[10]

3.      Moreover, the Supreme Court has established that federal tort statutes incorporate the common law of torts. *Staub v. Proctor Hosp*., 131 S. Ct. 1186, 1191, 179 L. Ed. 2d 144 (2011) (citing *Meyer v. Holley*, 537 U.S. 280, 285, 287, 123 S. Ct. 824, 829, 154 L. Ed. 2d 753 (2003) (applying traditional *agency principles* of Restatement (Second) of Agency (1958) to Fair Housing Act" and citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 754-55, 764, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) ("accommodat[ing] the agency principles of **vicarious liability** for harm caused by misuse of [agent's] *supervisory authority*" in Title VII); Restatement (Second) of Agency (1958) (emphasis added); and *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) ("Congress wanted courts to look to *agency principles* for guidance"). The Court has thus looked to common law tort doctrines, including agency, in applying vicarious liability to multiple federal statutory torts. *See Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 129 S. Ct. 1870, 1881, 173 L. Ed. 2d 812 (2009) (CERCLA; "traditional and evolving principles of common law."); *Burlington Indus.*, 524 U.S. at 764 (Title VII; agency/apparent

---

[10] See further discussion of principals' vicarious liability for agent's conduct, *infra,* at 87-101.

authority). *Federal courts of appeals and district courts have applied the common law of agency to False Claims Act cases without hesitation. See, e.g., Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 148 (D.C. Cir. 2011) (Anti-Terrorism Act; *respondeat superior*) (citing, *Staub, Burlington Northern, Ellerth*, and *Wilson v. Good Humor Corp*., 757 F.2d 1293, 1301, 244 U.S. App. D.C. 298 (D.C. Cir. 1985)).

4.      *The Court of Appeals for the Fifth Circuit has also applied agency vicarious liability to numerous federal statutes including the False Claims Act. See United States ex rel. Bias v. Tangipahoa Par. Sch. Bd*., 816 F.3d 315, 327 n.8 (5th Cir. 2016) (FCA retaliation; agency/apparent authority); *United States v. Ridglea State Bank*, 357 F.2d 495, 498 (5th Cir. 1966) (False Claims Act; agency/"at least apparent authority"); *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 349-53 (5th Cir. 2013) (Antikickback Act; apparent authority) ("When grappling with the standard for imposing vicarious liability in civil liability provisions, we look to the common law principles distilled in the Restatement (Second) of Agency for guidance.") (citing *American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 573-74, 102 S. Ct. 1935, 72 L. Ed. 2d 330 (1982) (Sherman Antitrust Act; apparent authority).

5.      **Overwhelming evidence**, including Ocwen's stipulations and admissions of unlawful conduct in a December, **2014 Consent Order**[11] with the New York State Department of Financial Services ("2014 NYDFS Consent Order") demonstrated that Ocwen had knowingly violated numerous state and federal laws and regulations for many years; that during the years it was violating such laws and regulations it falsely and expressly represented to the United States it

---

[11] *See* **Exhibit 1**.

was, and would be in compliance with those laws and regulations, and that it made or used its false claims, certifications, statements or records with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of those claims, certifications, statements or records. Ocwen's CEO Ron Faris and its General Counsel Timothy Hayes both signed the Consent Order which set forth pervasive violations of federal and state laws. As a consequence of the extensive violations of New York State laws, federal common law and the False Claims Act to which Ocwen stipulated and agreed in the Consent Order, the Trust Defendants (through the Trustee Defendants) in this action are **vicariously liable** for all damages arising from the Ocwen Defendants' violations while serving as a servicing agent for each of them under the Home Affordable Modification Program ("HAMP") and beyond.

### B.  Ocwen's Admissions: 2014 Consent Order under New York Banking Law

6.      On or about December 19, 2014, OFC and OLS officers executed the 2014 NYDFS Consent Order Pursuant to New York Banking Law § 44, entered between those two Ocwen entities and the New York State Department of Financial Services ("NYDFS"). OFC and OLS, each, *stipulated* that:

- in 2010 and 2011, the multistate examinations of Ocwen,[12] Litton, and Homeward[13] identified numerous and significant violations of New York State laws and regulations;[14]

- on September 1, 2011, in connection with Ocwen's acquisition of Litton and amid concerns regarding Ocwen's rapid growth and capacity to properly acquire and service a significant portfolio of distressed home loans, Ocwen and the Department entered into an Agreement on Mortgage Servicing Practices (the "2011

---

[12] "Ocwen" defined as OFC and OLS together. 2014 NYDFS Consent Decree at 1, *See* **Exhibit 1.**
[13] Litton was purchased by Ocwen in 2011; Homeward was purchased by Ocwen in 2012.
[14] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 1.

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                                    5

Agreement"), which required Ocwen to adhere to certain servicing practices in the best interest of borrowers and investors;[15]

• a June 2012 targeted examination of Ocwen revealed that Ocwen violated the 2011 Agreement; [16]

• as a result of Ocwen's violation of the 2011 Agreement, Ocwen entered into a Consent Order with the Department on December 5, 2012 [("2012 Consent Order")], which required Ocwen to retain an independent compliance monitor (the "Compliance Monitor") for two years to conduct a comprehensive review of Ocwen's servicing operations;[17]

• the Department and the Compliance Monitor identified numerous and significant additional violations of the 2011 Agreement, as well as New York State laws and regulations;[18]

7.      In the 2012 Consent Order, OFC and OLS similarly agreed to the following facts:

In 2010 and 2011, the Department participated in a multistate examination of Ocwen, as well as examinations of Litton and Homeward, the entities ultimately acquired by Ocwen. The examination of Ocwen identified, among other things, deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including (a) robo-signing, (b) inaccurate affidavits and failure to properly validate document execution processes, (c) missing documentation, (d) wrongful foreclosure, (e) failure to properly maintain books and records, and (f) initiation of foreclosure actions without proper legal standing.[19]

The examinations of Litton and Homeward identified substantial deficiencies, weaknesses, and violations of laws and regulations relating to, among other things, foreclosure governance, implementation of modification programs, record keeping, required notifications, and the charging of unallowable fees.[20]

The examination of Litton also revealed that, prior to Ocwen's acquisition of Litton, members of Litton's information technology staff falsified documents provided to

---

[15] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 2.
[16] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 2.
[17] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 2.
[18] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 2.
[19] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 3 ¶ 2.
[20] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 3 ¶ 3..

the Department during the review of Litton's information technology infrastructure.[21]

In connection with Ocwen's acquisition of Litton in 2011 and in light of the examination findings for both Ocwen and Litton, the Department sought to ensure that Ocwen had sufficient capacity to properly acquire and manage a significant portfolio of distressed loans, including the ability to effectively manage the increased volume and comply with requirements under the federal Home Affordable Modification Program, internal loss mitigation policies and procedures, and laws and regulations governing mortgage loan servicing and foreclosure activities.[22]

To that end, Ocwen and the Department entered into an Agreement on Mortgage Servicing Practices on September 1, 2011, which required Ocwen to: (a) establish and maintain sufficient capacity to properly acquire and manage its significant portfolio of distressed loans to ensure a smooth borrower transition; (b) engage in sound document execution and retention practices to ensure that mortgage files are accurate, complete, and reliable; and (c) implement a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third party vendors to prevent improper foreclosures and maximize struggling borrowers' opportunities to keep their homes.[23]

In June 2012, the Department conducted a targeted examination of Ocwen to assess its compliance with the 2011 Agreement and Part 419 of the Superintendent's Regulations, which governs business conduct rules for servicers. The examination identified gaps in the servicing records of certain loans that indicated **repeated non-compliance** by Ocwen, including: (a) failing to send borrowers a 90-day notice prior to commencing a foreclosure action as required under New York Real Property Actions and Proceedings Law ("RPAPL") § 1304, (b) commencing foreclosure actions on subprime loans without affirmatively alleging in the complaint that Ocwen had standing to bring the foreclosure action as required by RPAPL § 1302, and (c) commencing foreclosure actions without sufficient documentation of its standing to do so.[24]

The targeted examination also identified instances that indicated **widespread noncompliance** with the 2011 Agreement including: (a) failing to provide borrowers with the direct contact information for their designated single point of

---

[21] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 3 ¶ 4.
[22] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 3 ¶ 5.
[23] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 3-4 ¶ 6.
[24] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 4 ¶ 7.

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                    7

contact, a customer care representative whose role is to understand each assigned borrower's circumstances and history to ensure that the borrower receives efficient and consistent customer care; (b) dual-tracking;[25] (c) failing to conduct an independent review of loan modification denials; (d) failing to demonstrate adoption of policies and procedures to effectively track sanctioned third-party vendors, including local foreclosure counsel; (e) failing to demonstrate implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account; and (f) failing to ensure that trial or permanent modifications granted to borrowers by a prior servicer are honored upon transfer to Ocwen.[26]

Consequently, on December 5, 2012, Ocwen entered into a Consent Order with the Department, which required Ocwen to retain an independent compliance monitor for two years. The Consent Order mandated that the Compliance Monitor, which would report directly to the Department, would "conduct a comprehensive review . . . of Ocwen's servicing operations, including its compliance program and operational policies and procedures." The review would, at a minimum, consider (a) the adequacy of Ocwen's staffing levels, (b) the robustness of Ocwen's established policies and procedures, (c) the fairness of servicing fees and foreclosure charges, (d) the accuracy of borrower account information, (e) Ocwen's compliance with **federal and state law**, (f) borrower complaints and recordings of customer service, and (g) Ocwen's compliance with the Agreement.[27]

The Compliance Monitor began work in July 2013.[28]

In the course of the Compliance Monitor's review, it identified **numerous and significant violations of the 2011 Agreement**, as well **as New York State laws and regulations.[29]**

For example, a **limited review** by the Compliance Monitor of **478 New York loans** that Ocwen had foreclosed upon revealed **1,358 violations** of Ocwen's legal obligations, or **about three violations** per **foreclosed loan.** These violations included:

---

[25] "Dual tracking" refers to the practice of allowing foreclosure procedures to continue simultaneously with efforts to avoid foreclosure by processing a request for modification, a deed-in-lieu of foreclosure, a short sale, or other loss mitigation procedures.

[26] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 4-5 ¶ 8.

[27] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 5 ¶ 9.

[28] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 5 ¶ 10.

[29] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 5 ¶ 11.

- •     failing to confirm that it had the right to foreclose before initiating foreclosure proceedings;

- •     failing to ensure that its statements to the court in foreclosure proceedings were correct;

- •     pursuing foreclosure even while modification applications were pending ("dual tracking");

- •     failing to maintain records confirming that it is not pursuing foreclosure of service members on active duty; and

- •     failing to assign a designated customer care representative.[30]

The Department and the Compliance Monitor also identified, among other things, (a) **inadequate and ineffective** information technology systems and personnel, and (b) **widespread conflicts of interest** with related parties.[31]

### Inadequate and Ineffective Information Technology Systems and Personnel

In the course of its review, the Compliance Monitor determined that Ocwen's information technology systems are a **patchwork** of legacy systems and systems inherited from acquired companies, many of which are incompatible. A frequent occurrence is that a fix to one system creates unintended consequences in other systems. As a result, **Ocwen regularly** gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records. There are **insufficient controls** in place— either manual or automated—to catch all of these errors and resolve them.[32]

For example, Ocwen's systems have been **backdating letters for years**. In many cases, borrowers received a letter denying a mortgage loan modification, and the letter was dated more than 30 days prior to the date that Ocwen mailed the letter. These borrowers were given 30 days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the backdated letter. In other cases, Ocwen's systems show that borrowers facing foreclosure received letters with a date by which to cure their default and avoid

---

[30] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 5-6 ¶ 12.
[31] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 6 ¶ 13.
[32] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 6 ¶ 14.

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)          9

foreclosure—and the **cure date was months prior to** receipt of the letter. Ocwen's processes **failed** to identify and remedy these errors.[33]

Moreover, Ocwen **failed** to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and **alerted** the company's Vice President of Compliance. Ocwen ignored the issue for five months until the same employee raised it **again**. While Ocwen then began efforts to address the backdating issue, its investigation was incomplete and Ocwen has **not** fully resolved the issue to date, more than a year after its initial discovery.[34]

Ocwen's core servicing functions rely on its **inadequate systems**. Specifically, Ocwen uses comment codes entered either manually or automatically to service its portfolio; each code initiates a process, such as sending a delinquency letter to a borrower, or referring a loan to foreclosure counsel. With Ocwen's rapid growth and acquisitions of other servicers, the number of Ocwen's comment codes has ballooned to more than **8,400 such codes**. Often, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function. The result is an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative.[35]

Despite these issues, Ocwen continues to rely on those systems to service its portfolio of distressed loans. Ocwen's reliance on technology has led it to employ **fewer trained personnel** than its competitors. For example, Ocwen's Chief Financial Officer recently acknowledged, in reference to its offshore customer care personnel, that Ocwen is simply "training people to read the scripts and the dialogue engines with feeling." Ocwen's policy is to require customer support staff to follow the scripts closely, and **Ocwen penalizes and has terminated customer support staff** who fail to follow the scripts that appear on their computer screens. In some cases, this policy has frustrated struggling borrowers who have complex issues that exceed the bounds of a script and have issues speaking with representatives at Ocwen capable of addressing their concerns. Moreover, Ocwen's customer care representatives in many cases provide conflicting responses to a borrower's question. Representatives have also failed in many cases to record in Ocwen's

---

[33] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 6 ¶ 15.
[34] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 7 ¶ 16.
[35] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 7 ¶ 17.

servicing system the nature of the concerns that a borrower has expressed, leading to **inaccurate records** of the issues raised by the borrower.[36]

Ocwen's **inadequate infrastructure** and **ineffective personnel** have resulted in **Ocwen's failure to fulfill its legal obligations.** Prior to the Department's and the Compliance Monitor's review, Ocwen did **not** take adequate steps to implement reforms that it was legally obligated to implement pursuant to the 2011 Agreement.[37]

### Widespread Conflicts of Interest with Related Parties

 The Department's review of Ocwen's mortgage servicing practices also uncovered a **number of conflicts of interest** between Ocwen and four other public companies (the "related parties"),[1] all of which are chaired by **Mr. Erbey**, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen. In addition to serving as chairman of the board for Ocwen and each related company, Mr. Erbey's holdings in these companies total more than $1 billion. Other Ocwen executives and directors also own significant investments in both Ocwen and the related parties. Yet, Ocwen does **not** have a written policy that explicitly requires potentially conflicted employees, officers, or directors **to recuse** themselves from involvement in transactions with the related companies.

> [1.]   The related parties are, as of the date of this Consent Order, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd., and any of their affiliates, predecessors and successors in interest, both past and present, and any of their officers, directors, partners, employees, consultants, representatives, and agents or other persons and entities acting under their control or on their behalf.[38]

Despite Mr. Erbey's holdings in these companies, Mr. Erbey has **not** in fact recused himself from approvals of several transactions with the related parties. Mr. Erbey, who owns approximately 15% of Ocwen's stock, and nearly double that percentage of the stock of Altisource Portfolio, has participated in the approval of a number of transactions between the two companies or from which Altisource received some

---

[36] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 7-8 ¶ 18.
[37] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 8 ¶ 19.
[38] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 8 ¶ 20.

benefit, including the renewal of Ocwen's forced placed insurance program in early 2014.[39]

Ocwen's close business relationship with related companies is particularly evident in its relationship with **Altisource Portfolio**, which has dozens of subsidiaries that **perform fee-based services for Ocwen**. In one example, Altisource Portfolio subsidiary **Hubzu**, an online auction site, hosts nearly **all Ocwen auctions**. In certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers—charges which are then passed on to borrowers and investors. Moreover, Ocwen engages Altisource Portfolio subsidiary **REALHome Services and Solutions, Inc**. as its **default real estate agency** for short sales and investor-owned properties, even though this agency principally employs out-of-state agents who do **not** perform the onsite work that local agents perform, at the same cost to borrowers and investors.[40]

Conflicts of interest are evident at other levels of the Ocwen organization. For example, during its review, the Monitor discovered that Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource Portfolio. The Chief Risk Officer reported directly to Mr. Erbey in both capacities. This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was of particular concern given his role as Chief Risk Officer.[41]

8.       Based on the **stipulations and agreed facts** confirming **Ocwen's knowing and unlawful conduct, Ocwen agreed**, *inter alia,* to pay **$150 million** in penalties and restitution to borrowers on loans it serviced, to be overseen by an Operations Monitor to be selected by NYDFS and who would review and assess the adequacy and effectiveness of Ocwen's operations with respect to the violations found by NYDFS and the Compliance Monitor appointed pursuant to the 2012 NYDFS Consent Order. The Operations Monitor was also authorized to assess and consult with OFC's Board and its committees regarding numerous issues. Finally, the 2014 NYDFS

---

[39] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 9 ¶ 21.
[40] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 9 ¶ 22.
[41] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 9 ¶ 23.

Consent Agreement required **William Erbey to resign** from his positions as Chairman of Ocwen and four related entities.[42]

9.      Relator Jean-Marc Eichner ("J-ME"), employed at Ocwen from January 18, 2016 through May 10, 2019, witnessed many of the same and other knowing and material violations reflected in Ocwen's business records from 2015 through the present, and he is also an **original source** of the allegations regarding additional violations as described herein during his employment with Ocwen. In his capacity of Vice President, Customer Experience, he was managing the customer complaints processes, database, and reporting, so he had first-hand knowledge of all dysfunctions reflected in the customer complaints. His role was to investigate the root cause of all major complaints and trigger remediation projects.

10.     Relator Brandon Loyd ("MBL"), as an **original source**, witnessed virtually all the knowing and material violations described in the 2014 NYDFS Consent Agreement before they were made public and is an original source of the allegations regarding those violations. Ocwen should be **judicially estopped** from denying that it has been in material non-compliance with applicable federal, state and local laws, regulations, rules and requirements, all of which are outlined above and incorporated herein. Ocwen may not stipulate and agree to pervasive HAMP and New York mortgage servicing violations relied upon by the NYSDFS and affecting New York home loan borrowers and then deny its admitted conduct here. Those violations constituted violations of New York State laws and regulations, UDAAP, UDAP, HAMP regulations and rules, and FHA regulations and rules, all of which render false the Ocwen certifications and

---

[42] *See* **Exhibit 1**, 2014 NYDFS Consent Order at 10-17.

representations, both express and implied, initially and annually thereafter, that Ocwen was in compliance.

11.     Qui Tam Plaintiffs/Relators Jean-Marc Eichner and Brandon Loyd (together "Relators") therefore bring this action seeking a judgment against the Ocwen Defendants and the Trust Defendants (through the Trustee Defendants). On behalf of the Trust Defendants through their Trustees, the Ocwen Defendants acted as agent (with actual and apparent authority to enter the relevant agreements with the United States and, thereafter to submit false claims, make or use (false) statements, records, or certifications material to claims submitted for payment for its own benefit and that of its principals), servicing residential mortgage loans as to which the nominal Defendant Trustees, Wells, U.S. Bank, Deutsche, and BONY, were at all relevant times the Trustees for the Trusts (and the investors in securitized loans). The Trustee Defendants, are sued in their capacities **as Trustees, standing in the shoes of the Trusts, and as legal owners of the assets of the Trusts**, from which recovery is sought on behalf of the United States. In addition, acting as each Trust Defendant's agent, Ocwen knowingly and fraudulently induced the United States to enter and/or continue, annually, the HAMP Servicer Participation Agreement, and expressly or impliedly, knowingly made or used or caused to be made or used false statements, records or certifications material to the Government's decisions to make HAMP incentive payments through the years, all of which violated the federal False Claims Act, 31 U.S.C §§ 3729-3732. As Ocwen's principals, each of the Trust Defendants, respectively, is *liable* to the United States for all False Claims Act damages and penalties arising from Ocwen's servicing violations, which resulted in Ocwen's knowing and false claims, statements, records, and certifications made,

used or caused to be made or used in seeking payment from the United States of incentive fees under the HAMP program. The knowing and false statements and records resulted from Ocwen making false express and implied certifications and representations, initially and annually thereafter, and engaging in knowing and fraudulent courses of conduct in executing the Certifications of Compliance, initially and annually thereafter, and providing services under their fraudulently induced Servicer Participation Agreements and incorporated Financial Instruments (together "SPA") which were executed by Ocwen to enable Ocwen's participation under the U.S. Treasury's HAMP programs. All of Ocwen's violations were in the course and scope of Ocwen's performance while serving as each Trust Defendant's mortgage servicing agent under Pooling and Servicing Agreements or Servicing Agreements.

12.     OLS and OFC wrongfully procured for themselves and the Trusts (and their investors), approximately four and a half *billion* dollars in incentive payments (bonuses) from the Government (*see infra* at 35) (a relatively modest percentage of which indirectly benefitted distressed homeowners in the form of modest principal balance reductions effected by means of Government incentive payments to the investors on behalf of and for the mortgage principal accounts of the home loan borrowers) by knowingly and fraudulently inducing the U.S. to execute a mortgage servicer incentives contract (the SPA) and initial and annual certifications of compliance, all of which allowed the Ocwen entities to participate and recover incentives for themselves and the Trusts under the Treasury Department's HAMP program from and after its commencement. As a result of the knowing, fraudulent inducements, initially and annually, of the United States to enter and/or continue the SPA, all Ocwen's claims for incentive payments

thereunder (for the benefit of itself, the Trusts and to a lesser extent, and indirectly, the borrowers on the individual securitized home loan mortgages) were false claims constituting violations of the False Claims Act. Ocwen continued its knowing and fraudulent course of conduct by submitting to Fannie Mae, the financial agent for the United States under the HAMP program, false certifications and representations in the SPAs and the attendant Financial Instruments, as well as in the false annual certifications containing both express and implied false representations of past, present and future compliance with federal and state laws, regulations, rules and requirements.[43] As Ocwen was aware of credible evidence of false information provided to Fannie Mae or Freddie Mac in connection with the programs, the Agreements (SPAs, Financial Instruments and Annual Certifications) were continuously violated by not providing mandatory disclosures of violations to Fannie Mae and Freddie Mac notwithstanding the Agreement's express warning that failure to do so may violate federal criminal fraud statutes and the **civil False Claims Act.** Thus, although Ocwen knew from and after the day it became a HAMP program participant that its representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury were not true and correct, Ocwen knowingly failed to notify Fannie Mae and Freddie Mac immediately, as it had knowingly and falsely represented and promised that it would do, all of which is alleged below in detail.

13.      HAMP was designed to help homeowners struggling to pay their home mortgage loans; Relator MBL uncovered inside information showing wide-spread and serious violations by

---

[43] On information and belief based upon Relators' investigations as well as their own direct witness of evidence, many of the violations disclosed in this complaint have never been rectified and are ongoing.

Ocwen of federal and state laws that harmed those same borrowers while cheating the Government out of incentive fees. In many instances, these violations resulted in borrowers, including many families, being unlawfully thrown out of their homes through illegal foreclosure proceedings. Because Ocwen falsely certified and represented to the Government, as a condition of the payment of HAMP funds, that in the (1) past, (2) present and (3) future, it was and would continue to be in compliance, which it was not, with federal and state laws designed to protect borrowers, Ocwen wrongfully obtained incentive payments from the U.S. by presenting or causing to be presented false or fraudulent claims, and by making or using or causing to be made or used false or fraudulent statements, records, representations or certifications. Based on additional violations of federal and state required certifications and representations, Ocwen wrongfully received payments from Housing and Urban Development ("HUD") programs under Veterans' Administration ("VA") and Federal Housing Administration ("FHA") programs as well. Ocwen never notified the Government that it had made substantial overpayments to Ocwen of incentive fees to which Ocwen was never entitled, and Ocwen never refunded incentive fees that it was overpaid by the U.S.

14.     Therefore, qui tam Plaintiffs/Relators J-ME AND mblbring this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act" or "FCA") on behalf of the United States of America against the Ocwen Defendants, the Trustee Defendants, and the Trust Defendants, the latter of which are or were at the relevant times principals of their servicing agent Ocwen, to recover all damages, penalties, and other remedies available under the FCA to the United States and Relators. As the principals are **vicariously liable** for their agents' violations of law under these circumstances, Ocwen's violations of federal and state laws, regulations, rules and requirements,

such as those it admitted in the 2014 New York Consent Order render the Trust Defendants, Ocwen's Principals, liable for FCA damages that resulted from Ocwen's pervasive and continuing false certifications and representations, plus False Claims Act penalties, costs and fees. Moreover, Ocwen's violations as to New York State residents were a mere microcosm of the harm suffered by borrowers nationally, and that conduct equally affected residents similarly situated in all other states. No population was protected from Ocwen's outlaw conduct.

## II.     SUMMARY

15.     Ocwen was a participant in the Government's Home Affordable Modification Program, *i.e.*, HAMP, through which the United States incentivized note owners (the Trusts) and servicers of residential home mortgages to modify financially troubled borrowers' home loans to help American homeowners avoid foreclosure. The program also incentivized borrowers to remain in their homes by providing a loan modification process whereby they could become "current" and receive modest principal reductions on loans that remained current on modified loan payments for specified periods of time; the principal reductions were principal payments by the Government to the Trusts which correlatively reduced the borrowers' principal loan balances, providing incentives for the note owners (the Trusts) as well as the borrowers.

16.     Ocwen violated the FCA by fraudulently inducing Fannie Mae, acting as financial agent for the United States, to execute two (2) SPAs with Ocwen (the original and Amended and Restated SPAs) by falsely representing, warranting and covenanting therein and in the Financial Instruments that comprised a part of the SPAs, that Ocwen [1] was at that time [present] "in compliance with," and that [2] "all Services will be performed [future] in compliance with all

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                                 18

applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements . . . designed to prevent unfair, discriminatory or predatory lending practices" and [3] it was not aware of **any other legal or financial impediments to performing** its obligations under the HAMP Program or the SPA and it would **promptly notify** Fannie Mae **of any financial and/or operational impediments which may impair its ability to perform** its obligations under the Program or the Agreement.[44] Each annual recertification of compliance repeated the same false certifications and/or representations in addition to a certification that [4] all [HAMP] Services **had** been performed [past] in compliance with the same laws and regulations.[45] Moreover, Ocwen impliedly certified to the United States, falsely, by submitting numerous claims for incentive payments under HAMP, that it was in compliance with all such applicable laws and regulations; this multitude of implied false certifications also made Ocwen's billions of dollars' worth of claims submitted for payment **false claims** under the FCA.

17.    Ocwen continuously failed to meet basic and fundamental requirements related to the servicing of delinquent conventional and FHA loans under "default servicing" and/or "loss mitigation" requirements—procedures designed to protect delinquent borrowers from losing their homes, protect investors/note owners (the Trusts) from losing the income streams from the loans and, finally, to protect the FHA, as insurer, from unnecessarily paying claims under FHA loan

---

[44] Ocwen Servicer Participation Agreement (executed by OFC) at Exhibit A, Financial Instrument at ¶5(b), attached hereto as **Exhibit 2 (emphasis added);** Ocwen Amended and Restated Servicer Participation Agreement (executed by OLS) ("Amended SPA") at Exhibit B, Financial Instrument at ¶5(b), attached hereto as **Exhibit 3 (emphasis added)**.
[45] *See* **Exhibit 2** at Exhibit B, Form of Annual Certification ¶ 2; **Exhibit 3** at Exhibit C, Form of Certification, ¶ 2. Beginning with its September 22, 2011 Annual Certification, OLS made these additional certifications.

insurance programs when the losses could and should have been avoided by proper servicing conduct. Ocwen knowingly failed to comply with federal and state laws (including at least Texas, New York, and California laws) designed to prevent unfair, discriminatory or predatory lending practices including but not limited to UDAAP and UDAP laws and state consumer lending laws. Ocwen further failed to provide consumers with notices of the right to rescind loan modification agreements involving new advances of credit entered between the borrowers and Ocwen, as required by the Truth in Lending Act ("TILA") and the laws of Texas, New York and Massachusetts when Ocwen advanced to borrowers **new** extensions of credit **not** arising from the original notes or deeds of trust/mortgages.

18.      Ocwen's numerous, knowing false representations regarding certifications, warranties, and covenants of compliance with HAMP requirements and obligations, and with all other applicable federal, state and local consumer lending laws, regulations and rules, including the loss mitigation requirements of Government Sponsored Entities ("GSEs" such as Fannie Mae and Freddie Mac), and of the FHA and Ginnie Mae, rendered the initial certifications and representations provided by Ocwen in the SPAs, the Financial Instruments and in each annual recertification thereafter, materially false certification/representations/statements. All of Ocwen's statements in its SPAs regarding present, past, and future compliance with federal and state consumer and other lending laws were false statements and/or false records made or used by Ocwen to fraudulently induce the United States to enter the agreements and thereby obtain the full range of incentive payments from the United States. These violations and the implied certifications rendered all Ocwen's requests for payment **false claims** under the FCA. As Ocwen's principals,

the Trust Defendants, respectively, are liable for Ocwen's violations of the FCA under Principal-Agent law imposing vicarious liability for the agent's unlawful conduct while serving as the servicing agent for each Trust Defendant.

## III.   PARTIES

19.     Relator J-ME is a citizen of the United States and a resident of Frisco, Denton County, Texas (E.D. Tex.). J-ME was employed by Ocwen as vice president of customer experience from January 2016 until laid off with other officers and employees in May of 2019 when Ocwen closed its North Texas office.

21.     Relator MBL is a citizen of the United States and a resident of Colleyville, Tarrant County, Texas, (N.D. Tex.). MBL was formerly employed at the successive entities AHMSI/Homeward Residential, Inc./Ocwen in the company's home retention and loss mitigation departments. Relator MBL has over 16 years of experience in the financial services industry, including experience in default servicing and foreclosure.

20.     Defendant Ocwen Loan Servicing, LLC ("OLS") is a Delaware limited liability company with its principal place of business in West Palm Beach, Florida. OLS is licensed to service mortgage loans in all 50 states, the District of Columbia and two U.S. territories. OLS is wholly owned by Ocwen Mortgage Servicing, Inc. ("OMS"), a U.S. Virgin Islands corporation, with its principal office in St. Croix, U.S. Virgin Islands. OMS is wholly owned by Ocwen Financial Corporation. OLS and OMS are alter egos of Defendant Ocwen Financial Corporation. OLS may be served with process by serving its agent for service of process in Texas, Corporation

Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

22.     Defendant Ocwen Financial Corporation (NYSE: OCN) ("OFC"), a Florida corporation with its principal place of business in West Palm Beach Florida, is a financial services holding company. OFC, through its subsidiaries, originates and services loans. In addition to its West Palm Beach headquarters, OFC has offices in Orlando, Florida, Houston, Texas, McDonough, Georgia, and Washington, DC and support operations in India and Uruguay. OFC, formed in 1988, and its predecessors have been servicing residential mortgage loans since 1988. OFC has no registered agent for service of process in Texas and thus can be served with process by making service upon the Texas Secretary of State

23.     OLS and OFC have a substantial overlap in terms of leadership and control. Prior to January 16, 2015 William C. Erbey served as OLS's Executive Chairman, as well as OFC's Executive Chairman of the Board of Directors (since September 1996) and former Chief Executive Officer (January 1988 to October 2010). William C. Erbey was forced to resign, because of material conflicts of interest, from his position as Executive Chairman of OFC, OLS, and several other related entities on January 16, 2015, pursuant to the Consent Order entered between OFC and OLS, on the one hand, and the NYDFS, on the other hand, on or about December 19-22, 2014.

24.     Trustee Defendant U.S. Bank, National Association, sued *as Trustee*, on behalf of 457 Residential Mortgage Backed Securities Trust Defendants,[46] is a national banking association formed under the laws of the United States, with its principal place of business in Cincinnati,

---

[46] See **Exhibit 7,** attached hereto and incorporated herein by reference, for list of Defendant Trusts.

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                                              22

Ohio.[47] At relevant times, U.S. Bank was Trustee for, at a minimum, the pools of loans (Trusts) listed in **Exhibit 7**, for each of which Ocwen was servicing agent.

25.     Each of the 457 Residential Mortgage Backed Securities Trust Defendants is a Trust created by the pooling and securitization of residential mortgages for which U.S. Bank was Trustee and Ocwen was a Servicer.[48] Each of the 457 Defendant Trusts may be served with process by serving their Trustee.

26.     Ocwen was a Servicer for each of the above listed U.S. Bank Trusts pursuant to the above referenced servicing agreements, and as such, it was U.S. Bank's agent under the agreements and applicable federal common law. U.S. Bank may be served with process by serving its registered agent for service of process in Texas, C-T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136 USA.

27.     Trustee Defendant Deutsche Bank National Trust Company, sued *as Trustee*, on behalf of 617 Residential Mortgage Backed Securities Trust Defendants[49] is formed under the laws of New York with its principal place of business in Irvine, California. Deutsche is wholly owned by Deutsche Bank Americas Holding Corp., a Delaware corporation with its principal place of business in New York. At all relevant times, Deutsche was Trustee for, at a minimum, the pools of loans (Trusts) listed in **Exhibit 8**, for each of which Ocwen was its servicing agent.

---

[47] U.S. Bank is a banking subsidiary of U.S. Bancorp, a Delaware corporation with its principal place of business in Minneapolis, Minnesota.
[48] See **Exhibit 7,** attached hereto and incorporated herein by reference, for list of Defendant Trusts.
[49] See **Exhibit 8,** attached hereto and incorporated herein by reference, for list of Defendant Trusts.

28.     Each of the 617 Residential Mortgage Backed Securities Trust Defendants is a Trust created by the pooling and securitization of residential mortgages for which Deutsche was Trustee and Ocwen was a Servicer.[50] Each of the 657 Defendant Trusts, respectively, may be served with process by serving their Trustee.

29.     Ocwen was a Servicer for each of the above listed Deutsche Trusts pursuant to the above referenced servicing agreements, and as such, it was Deutsche's agent under the agreements and applicable federal common law. Deutsche has no agent for service of process in Texas. Pursuant to the FCA's nationwide service of process provision, service may be made upon its agent for service of process in New York, C-T Corporation System, 111 Eighth Avenue, New York, New York, 10011.

30.     The Bank of New York Trustee Defendants are The Bank of New York Mellon Trust Company, N.A. f/k/a The Bank of New York Trust Company, National Association, The Bank of New York Mellon f/k/a The Bank of New York, and The Bank of New York Mellon Corporation f/k/a The Bank of New York Company, Inc., sued *as Successor-Trustees* to J.P. Morgan Chase Bank, N.A., on behalf of 329 Residential Mortgage Backed Securities Trust Defendants.[51] The BONY Defendants are further identified as follows:

● The Bank of New York Mellon Trust Company, National Association f/k/a The Bank of New York Trust Company, National Association is chartered as a national banking association subject to primary regulation, supervision and examination by

---

[50] See **Exhibit 8** attached hereto and incorporated herein by reference, for list of Defendant Trusts.
[51] See **Exhibit 12,** attached hereto and incorporated herein by reference, for list of Defendant Trusts.

the Office of the Comptroller of the Currency ("OCC"). It may be served with process by serving its Registered Agent CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

● The Bank of New York Mellon f//k/a The Bank of New York is a New York state banking corporation with its principal place of business in New York. It may be served with process by serving its Registered Agent, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

● The Bank of New York Mellon Corporation is a Bank Holding Company subject to federal capital rules, administered by the Federal Reserve. It has no agent for service of process in Texas and so service may be made by service on the Texas Secretary of State.

● At all relevant times, BONY was Successor-Trustee for, at a minimum, the pools of loans (Trusts) listed in **Exhibit 9**, for each of which Ocwen was its servicing agent.

31.     Each of the 329 Residential Mortgage Backed Securities Trust Defendants, respectively, is a Trust created by the pooling and securitization of residential mortgages (Trusts) for which BONY was Trustee and Ocwen was a Servicer.[52] Each of the 329 Defendant Trusts may be served with process by serving their Trustee.

---

[52] See **Exhibit 9,** attached hereto and incorporated herein by reference, for list of Defendant Trusts.

32.     Ocwen was a Servicer for each of the above listed BONY Trusts—for which BONY became Trustee in October 2006 by acquisition of JP Morgan Chase's trust business[53]—pursuant to the above referenced servicing agreements, and as such, Ocwen was BONY's agent under the agreements and applicable federal common law.

33.     Trustee Defendant Wells Fargo Bank, N.A., sued *as Trustee*, on behalf of 194 Residential Mortgage Backed Securities Trust Defendants, is a national banking association formed under the laws of the United States with its principal place of business in California. At all relevant times, Wells was Trustee for, at a minimum, the pools of loans (Trusts) listed in **Exhibit 10**, for each of which Ocwen was servicing agent.

34.     Each of the 194 Residential Mortgage Backed Securities Trust Defendants, respectively, is a Trust created by the pooling and securitization of residential mortgages for which Wells was the Trustee and Ocwen was a Servicer.[54] Each of the 194 Defendant Trusts may be served with process by serving their Trustee.

35.     Ocwen was a Servicer for each of the above listed Wells Trusts pursuant to the above referenced servicing agreements, and as such, it was Wells' agent under the agreements and applicable federal common law. Wells may be served with process by serving its registered agent for service of process in Texas, Corporation Service Company dba CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

---

[53] *See* BONY 8-K, dated October 5, 2006, attached hereto as **Exhibit 6.**
[54] See **Exhibit 10,** attached hereto and incorporated herein by reference, for list of Defendant Trusts.

## IV.  JURISDICTION AND VENUE

36.    This matter is within the Court's federal question jurisdiction, as Relators bring this action under 31 U.S.C. § 3730(b)(1). Venue is proper, pursuant to the FCA, 31 U.S.C. § 3732(a), in the Eastern District of Texas, where Relator J-ME resides, servicing agent Ocwen, U.S. Bank, Deutsche, Wells, and BONY have transacted business, if not substantial business, and where violations of the FCA occurred, in part.

## V.  HOME AFFORDABLE MODIFICATION PROGRAM

37.    In the third quarter of 2009, the U.S. Treasury Department rolled out the Home Affordable Modification Program[55] to encourage servicers and lenders or investors (the Trusts) to modify home-secured loans. Under HAMP, loan servicers, investors in securitized loans (the Trusts), and borrowers receive incentive payments from the Government in connection with granting the modification and keeping the modified payments current (borrowers' incentives are paid to the servicer to be applied as principal reduction paid to the investors (the Trusts)). HAMP applications for loan modifications were accepted through the end of 2016; applications timely submitted before that date were considered for HAMP modifications in 2017. Incentive payments on completed modifications continue under the terms of the HAMP program.

## VI.  FACTS

38.    Ronald Faris, as President of OFC, executed on behalf of OFC on April 16, 2009 a (combined) Commitment to Purchase Financial Instrument and Servicer Participation Agreement

---

[55] In addition to the Treasury Department's HAMP program for non-GSE loans—loans not owned by GSEs, Fannie Mae, Freddie Mac, the VA, and the FHA administered their own versions of HAMP pursuant to the Government's Making Home Affordable initiative.

with Fannie Mae, which acted as financial agent for the United States.[56] On or about September 9, 2010, Faris executed as President of OLS an Amended and Restated Commitment to Purchase Financial Instrument and SPA with Fannie Mae (accepted by Fannie Mae on September 15, 2010).[57] Ocwen continued as a HAMP participant and has continued to receive incentive payments through the current date, although as of December 30, 2016, new HAMP loan modification applications were no longer accepted. The certifications, obligations, representations, warranties and covenants of Ocwen under its SPA agreements, and as annually repeated and extended, expressly survive the expiration or termination of its agreement.[58]

39.     The Ocwen SPAs (**Exhibits 2 and 3**) required representations, warranties, and certifications by Ocwen, the Servicer, to be made within the SPA and Financial Instrument and in subsequent annual certifications:

> Servicer's representations and warranties . . . are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually . . . .

**Exhibit 2**, Ocwen *SPA*, at p. 2 ¶ B; **Exhibit 3**, Ocwen *Amended and Restated SPA*, at p. 2 ¶C.

40.     In paragraph 5(b) of the "Representations, Warranties and Covenants" of the Financial Instrument, which is a part of the SPAs,[59] at the time of executing its agreement, OFC represented, warranted, and covenanted that:

> (b)     Servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws,

---

[56] **Exhibit 2**, Ocwen Original SPA.
[57] **Exhibit 3**, Ocwen Amended and Restated SPA.
[58] **Exhibit 3** at p. 1, ¶1(C).
[59] *See* Ocwen SPA, **Exhibit 2**, at p. 10 ¶ 11.G; Ocwen Amended and Restated SPA, **Exhibit 3**, at p. 12 ¶ 11G.

regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq. [sic] . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices . . . .

**Exhibit 2**, Ocwen *SPA*, at Exhibit A Financial Instrument, p. 2 ¶ 5(b); **Exhibit 3**, Ocwen *Amended and Restated SPA*, at p. B-3 ¶ 5(b).[60]

41.     The following certification was included in the Annual Certificates executed and delivered each year to the Government by Ocwen, beginning on June 1, 2010, and again on June 1 of each year during the Term of the Agreements, pursuant to Section 1.C of the Ocwen SPAs, as well as paragraph 5(l) of their Financial Instruments.

### CERTIFICATION

2.     Servicer is **[currently**] in compliance with, and certifies that all Services have been performed **[past]** in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq. [sic] . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices . . . .

**Exhibit 2**, Ocwen *SPA*, Exhibit A Financial Instrument, p. 2 ¶ 5(b) and Exhibit B Annual Certification, p. 2 ¶ 2 (emphasis added); **Exhibit 3**, Ocwen *Amended and Restated SPA*, at Exhibit B Financial Instrument, p. B-3 ¶ 5(b) and Exhibit C Form of Certification p. C-1 ¶ 2; *see also* form for annual certification accessible at

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/servicerparticipationagreemen t.pdf p. 29 of 36 (accessed May 8, 2019).

_____

[60] *See also* **Exhibit 2**, Ocwen SPA at Exhibit B Form of Annual Certification, p. 1 ¶2 and **Exhibit 3**, Ocwen Amended and Restated SPA at Exhibit C Form of Certification, p. 1 ¶2.

42.    The subsequent, annual certifications of compliance were made and delivered to the Government by Ocwen each year during the Term of the Agreements, pursuant to Section 1.C of the Ocwen SPAs, as well as paragraph 5(l) of their Financial Instruments. In addition to the certifications, Ocwen's cover letter enclosing each annual certification made additional false representations and certifications:

> As of the date of this letter, there **are no instances of noncompliance,** either through internal or external reviews, which would have a material effect on Ocwen's ability to comply with the Program requirements. . . . Ocwen has a comprehensive Internal Audit process **implemented to ensure compliance with all aspects of HAMP and the scope of this certifications falls within this process.**

Subsequent Certification dated September 25, 2014 (emphasis added).

43.    Ocwen knowingly and falsely represented that it was in full compliance with the above requirements with the execution of the Original SPA on April 16, 2009, as well as in its Amended and Restated SPA on September 9, 2010, (**Exhibit 3**).

44.    The (false) representations of compliance with federal and state law made by Ocwen were express conditions of payment, and material to payment by the United States:

> A.    Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument . . . in consideration for the payment by Fannie Mae, as agent, of the Purchase Price . . . . The **conditions precedent** to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of the Commitment and the Financial Instrument by Servicer to Fannie Mae; . . . (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.
> . . .
> C.    The Purchase Price will be paid to Servicer by Fannie Mae as the financial agent of the United States . . . in consideration for the execution and delivery of the

Financial Instrument by Servicer . . . , upon the **satisfaction of the conditions precedent to payment** described in subsections A. and B. above. (emphasis added).

**Exhibit 2**, OFC *Original Servicer Participation Agreement*, at 3 ¶¶ 4.A. - 4. C. (emphasis added);

*see also* **Exhibit 3**, OLS *Amended and Restated Servicer Participation Agreement* at 4.

45.      Ocwen acknowledged in the Financial Instruments purchased by Fannie Mae that providing false or misleading information to Fannie Mae or Freddie Mac in the HAMP Program may constitute violations of (1) federal criminal laws or of the **civil False Claims Act**. **Exhibit 2**, Ocwen *SPA*, at Exhibit A Financial Instrument at p. 3 ¶ 5(f); Exhibit 3, *Ocwen Amended and Restated SPA*, at Exhibit B Financial Instrument at p. B-4 ¶ 5(f). Given the scope of the certifications, representations, warranties, and covenants, the Servicer's continuing obligations of truthfulness and accuracy and its obligation to notify Fannie Mae and Freddie Mac immediately if any of them ceased to be true, Ocwen was on notice of the obligations of truthfulness and accuracy and acknowledged that failures to fulfill these obligations could lead to criminal and civil False Claims Act prosecution. **Exhibit 2**, Ocwen *SPA*, at Exhibit A Financial Instrument, at p. 2 ¶ 5; **Exhibit 3**, Ocwen *Amended and Restated SPA,* at Exhibit B Financial Instrument P. B-2 ¶ 5. Ocwen has knowingly failed to notify (self-report to) the government as required when its certifications and representations of compliance have been or have become false. Ocwen has also failed to repay the Government huge amounts constituting overpayments. Ocwen's violations of its many duties, as well as the concealment of those violations made **false** the representations that are expressly defined conditions precedent to payment in the SPA.

## VII.    OLS LOAN MODIFICATIONS

46.     In addition to offering loan modification agreements under the Government's Making Home Affordable (MHA) – HAMP (and similar, related Government programs) under guidelines established by the Treasury Department, Ocwen sometimes modified loans under its own proprietary programs; such modifications are referred to here as "non-HAMP modifications." For HAMP modifications, Ocwen submitted claims for payment of incentive fees by the U.S. Government pursuant to HAMP policies and regulations. For non-HAMP modifications, the servicer and lender or investor (the Trust) of the loan determine the relevant guidelines, and the servicer must look to the borrower or investor (the Trusts) for any compensation.

47.     These two types of modification contracts were usually similar. The HAMP modifications generally include more restrictive requirements, and the non-HAMP modifications have more flexibility and are not required to be completed within the boundaries of the MHA Handbook.

48.      In the numerous HAMP and non-HAMP OLS loan modifications reviewed by Relators in the course of their duties at Ocwen, OLS or OFC virtually always added *(capitalized)* to the loan's unpaid principal balance (*i.e., creating a* new unpaid principal balance) in the form of sums (1) past due, (2) not yet due, and/or (3) of unlawful advances never actually made or prohibited by HAMP. The new, additional principal—above and beyond the principal balance owed prior to modification—that was charged to borrowers in modifications reviewed by Relators, typically amounted to tens of thousands of dollars. The new capitalized debt was supposed to include, generally, delinquent interest, property taxes paid, force-placed insurance paid and

various, undefined and undisclosed modification fees and costs not arising out of (i) the original note or (ii) original deed of trust. OLS or OFC often capitalized a lump sum without any itemization of the amount financed, making it impossible for the borrower to discern what charges comprised the added principal. These non-itemized additions to the borrowers' unpaid principal balances in some instances also included the total amount of past-due payments, which would unlawfully add to the principal balance the amount of past-due monthly principal paydown payments which were already included in the principal balance; such additions constituted double billing, or double capitalization of the same amount, which was loaned to the borrower only once, when the original loan was made, not twice. On the amounts added to the principal balance, Ocwen charged interest to be repaid over, typically, 25-40 years. OLS or OFC did not, however, provide a TILA and state-law-required notice of the right of rescission, notwithstanding the resulting first lien mortgage retained or acquired in the borrower's principal residence for the deferred debt payment, or the additional amount (**new extension of credit**) advanced and secured.

49.     The HAMP modification agreements typically state:

> *The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan.*

Many of these modification contracts with increased capitalized debt, reportedly included past due obligations, un-loaned [unlawful] principal (*paydown principal* in the past-due monthly payments) and prohibited costs, such as late fees, not arising under the original (i) note or (ii) original deed of trust, and often included the deferral of a large principal (balloon) payment or failed to fully

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                          33

amortize as often required by laws, regulations and rules, for example, of the State of Texas. The proprietary Ocwen HAMP loan modifications reflected new debt balances that were always substantially more than the pre-modification outstanding principal balances without borrowers having the ability to review the charges in the capitalized debt; **take it or leave it**. Such an oppressive scheme was grossly unfair, deceptive and abusive under UDAAP and/or UDAP.

50. Each OFC or OLS modification contract contained the following or substantially similar language:

> If under the Servicer's procedures a title endorsement or subordination agreements are required to ensure that the modified mortgage Loan retains its **first lien position** and is fully enforceable, I understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Servicer has not received an acceptable title

> endorsement and/or subordination agreements from other lien holders, as Servicer determines necessary.

*See, e.g.,* **Exhibit 4 at p. 4, para. J** (emphasis added).

51. As acknowledged in the language quoted in the previous paragraph, in OFC or OLS loan modification contracts, the original first lien security interest in the original loan obligation was *retained* by the Investor (the Trust). In addition, OLS, as Servicer, *acquired* a new, first-lien security interest in the residential real property for its new HAMP-modification added principal. This new security interest secured an obligation to a new lender (the Servicer), and secured a larger loan obligation than the pre-modification loan obligation.[61] Thus, this satisfied 12 C.F.R. §

---

[61] In some modifications, OLS adds amounts to existing principal balances, and forgives part of the original principal. In these cases, the new loan amount is owed to and a new security interest acquired or retained by a new lender, OLS. The amount of principal forgiven **is forgiven** by the investor (the Trust); the newly advanced amount loaned by OLS

1026.23, as the **new extension of credit** was secured by a first-lien security interest that was both retained (Investor—the Trust) and acquired (Servicer).[62] The continuing first lien security interest covered the newly capitalized amounts in addition to the pre-modification principal balance.

52. As a result of the **newly advanced sums**, which were not based upon the original note or Deed of Trust, OFC and OLS knowingly failed to provide TILA and Regulation Z's ("Reg. Z") Right of Rescission notices when making HAMP or proprietary modifications, despite the fact that OFC's and OLS's sophisticated real-estate lending lawyers prepared each of the files, and Section 1026.23(a) requires that the notice be provided.[63]

53. Through March 2019, the United States has paid a total of **$4,498,841,379.34** in incentive fees for OFC/OLS HAMP modifications, which included **$639,340,221.93** allocated to the servicer, Ocwen.[64] The balance of the funds was paid for the benefit of the relevant investors and, indirectly by credit, the borrowers.[65]

54. The procedure by which OFC and OLS has requested and received the Government-paid incentives for OLS's loan modifications was set forth in **Exhibit 5**, *MHA Compensation Matrix*, dated July 31, 2012 at p. 7. OFC and OLS followed this procedure and generated $4,498,841,379.34 in Government incentive payments for the benefit of Ocwen, the

---

is **not** forgiven and a new security interest in the property is acquired or retained by OLS.
[62] 15 U.S.C. § 1635; 12 C.F.R§ 1026.23(a).
[63] 12 C.F.R. § 1026.23(a)-(b).
[64] The Government's incentives were created for the benefit of the servicer, lenders/investors and borrowers, the other two beneficiaries, **are paid by Treasury to OLS** to be distributed or credited promptly to the appropriate recipient.
[65] *TARP Housing Transactions Report for Period Ending 3/27/2019*, at p.94, Supplemental Information [Not Required by EESA §114(a)] Making Home Affordable Program Non-GSE Incentive Payments. http://www.treasury.gov/initiatives/financial-stability/reports/Pages/TARP-Housing-Transaction-Reports.aspx.
Under "All Reports by Frequency," "As Indicated," click on TARP Housing Transaction Reports" and select report by date.

lenders or investors (the Trusts) and its borrowers, by a credit, through March 2019.[66] That sum therefore constitutes the single damages number under the False Claims Act not including trebling or mandatory statutory penalties; especially, damages arising from fraudulent inducement, originally and annually by Certifications of Compliance.

## VIII.   LOYD'S DIRECTLY AND INDEPENDENTLY ACQUIRED KNOWLEDGE OF OCWEN VIOLATIONS

### A.   Federal Housing Administration ("FHA") Violations

55.     The FHA, an agency of the Department of Housing and Urban Development, provides mortgage insurance to approved lenders for single-family housing loans, to incentivize home mortgage lending by insuring the lenders against the risk of loss resulting from borrower default.[67] FHA-approved servicers are obligated to comply with all applicable laws and regulations; especially HUD/FHA regulations and rules.[68] Those servicers that fail to comply with HUD statutes, regulations, handbook requirements or mortgagee letters may be required to repay incentives received or indemnify HUD for any losses incurred by servicer's improper FHA insurance claims.[69]

56.     In 1996, the FHA initiated a comprehensive loss mitigation program to provide relief to borrowers in default and thus minimize FHA's insurance losses.[70] The loss mitigation

---

[66] *TARP Housing Transactions Report for Period Ending 3/27/2019*, at p.96.
[67] *See* 12 U.S.C. § 1709; *See generally* 24 C.F.R § 203.
[68] Letter from David H. Stevens, Ass't Secretary of Housing – Federal Housing Commissioner (Oct. 8, 2010), available at http://portal.hud.gov/hudportal/documents/huddoc?id=OCT201008.pdf .
[69] *Id.*
[70] *See generally* 24 C.F.R. § 203.605; Mortgagee Letter ("ML") 2000-05 ("Loss Mitigation Program-Comprehensive Clarification of Policy and Notice of Procedural Changes") (Jan. 19, 2000), available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/lmmltrs (accessed May 10, 2018).

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                                36

program made the servicer responsible for managing loan defaults and provided financial incentives for this effort. HUD regulations and guidance *require* FHA-approved lenders to engage in loss mitigation to avoid the foreclosure of HUD-insured residential mortgages.[71] OFC and OLS had continuously failed to meet the basic and fundamental requirements related to the servicing of delinquent FHA loans under the mandated loss mitigation program.

### 1.    OLS Violations of FHA Loss Mitigation Requirements

### a.    Failure To Engage in Loss Mitigation in a Timely Manner

57.    The foundation of HUD's loss mitigation program is the requirement that mortgage servicers engage in "**early delinquency servicing**."[72] Specifically, servicers must review a delinquent loan for FHA retention options in order to determine appropriate loss mitigation techniques prior to the loan becoming four monthly payments past due or **within 90 days** of delinquency.[73] However, OFC or OLS rarely, if ever, managed to complete the proper review of FHA loans in default prior to the 90th day of delinquency and sometimes missed this mandatory deadline by several months, while FHA files sat unlawfully unattended and un-reviewed. Thus, the SPA certifications/representations executed by Ocwen that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices" were false

---

[71] 24 C.F.R. § 203.500 et seq.; ML 2000-05 at p. 6; *see also* ML 2008-27 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008) (available at
 http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/lmmltrs (accessed May 10, 2019).
[72] ML 2000-05 at pp. 4-5 (emphasis added).
[73] *See* 24 CFR § 203.605(a); See also ML 2000-05 at pp. 9-10 and ML 2008-27.

and made with actual knowledge or reckless disregard or intentional ignorance of their truth or falsity, all of which was material to the payment decision of the United States under HAMP.

### b.   Failure To Engage in FHA-Specific Loss Mitigation Procedures

58.   OFC and OLS knowingly and continuously failed to engage in any meaningful form of HUD-required FHA-specific loss mitigation practices. Ocwen's practice has been to treat **all** loan default processes, including FHA loss mitigation, as if the loans were conventional loans; HUD, however, had developed and required particularized processes and procedures to be strictly applied to loss mitigation for FHA/VA loans. OLS failed to act in good faith and refrain from taking advantage of the FHA, and never disclosed or self-reported its substantial violations to Fannie Mae or Freddie Mac as mandated by the HAMP agreements.[74] Therefore, Ocwen's standard practices violated HUD's FHA requirements, and the initial and annual SPA certifications/representations executed by Ocwen, stating that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices" were **false** and made with actual knowledge, reckless disregard or deliberate ignorance of their falsity, all of which was material to the payment decisions of the United States.

---

[74] See 24 C.F.R. §203.5(c) (requiring an underwriter to exercise due diligence at "the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment."); 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983 ) (Supplementary Information, asserting in connection with promulgation of substantially identical provisions of former 24 C.F.R. §200.163(b) that due diligence and good faith are owed the insurer not only by regulation but civil law, citing *United States* v. *Bernstein,* 533 F.2d 775, 797 (2nd Cir.) (**holding that a mortgagee has <u>an affirmative duty to FHA to use due care</u>**), *cert. denied,* 429 U.S. 998, 97 S. Ct. 523; 50 L. Ed. 2d 608 (1976)) (emphasis added).

### c. Failure To Properly Implement FHA-HAMP

59.     The FHA Home Affordable Modification Program ("FHA HAMP") provides defaulting borrowers a loss mitigation solution that combines a loan modification with a "partial claim."[75] The specific guidelines for FHA HAMP are found in a HUD document titled, "Making Home Affordable Program: FHA's Home Affordable Modification Loss Mitigation Option."[76] These guidelines specifically require that the FHA modified loan must be re-amortized to a 30-year fixed-rate mortgage in order to qualify for FHA HAMP. *Id.* In some instances, OLS amortized modified FHA loans loan for more than 30 years. This was **expressly prohibited** by HUD and resulted in some borrowers' disqualification from eligibility in the FHA HAMP program. Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices" were **false** and made with actual knowledge or reckless disregard or deliberate ignorance of their truth or falsity, all of which was material to the payment decisions of the United States.

### 2. OLS Violations of FHA Quality Control Requirements

### a. Failure To Implement an FHA-Compliant Quality Control Program

60.     To service FHA loans, a servicer must have a fully functioning **Quality Control**

---

[75] Legal authority for the program: Section 230(b) of the National Housing Act (12 U.S.C. 1715u (b)), as amended by the Helping Families Save Their Homes Act of 2009, Division A of Public Law 111-22. *See also* "Making Home Affordable Program: FHA's Home Affordable Modification Loss Mitigation Option," attachment thereto, and ML 2009-23, "Making Home Affordable Program: FHA's Home Affordable Modification Loss Mitigation Option" available at https://www.hud.gov/sites/documents/09-23ML.DOC (accessed May 10, 2019.
[76] *Id.*

("**QC**") **Program** in place to ensure that FHA-compliance procedures are followed and that servicer personnel understand how to meet the strict FHA requirements.[77] FHA-compliant QC programs and plans provide for the correction and reporting of problems and violations to HUD once the lender becomes aware of them; virtually always, Ocwen violated these requirements by its knowing non-disclosure.

61.    OFC and OLS knowingly failed to establish a compliant QC program for its FHA portfolio. OLS failed to (i) assure compliance with FHA's and the mortgagees' servicing requirements throughout its operations, (ii) protect the mortgagee and FHA from unacceptable risks, (iii) guard against errors, omissions and fraud, (iv) assure swift and appropriate corrective action and (v) notify the HUD Homeownership Center of any finding of fraud or other serious violations.[78] OLS employees servicing the OLS FHA portfolio, however, did **not** have a checklist,

---

[77]*See* HUD Handbook No. 4060.1 Ch. 7: Quality Control Plan, available at
https://www.hud.gov/program_offices/administration/hudclips/handbooks/hsgh/4060.1
(accessed May 10, 2019), *e.g., inter alia:*
- § 7-1. FHA approved mortgagees must implement and continuously have in place a quality control plan for originating and/or servicing insured mortgages
- § 7-3, A. All quality control plans must be in writing and fully functional from date of mortgagee's initial FHA approval
- § 7-3,B. Quality Control must be independent of originating and servicing functions; mortgagee is responsible for ensuring outside source performing quality control meets HUD requirements
- § 7-3,C. Mortgagees must properly train quality control staff, and provide them access to current guidelines in electronic or hard format
- § 7-3,D. Mortgagees must ensure quality control reviews are regular and timely, and completed within 90 days of closing loan.
- § 7-3,J. Quality control must ensure findings by employees or quality control staff are reported to HUD within 60 days of discovery.
- § 7-8,E. Quality control must verify escrow funds received are not used for other purposes and are maintained in separate account.
- § 7-11,C, D. Quality control must review for compliance with fair lending laws and transfer of servicing provisions in section 6 of RESPA.
[78] See HUD Handbook, Quality Control Plan No. 4060.1 Ch. 7.

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                        40

reference guide or instruction manual to assist them in their determination of compliance with FHA requirements, nor were they provided adequate instruction by management. Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices" were false and made with actual knowledge or reckless disregard or deliberate ignorance of their truth or falsity. The servicer's knowing failure to implement an FHA-compliant QC program was a direct violation of HUD requirements and material to the payment decisions of the United States and, additionally, rendered each of Ocwen's requests for payment from the FHA insurance fund a false claim.

### b.      Improperly Servicing FHA Loans Offshore

62.      In addition, the review and underwriting of FHA loan modification packages were outsourced overseas to third party contractors in India, and unlawfully treated as modifications of conventional loans in violation of HUD regulations and guidelines.[79] HUD Handbook 4060.1 allowed for the outsourcing of certain administrative and clerical functions, but only those "that do not materially affect underwriting decisions or increase the risk to FHA," and explicitly prohibits the outsourcing of management, underwriting, and loan origination functions.[80] Ocwen knowingly violated those restrictions. The offshore company applied the review criteria applicable

---

[79] HUD Handbook No. 4060.1 REV-2, Ch. 2-13: Outsourcing, available at
https://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/handbooks/hsgh/4060.1 (accessed May 10, 2019).
[80] *Id.*

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                              41

to conventional loans, but not those applicable to FHA loans, to all loans. As a result of the FHA loans being reviewed under the wrong (conventional) criteria, some borrowers were wrongfully denied FHA-HAMP modifications, and their loans ultimately proceeded to foreclosure.

63.     OLS knew that it was responsible, pursuant to the terms of the Financial Instrument contained in Ocwen's Original and Amended SPAs, for these serious violations committed by offshore and/or other third party contractors, as the agreement made Ocwen responsible for contractor supervision and management, required Ocwen to ensure their compliance, and specified OFC or OLS would be liable for their contractors' acts or omissions as though they were Ocwen's own acts or omissions. Ocwen's Original and Amended SPAs, **Exhibits 2 and 3**, at Financial Instrument ¶ 6. Thus, the initial and annual SPA certifications/representations made by Ocwen, that it was "in compliance with "all applicable Federal, state and local laws, regulations . . .requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices . . ." were false and made with actual knowledge, reckless disregard or deliberate ignorance of their truthfulness or falsity, because of Ocwen's knowing approval of violations of non-delegable duties committed by Ocwen's third-party, offshore contractors.

64.     OLS had implemented a round-robin process for assigning FHA modification packages to employees, which resulted in FHA loans being sent offshore for review and underwriting in violation of FHA regulations and guidelines.[81] Specifically, OLS's computer system assigned modification packages based upon employee workload, without regard to whether the loan involved was FHA, conventional or other, and operated with an eye toward leveling out

---

[81] *See* HUD Handbook, No. 40.61.1 Rev-2.

workloads across the entire OLS system without regard to the type of loan involved and mandatory servicing requirements for FHA loans. If an employee in the United States had approximately 1,100 modification packages in his or her queue, and a third-party offshore contractor employee had only 800 modification packages, the incoming packages would be assigned to the overseas agent for review and underwriting. This unlawful and fraudulent course of conduct was a direct violation by OFC and OLS of FHA regulations and guidelines and was material to the payment decisions of the United States.

65.     What's more, there was no system in place to catch these serious violations. Instead, it was solely up to the untrained, individual, overseas employee to recognize and notify a supervisor of the violation—namely, that they should not be reviewing and underwriting an FHA modification, because they are not located in the United States as required by HUD.[82] If the employee did not notify a supervisor and correct the improper and unauthorized transmittal of FHA loans for underwriting, the borrower and employees in the United States had no way of knowing that the FHA loan was improperly sent offshore for servicing. There was no safety net for FHA loans, and this fraudulent course of conduct made or used or caused to be used false certifications of compliance with all applicable federal laws, regulations, rules and requirements as contained in the Financial Instruments, the original Certification and the Annual Certifications thereafter. Such violations were material to the payment decisions of the United States under the HAMP agreements.

---

[82] *Id.*

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                                43

66.     Indeed, when such a problem *was* identified, managers were forced to use an indirect workaround in order to get the FHA loan assigned stateside, where it should have been assigned in the first place. To ensure that the FHA loan was returned stateside for review, a "United States Associate Only" or USAO flag had to be raised on the account, *and* it was marked "Spanish speaking" to indicate a Spanish speaking employee was needed to work with the borrower— whether or not this was actually true. By indicating that a Spanish speaker was needed, the file was steered to an OLS location such as West Palm Beach, Florida or Houston, Texas, where Spanish speaking employees are located. The improper transmittal of FHA modification packages overseas violated HUD guidelines and requirements. Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance [or "material compliance"] with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices" were false and made with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity, because of OLS's knowing violations of non-delegable duties committed by third-party, offshore contractors.

### 3.     Ocwen's False Certifications

67.     The FHA has paid insurance claims for insured mortgages based on Ocwen's false certifications that it was in compliance with all FHA and HUD regulations. These certifications were material to the government's decision to pay FHA mortgage insurance proceeds, and in fact, FHA would not have paid OFC or OLS if it had known about OFC or OLS's false certifications and knowing failures to comply with FHA requirements.

68.     Specifically, in order to qualify as an FHA-insured lender, Ocwen was required to submit an annual certification to HUD.[83] Ocwen annually certified to HUD as follows (or in substantially similar terms):

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

69.     This certification has been made by Ocwen annually from and after August 16, 2004, the date Ocwen was first approved to participate in HUD's Title I and Title II Programs and became eligible to submit mortgages for FHA insurance endorsement.[84]

---

[83] *See* 24 CFR § 202.5; *see also* ML 2009-42 ("Sub-Servicing of FHA-insured Mortgages") (Oct. 19, 2009), available at
https://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/sfhsuperseded/mltrs_full#2009
(accessed May 10, 2019) ("As a reminder, the servicing of FHA-insured loans must be performed by a mortgagee that is approved by FHA pursuant to FHA guidelines. See 24 CFR §§202.5 and 203.502.").
[84] *See* http://www.hud.gov/ll/code/getllst.cfm?startseq=-
1&called_by=llslcrit&ldrtp=05&lndrnme=Ocwen&lndrcity=&lndstate=all_states&lndrcounty=&lndrcountyCode=n
one&lndrzip=&ldrad=1&aafb=all_areas&groupsize=10&pbox1=on&pbox2=on&sobox1=on&sobox2=on&sobox3=
on&sobox4=on&sobox5=on&sobox6=on (accessed May 10, 2019.

70.     As a participant in both the FHA Title I and Title II Programs, OLS must submit the annual certification in order to maintain its approval. In each annual certification, OLS certified that it had "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with the Department. [85] Absent such a certification, a lender cannot submit a mortgage for FHA insurance endorsement. The FHA has paid Ocwen insurance claims based on the false certification that Ocwen had complied with all HUD-FHA regulations, including servicing requirements. The FHA would not have paid such mortgage insurance claims if it had known of Ocwen's false certifications and its material non-compliance with HUD-FHA rules and regulations.

71.     Ocwen's false certifications and cumulative FHA loss mitigation violations were material to the United States' payment decisions. The initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **false** and made with actual knowledge, reckless disregard, or conscious indifference of their truth or falsity; because the initial certification fraudulently induced the FHA to enter agreement(s) with Ocwen, the agreement(s) were fraudulently induced and all claims for payment under such agreement(s) were false. Ocwen thus knowingly presented, or caused to be presented, false or fraudulent claims for payment in violation of 31 U.S.C. 3729(a)(1)(A). Furthermore, Ocwen knowingly made, used

---

[85] *See* HUD Mortgagee Letter 2009-25 and the sample Annual Certification attached thereto, available at https://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/sfhsuperseded/mltrs_full#2009 (accessed May 10, 2019).

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                                          46

or caused to be made or used false records or statements material to false or fraudulent claims that were material to the United States' decision to pay insurance claims for insured mortgages in violation of 31 U.S.C. § 3729(a)(1)(B). These false statements/certifications fraudulently induced the United States to make insurance claim payments from the FHA insurance fund. Therefore, Ocwen is liable to the Government for a civil penalty of not less than $5,500 ($10,957 for violations occurring after November 2, 2015) and not more than $11,000 ($21,916 for violations occurring after November 2, 2015) for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim under 31 U.S.C. §§ 3729(a)(1)(G).

## B.   UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES

72.     HAMP's instructions to servicers explicitly and prominently state that "Lenders MUST revise the [Home Affordable Modification Agreement] . . . as necessary to comply with applicable federal, state and local law."[86] Ocwen failed to make such required revisions, as outlined herein below.

### 1.   UDAAP and UDAP Laws

73.     The federal Dodd-Frank Act prohibits unfair, deceptive, or abusive acts or practices (UDAAP). In addition, some state laws contain broad prohibitions on unfair and deceptive acts and practices (UDAP). Others contain only specific prohibitions on clearly specified activities.[87]

---

[86] Home Affordable Modification Agreement—Document Summary for non-GSE Loans (for use with Form 3157) (available at https://www.hmpadmin.com/portal/programs/hamp.jsp). This language reveals that the model HAMP forms establish a floor not a ceiling. In other words, Ocwen is not immunized from liability because it used the model forms. Rather, the HAMP instructions make clear that Ocwen was required to go beyond the requirements of the model forms if necessary to comply with federal, state and local law.
[87] Some state laws exclude creditors from coverage.   *See generally,* Carolyn L. Carter, Consumer Protection in the States (National Consumer Law Center, February 2009).

Thus, the extent to which Ocwen knowingly violated state UDAP laws will vary based on the peculiarities of each state's law, but Ocwen did violate federal (UDAAP) and state (UDAP) laws from the beginning of the HAMP program and does so through the present.

74. Several the terms (and omitted terms) in OLS's loan modification agreements raise UDAAP and UDAP violations:

- <u>OLS often failed to make clear that borrowers had to pay any "deferred principal" at maturity</u>. In modifications that deferred some of the principal, OLS included a clause stating the borrower agrees to pay any amount still due at the term of the loan but failed to state the amount that would remain. This included any balloon payment resulting from (1) the deferral of principal or (2) non-fully amortizing loan schedules. Deferred principal is simply an amount of principal which is payable at the term of the loan, and usually is exempt from interest until then. In a non-fully amortizing loan, the payments are not high enough to pay off the loan by the end of its term ("amortize"). The payment amounts are calculated based on an amortization schedule longer than the term of the loan; for instance, the lender might calculate the amount of the payments as though the loan term was 40 years, even though the term is only 30 years. As a result, the loan does not fully amortize; instead there is a monthly shortage of the amount that would fully pay down the principal. The total shortfall comes due in a balloon at the end of the loan. Sometimes both mechanisms were used in one loan modification. Often, OLS failed to state the specific total amount that would be due in a balloon payment at the term of the loan.

- In the HAMP Loan Modification Agreements, <u>OLS failed to provide the borrowers with the current pre-modification principal balance of their loans</u>, which impeded their ability to make meaningful comparisons of their principal balance, their adjusted principal balances, and the payments they would have to make at maturity. In addition, without this information, the borrowers could not determine whether OLS's calculations based upon their pre-modification principal balances were correct.

- OLS often failed to break down the amounts it had advanced for taxes, insurance and interest.

● Many of the modifications had <u>interest rates that increased over time</u>. In many cases the lower initial interest rates were necessary to allow the borrowers to initially afford the loans and thus qualify. In most cases, if borrowers could not afford the loans at higher interest rates at the time of the modification, it was unreasonable to assume they would be able to afford the higher interest rates in a few years, and the modifications unfairly benefitted the servicer and note holders at the expense of the borrower, who would spend 30 years paying for a home and own nothing at the end. Such predatory lending practices are unfair and abusive, and the failure to disclose these facts is deceptive

75.     The modifications that OLS provided borrowers <u>depended on home values rising</u>. This is the same misguided assumption that banks and non-bank lenders like OLS, made prior to the 2008 financial crisis that resulted in many people defaulting on their loans, and the modifications unfairly benefitting the servicer and note holders at the expense of the borrower, who would spend 30 years paying for a home and own nothing at the end. Such predatory lending practices are unfair and abusive, and the failure to disclose these facts is deceptive.

76.     OLS provided only temporary relief to borrowers, the effect of which was to postpone foreclosures, not to facilitate people truly keeping their homes. The loan modifications, with their deferred principal and balloon payments were not affordable in the long-term. By the maturity date of the modified loans, many borrowers will be elderly, having paid on their mortgages 30 years or more-and living on reduced, fixed retirement incomes, and thus be unable to obtain a loan to refinance their homes to pay off the balloon payments. Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices" were false

and made with actual knowledge, reckless disregard, or deliberate ignorance of their truth or falsity, because the modifications unfairly benefitted the servicer and note holders at the expense of the borrower, who would spend 30 years paying for a home and, likely, own nothing at the end. Such predatory lending practices are unfair and abusive, and the failure to disclose these facts is deceptive, all in violation of UDAAP and UDAP laws.

### 2.    Dodd-Frank Act

77.    The Dodd-Frank Act[88] makes it unlawful, among other things, for persons extending credit:[89]

> (A) to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law; or

> (B) **to engage in any unfair, deceptive, or abusive act or practice**."[90]

78.    From and after the enactment of Dodd-Frank through the present, OLS has regularly and systematically committed knowing violations of the Dodd-Frank Act in its servicing of borrowers' loan modifications.

### a.    Unfair

79.    Unfairness is defined as an act or practice that:

> (A)    . . . causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

---

[88] The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat., 1376-2223 (July 21, 2010). The CFPB is still shaping the contours of Dodd-Frank's prohibitions on unfair, deceptive and abusive acts or practices, relying in large part on interpretations the FTC and the courts have given to prohibitions on unfair or deceptive acts or practices under the FTC Act. 15 U.S.C.A. § 45(a)(1) (2006).

[89] A covered person is "any person that engages in offering or providing a consumer financial product or service."12 U.S.C.A. § 5481(6) (2010). A consumer financial product or service includes extending credit. 12 U.S.C.A. § 5481(5) and (15)(A)(1) (2010).

[90] 12 U.S.C.A. § 5536(a)(1) (2010).

(B)     such substantial injury is not outweighed by countervailing benefits to consumers or to competition."[91]

80.     The likelihood that borrowers will lose their homes at maturity or when their interest rates go up pursuant to an Ocwen modification is a substantial injury.

81.     In its Supervision and Examination Manual, the Consumer Financial Protection Bureau ("CFPB") has put some flesh on the second element-- that consumers are not reasonably able to avoid the injury. The critical inquiry is whether "material information about a product, such as pricing . . . is withheld until after the consumer has committed to purchasing the product. . . . The question is whether an act or practice hinders a consumer's decision-making. For example, not having access to important information could prevent consumers from comparing available alternatives, choosing those that are most desirable to them, and avoiding those that are inadequate or unsatisfactory."[92]

82.     The OLS modifications obscured and excluded material information by excluding a breakdown of the sums constituting the amount of the deferred principal, by not including the pre-modification principal balance, by not providing borrowers information from which they could assess the accuracy of OLS's figures, and by not making clear, in all instances, that OLS would be

---

[91] 12 U.S.C.A. § § 5531(c)(1) (2010).

[92] CFPB Supervision and Examination Manual, version 2 (October 2012), p. 30 of 70, UDAAP 2, http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf (accessed May 10, 2019) citing the FTC Policy Statement on Deception (available at http://www.ftc.gov/bcp/policystmt/ad-unfair.htm (accessed May 10, 2019)).

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                              51

under no obligation to refinance their balloon and deferred principal payments at maturity or any other time.

83.     Obscuring the terms of the modifications does not benefit competition or consumers.

###     b.      Deceptive

84.     Although the Dodd-Frank Act does not define the term deceptive, the CFPB Supervision and Examination Manual states that a representation or omission is deceptive if:

(1)     the representation, omission, act, or practice misleads or is likely to mislead the consumer;

(2)     the consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

(3)     the misleading representation, omission, act, or practice is material.[93]

85.     One feature of the loan modifications that falls under the deception prong is the omission of the deferred principal amounts from the payment schedules. In some instances, these amounts were disclosed in fine print outside of the prominent payment tables. Again, the CFPB Manual provides guidance: "Oral or fine print disclosures or contract disclosures may be insufficient to cure a misleading headline or a prominent written representation . . . . Acts or practices that may be deceptive include making misleading cost or price claims."[94] The payment

---

[93] *Id.* at p. UDAAP 5.
[94] *Id.*

schedules are prominent in the loan modification agreements and give the impression that they reflect the true cost of the loan modifications even though the truth was either undisclosed or relegated to fine print.

86.    The CFPB cites to the FTC's "four Ps" test for determining whether a statement is likely to be misleading. The test focuses on the prominence of the statement, whether the statement is presented in a format consumers can understand, whether the information is in a place consumers would look, and "whether the information is in close proximity to the claim it qualifies."[95] The critical language about the date for paying the deferred principal is not prominent, nor is it in close proximity to the payment schedule, which it qualifies.

87.    The focus of the second element, presentation in a format consumer can understand, considers the target audience. The question is: how would ordinary, reasonable people who are financially distressed and seeking assistance under a federal program intended to save their homes from foreclosure interpret the information? If "a significant minority" of such people would find the schedule misleading, this element is satisfied.[96]

88.    Finally, the last element is satisfied because the ambiguous and incomplete mention of deferred principal payments, which amount to tens and even hundreds of thousands of dollars is material to every consumer's choice.

### c.    Abusive

89.    An abusive act or practice is one that:

(1)    materially interferes with the ability of a consumer to understand a

---

[95] *Id*. at p. UDAAP 5-6.
[96] *Id* at 6.

term or condition of a consumer financial product or service; or

> (2)      takes unreasonable advantage of—

> > (A)      a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

> > (B)      the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

> > (C)      the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.[97]

90.      Abusive acts and practices are not well-defined because abusive is a recent addition to the traditional UDAP coverage. The CFPB has not yet provided any explicit guidance on the parameters of the prohibition. With that in mind, the same provisions and omissions that would support an unfairness claim would satisfy the category of abusive acts and practices.[98]

91.      Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **false** and made with actual knowledge, reckless disregard or deliberate ignorance of the facts or law.

---

[97] 12 U.S.C.A. § § 5531(d) (2010).
[98] *Supra*, at 50.

### 3.      Additional Unfair, Deceptive or Abusive Acts and Practices

#### a.      Loss Mitigation – OLS's Modification Delays and Wrongful Denials

92.      In addition to violations contained in the terms (and omitted terms) of the modification agreements, OLS's handling of modification applications amounted to unfair, deceptive and abusive acts and practices. These practices, which resulted in the severe detriment of borrowers seeking assistance, routinely occurred from at least as early as 2011, and on information and belief from as early as April 16, 2009, through the present.

93.      In the course of their employment, both Relators J-ME and MBL witnessed that it was a common practice of OLS, after borrowers sought assistance, to delay modification by causing the borrower (or their legal counsel) to have to submit the same documentation **several times**. OLS made redundant demands for loan documents **already provided** to Ocwen by knowingly and falsely, or recklessly or indifferently, claiming that documents were "missing" **when they were not**. Typically, OLS either claimed that the entire package was not received, that certain pages of the package were missing, or that its own delay of a decision had now taken so long that it required all new, updated financial records in order to render a final decision. It was not uncommon for this scenario to play out more than once in a single borrower's attempted modification process, and each time OLS required new documentation, the entire process began anew. Some borrowers were required to make as many as **five to six submissions over a period of nine to twelve months or more**. MBL directly witnessed evidence that OLS often lied to borrowers about the progress of their modification applications.

94.     For instance, MBL directly witnessed evidence of several loan modifications with all the documents necessary to complete a full HAMP review; however, OLS failed to fully review the files and borrowers were denied modifications due to alleged "missing" documents—which were not missing at all. Thus, borrowers who might have qualified were wrongfully denied modifications without, first, receiving full and fair review of their modification packages. Had OLS maintained a **full and properly trained staff**, as it expressly covenanted to do in the Financial Instrument of the SPA, **OLS could have avoided virtually all the pervasive violations attendant to its extreme loan modification pipeline processing problems.**[99]

95.     Thousands of borrowers seeking modifications experienced OLS's demands for multiple submissions of documents. OLS's document scheme resulted from intentional delay, recklessness or indifference and was not the result of mere error or oversight. Instead, the overwhelming majority of redundant document demands **resulted from OLS's repeated failures to properly staff Loss Mitigation with enough employees properly trained to avoid violations of federal and state laws.**

96.     For borrowers enrolled in trial period plans ("TPP") providing for lowered payments during the trial modification, OLS's demands for redundant documentation during the trial were especially detrimental. When the eventual decision was a denial after six to twelve months and the borrower had sent the agreed lower trial payments during that time, OLS then demanded the immediate payment of ***all amounts "past due"*** – *including* the difference between

---

[99] *See* **Exhibit 2**, Ocwen SPA at Financial Instrument, p. 3 ¶ 5(d); **Exhibit 3**, Ocwen Amended and Restated SPA at Financial Instrument, p. B-3 ¶ 5(d).

the modified trial payment amount and the amount the full payment would have been but for the reduced trial payments. OLS required this amount, often thousands of dollars, to be paid within thirty days or the borrower was forced into foreclosure, which occurred regularly, because the borrowers were under severe financial distress and unable to pay this "denial penalty." Furthermore, OLS often reported the lesser, modified trial payment to the credit reporting bureaus as a payment that was not made in full and on time, harming the borrower's credit rating and causing a situation where, after a denial of a modification, the borrower also could not obtain refinancing because of their damaged credit score.

97.    Often when a loan modification package became improperly aged or outdated, OLS would knowingly deny the modification based on "missing or aged documents," when in fact that was untrue, because it was Ocwen that was untimely, **not** the borrowers. Further, borrowers' documents were regularly mislabeled at Ocwen's intake into the imaging system, making it difficult for employees to locate the correct document. Because of the mislabeled documents, employees sometimes believed documents to be missing, and consequently, borrowers' loans weren't further reviewed for eligibility. This occurred due to OLS's own failure to properly staff and train enough qualified and experienced employees to perform the required and promised Loss Mitigation services. Inefficient communications among OLS employees handing the same file also harmed borrowers. For instance, comments, codes or notes entered by employees into the communication logs [RealServicing] on borrower files might have reflected "missing HAMP package," but on an earlier date reflected "complete HAMP package received." Because the later communication inaccurately reflected a missing package, the borrower was not further reviewed,

but should have been, for eligibility as he/she was entitled under HAMP. These issues were common and, as a result, borrowers' homes were foreclosed upon because a modification wasn't timely obtained and OLS unlawfully failed to suspend foreclosure sale dates during the borrowers' review period.

98.     In those situations where a borrower was in fact missing necessary documents, OLS employees often delayed the modification process further by requesting one document at a time, without first completing a full and thorough review of the entire modification package. Generally, OLS employees stopped the modification review outright for a missing document or additional information needed from the borrower. After the borrower sent in the requested document and the review continued, employees often caught additional errors or missing documents. They then stopped the review, once again, to request the next missing document from the borrower. This drawn out process continued until the file was finally complete and was approved or denied, which typically took many months. These practices unfairly and unnecessarily extended the review process and, importantly, the time required for desperate borrowers to receive much-needed assistance. As a result, many borrowers were improperly denied a modification and lost their home.

99.     In addition, OLS often failed to timely send borrowers Incomplete Information Notices, required under HAMP.[100] Many modifications would then be denied for incomplete documentation. Under HAMP guidelines, when a borrower applies, the servicer is required to inform the borrower, within 5 business days following receipt of any component of an application, whether their application is complete or incomplete and list any additional document(s) or

---

[100] *See* MHA Handbook 4.4, at p. 97 ¶ 4.5.

information required. The date by which the borrower must remit the requested information may be no less than 30 calendar days from the date of the notice.[101] When OLS does send the Incomplete Information Notice, it provides borrowers 45 days to submit the requested documents. However, OLS communication logs [RealServicing] often reflect that OLS did not send timely missing document notice(s) to borrowers. In some instances, borrowers didn't know for weeks that any documentation was still needed, until the borrowers called to inquire about their modifications. Consequently, many borrowers were wrongfully denied modifications thus unlawfully losing their family homes due to **Ocwen's** incompetence or duplicity.

100.     These knowing violations were common and, as a result, numerous borrowers' homes were foreclosed upon. Moreover, **OLS compounded the problem by unlawfully failing to suspend foreclosure sale dates while a modification application was pending.** Further, MBL observed that some borrowers had equity in their property when they lost their home to wrongful foreclosure. It was more beneficial to OLS to foreclose on a home in which the borrower had equity than to foreclose where the borrower was "underwater," owing more on the home than the home was worth, *i.e.,* having "negative equity." The benefit was that if the borrower owed less than the value of the home, Ocwen could sell the property for as much or more than was owed, recovering fully—or closer to fully—for the /investor (the Trust) and for itself. It thus appeared that Ocwen foreclosed on properties in which the homeowner had positive equity in a greater percentage of cases than upon properties in which the homeowner had negative equity, although the precise percentages are presently unknown. Homes with positive equity were also likely to

---

[101] *Id.*

have higher values overall, being in situations where the negative forces in the economy had not had as severe effects as in other markets or neighborhoods. In both situations, however, Ocwen failed miserably to fulfill its regulatory obligation to provide loss mitigation options and failed more spectacularly in cases where it was likely to benefit more. The failure to provide loss mitigation options was a regulatory violation and was unfair, deceptive, and/or abusive in any case, but was perhaps more unfair to higher equity homeowners disproportionately targeted for foreclosure.

### b.    OLS's Violations of Loss Mitigation Requirements

101.    Aside from engaging in tactical delays designed to force delinquent borrowers into foreclosure, OLS from at least as early as 2011, and on information and belief from as early as April 16, 2009 regularly engaged in the following harmful and unlawful behavior, violating their obligations to the Treasury and loss mitigation standards:

a)    Inadequate staffing to accomplish goals of the loss mitigation programs, compounded by the staff's lack of training, education, experience and skills needed to perform the services for which the staff was hired. OLS's failure to adequately train and supervise personnel and facilitate the development of such skills and understanding was a major cause of pervasive unlawful underwriting;[102]

b)    Failure to evaluate delinquent loans for all loss mitigation options within 30 days;[103]

---

[102] *See* **Exhibit 2**, Ocwen SPA at Financial Instrument, p. 3 ¶ 5(d); **Exhibit 3**, Ocwen Amended SPA at Financial Instrument, p. B-3 ¶ 5(d).

[103] *See* http://files.consumerfinance.gov/f/201301_cfpb_final_rule_servicing-respa.pdf at p. 9. ("For a complete loss mitigation application received more than 37 days before a foreclosure sale, the servicer is required to evaluate the borrower, within 30 days, for all loss mitigation options for which the borrower may be eligible in accordance with the investor's eligibility rules, including both options that enable the borrower to retain the home (such as a loan modification) and non-retention options (such as a short sale)… The servicer must provide the borrower with a written decision, including an explanation of the reasons for denying the borrower for any loan modification option offered by an owner (such as the Trusts) or assignee of a mortgage loan with any inputs used to make a net present value

c)      Failure to evaluate delinquent FHA loans for loss mitigation options prior to the loan becoming four monthly payments past due or within 90 days of delinquency;[104]

d)      Improper performance of modification underwriting;

e)      Inadequate establishment of loan modification procedures;

f)      Misplacing and failing to properly store loan modification documents;

g)      Wrongful, fraudulent denial of modification applications;

h)      Providing false/misleading information to borrowers;

i)      Not responding timely to borrower inquiries;

j)      Improper calculations of borrowers' eligibility for loan modifications;

k)      Continuing to unlawfully assess late fees when borrowers were in review for loss mitigation options;

l)      Improper processing of modification applications, leading to denial; and

m)      Off-shore loan underwriting and reviews resulting in wrongful denials due to misunderstanding, confusion, lack of experience, education, training and cultural misunderstandings.

102.    These corporate-wide, **knowing** violations of loss mitigation standards by OLS further rendered Ocwen's initial and annual SPA certifications/representations, including that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair,

---

calculation to the extent such inputs were the basis for the denial.") (accessed May 10, 2019).
[104] 24 CFR § 203.605.

discriminatory or predatory lending practices . . .," false**,** and the knowing violations were made with actual knowledge, reckless disregard or deliberate ignorance of truth or falsity.

### c.      Unlawful Failure to Suspend Foreclosure

103.     OLS regularly and knowingly failed to suspend foreclosure proceedings when a delinquent borrower's modification package was under review, in direct violation of CFPB rules and numerous state laws, including but not limited to California law. Specifically, the rules and relevant laws restricted "**dual tracking,"** where a servicer is simultaneously evaluating a consumer for loan modifications or other alternatives while it prepares to foreclose on the property. Specifically, the rules prohibit a servicer from making the first notice or filing required for a foreclosure process until a mortgage loan account is more than 120 days delinquent. Even if a borrower is more than 120 days delinquent, if a borrower submits a complete application for a loss mitigation option before a servicer has made the first notice or filing required for a foreclosure process, a servicer may not start the foreclosure process unless (1) the servicer informs the borrower that the borrower is not eligible for any loss mitigation option (and any appeal has been exhausted), (2) a borrower rejects all loss mitigation offers, or (3) a borrower fails to comply with the terms of a loss mitigation option such as a trial modification.[105]

---

[105] *See* http://files.consumerfinance.gov/f/201301_cfpb_final_rule_servicing-respa.pdf at p. 694 (accessed May 10, 2019); 12 C.F.R. 1024.41 (f)–(g). This also violated The **California Homeowner Bill of Rights**, Cal. Civ. Code § 2923.6(b) (2013), which prohibits dual tracking, effective January 1, 2013. *See Singh v. Bank of Am.,* N.A., No. 2:13-cv-00729-MCE-AC, 2013 U.S. Dist. LEXIS 63127, at *5-6, 2013 WL 1858436 (E.D. Cal. May 1, 2013) (granting homeowner's application for preliminary injunction preventing bank from selling plaintiff's home during litigation; Section 2923.6(b) states "it is the intent of the legislature that **the mortgage servicer offer the borrower a loan modification or work out a plan** if such a modification or plan is consistent with its contractual or other authority." The statute further provides that "**if a borrower submits a complete application** for a first lien loan **modification** . . . the mortgage servicer . . . shall **not record a notice of default or notice of sale, or conduct a trustee's sale, while the complete first lien loan modification application is pending**." Cal. Civ. Code § 2923.6(c) (2013)) (emphasis

104.     OLS's pervasive, knowing, unfair, abusive and deceptive violations under the Dodd-Frank Act and CFPB rules rendered Ocwen's certifications/representations, including that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…," false and made with actual knowledge, reckless disregard or deliberate ignorance of truth or falsity of the facts or the law, all of which was material to the payment decisions of the United States.

105.     Relators MBL and J-ME directly witnessed evidence showing that an estimated 70% of foreclosure activity was not suspended during loss mitigation efforts, and borrowers were charged unauthorized charges and fees, including attorneys' fees and late fees, in connection with foreclosures that should have been suspended. This unfair and deceptive scenario occurred regularly with borrowers facing foreclosure.

### d.     Unlawful Capitalization of Un-loaned Principal

106.     Furthermore, past due monthly payments that were capitalized by OLS at the closing of a modification often included the entire past due monthly payment amount, including the principal paydown component of the payment, which was thus unlawfully and redundantly capitalized. This is because *past due* principal was already a part of the borrower's principal balance, since it hasn't been paid. Adding the amount of a *past-due* principal component of the monthly payment to the principal thus results in double billing the borrower for that amount of principal, which is already included in the balance. While servicers may capitalize past due interest

---

added).

payments, there is no state or federal law that allows for the capitalization of allegedly *past-due* principal component that was never re-loaned to the borrower after the original loan. As this unlawful practice was implemented through the servicer's computer system, it was applied to most, and more likely applied universally to most or all loan modifications. This pervasive practice amounts to a knowing and unlawful taking and an egregious violation of both state and federal UDAAP laws and Dodd- Frank, all of which rendered Ocwen's [time-relevant] certifications/representations, including that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" false, and made with actual knowledge, reckless disregard, or deliberate indifference of falsity, all of which was material to the payment decisions of the United States.

107.    OLS states, unfairly, deceptively and abusively, in its Modification Agreements, that the borrower now owes a new principal balance, without disclosing any detail or specificity (1) as to the amount of the previous unpaid principal balance, (2) as to the total additional amount being added or capitalized to create the new, higher principal balance or (3) as to the specific component types and amounts being added, *e.g.*, interest, taxes, late fees, HOA dues, etc. These knowing and purposeful omissions and/or misrepresentations on the part of OFC or OLS deny the borrowers any means of determining whether the amount of the new principal balance is accurate. Borrowers under extreme duress and the stress of potentially losing their homes had no ability to negotiate and were forced to accept as accurate, without challenge, the dollar amount claimed by

OLS. Such conduct violated Dodd-Frank and many State UDAP provisions against unfair, abusive and deceptive conduct toward consumers: take it or leave it.

108.    These unlawful, unfair practices also violate express HUD guidelines regarding capitalized accounting. HUD Handbook 4330.1 Rev -5, specifically provides that "[m]ortgagees that capitalize **may not capitalize delinquent mortgage payments or late charges** (i.e., amounts due but not paid may not be added to unpaid principal unless advances are actually made by the mortgagee)" (emphasis added).[106] In fact, OLS's knowing, unlawful practice of capitalizing the entire delinquent monthly payment amount, including un-loaned principal, was pervasive, not the exception at OLS.

109.    OLS's unlawful taking of borrowers' funds, through the capitalization of un-loaned principal from past due payments, has resulted in severe detriment, likely billions of dollars, to the borrowers receiving modifications . The extent of those fraudulent takings may well rival the huge incentive payments wrongfully paid by the United States to Ocwen in the HAMP program. Given these additional violations of federal and state laws, Ocwen's knowing representations/certifications, including that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were false and made with actual knowledge, reckless disregard or deliberate ignorance of truth or falsity, and were material to the payment decisions of the United States.

---

[106] HUD Handbook 4330.1 Rev-5, "HUD Escrow and Mortgage Insurance Premiums (MIP)" Ch. 2-2: Capitalized Accounting at pp. 1-2, available at
 http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4330.1/43301c2HSGH.pdf.

#### e. Force-Placed Advance of Escrow

110.    Ocwen regularly force-placed escrow advances for property taxes and insurance on many borrowers who had already paid these obligations from their own pockets. Many borrowers who provided OFC or OLS proof of payment nonetheless had charges for "force-placed insurance" or tax escrows added to their principal balances, needlessly and fraudulently increasing the borrower's obligations and the amount of money on which the borrower was forced to pay interest. MBL reviewed HAMP modifications in which OLS employees noted that the borrowers had sent notice of proof of payment of homeowner's insurance; however, OLS continued to charge the borrowers for forced place insurance. Moreover, the force-placed insurance was purchased by OLS from Altisource, which was owned and controlled, at least in large part, by William Erbey, who was a substantial stakeholder in Ocwen and the affiliated entities. Such transactions violated the prohibition on conflicts of interest in the Financial Instrument at paragraph 5(e), all of which was knowing, unlawful conduct that was material to the payment decisions of the United States.

111.    This abusive practice also directly violates rules issued by the CFPB which require transparency by the servicer. Servicers generally must ensure that borrowers maintain property insurance;[107] if the borrower does not maintain an insurance policy, the servicer typically has the right to purchase such insurance on the borrower's behalf. To avoid unfair surprise to borrowers, however, the CFPB requires that servicers must (1) provide advance notice and pricing information before charging consumers for force-placed insurance; (2) have a reasonable basis for concluding that a borrower lacks such insurance before purchasing a policy on the borrower's property; and

---

[107] 12 C.F.R § 1024.37.

(3) terminate a force-placed policy within fifteen days and refund premiums if they receive evidence that the policy was not needed, where, for instance, the borrower had already purchased insurance on the property.[108] OLS regularly violated this CFPB consumer protection regulation by failing to acknowledge the borrower's purchase of insurance and failing to refund premiums advanced on a force-placed plan.

112.    Forcing the advance of escrow funds on unwitting borrowers created an avalanche of late charges and fees. When borrowers who had already paid the escrow without knowledge of the force-placed funds sent in their regular monthly payments, they were unlawfully deemed "insufficient," because they did not include the amount for the escrow funds improperly advanced by the servicer. If the borrower was fortunate enough to have this "insufficient" payment returned by Ocwen, he or she might have discovered the discrepancy through a phone call to Ocwen. Ocwen, however, usually did not give the borrower notice of the shortfall and placed the "insufficient" payment in a suspension account, so the borrowers had no idea their payments had not been accepted and often did not find out for several months. At that point, (1) the borrower was considered several months in default; (2) their monthly payments had been placed in a suspense account; (3) they were accruing late charges monthly, and (4) their "defaults" had been reported to credit bureaus, resulting in a negative hit to their credit reports. This unfair and abusive practice literally *forced borrowers into delinquency*, and rendered Ocwen's certifications/representations, including that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to

---

[108] *Id.*

prevent unfair, discriminatory or predatory lending practices" false and made with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the information.

### f.    "In-Flight" Modifications

113.    "In-Flight" modifications are loan modifications that are already in progress, and perhaps have even been approved, when the servicing rights are sold to another financial institution. OFC acquired several portfolios of servicing rights from Litton, Saxon, and ResCap, to name a few, which OFC delegated to OLS. OLS typically received only a portion of a borrower's loan file including incomplete modification packages. Many borrowers who already had a final modification at the time of transfer to OFC began making the adjusted payments to OLS, which believed the borrowers' payment were short, because the transferred file had no record of the modification. Even after identifying the problem, however, OLS failed to remedy the matter, and borrowers were wrongfully forced into foreclosure.

114.    Moreover, OLS regularly refused to honor borrowers' in-flight modifications and required borrowers to re-start the modification application process. MBL is aware of numerous instances where borrowers' HAMP modifications were denied by OLS, despite being approved by the prior servicer. This violation resulted in several homes being lost to wrongful foreclosure. OLS's knowing course of conduct has caused substantial injury to consumers and violated the Dodd-Frank Act and state and federal UDAAP/UDAP laws. These state and federal violations are additional reasons that Ocwen's certifications/representations, including that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," were

false and made with actual knowledge, reckless indifference, or deliberate ignorance to truth or falsity of the information and were material to the payment decisions of the United States.

### g.  Manipulation of Modification Process

115.    Additionally, MBL directly witnessed evidence showing OLS employees often manipulated the loan modification process in order to achieve "completion codes" and receive employee incentives from the servicer, at great detriment to borrowers. OLS's operating procedure was to reward employees in the home retention department based upon the number of "completion codes" achieved, a system known as the HRD Incentive Plan. This system incentivized employees to work backwards in the modification process, in order to achieve completion codes. This unfairly delayed the modification process for borrowers, many of whom had homes that were quickly proceeding to foreclosure, and further rendered Ocwen's certifications/representations, including that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," false and made with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the information.

### h.  Manipulation of Modification Documents

116.    OLS regularly engaged in the unlawful and fraudulent manipulation of borrowers' modification documents. Often, "contingent" modification agreements, the validity and effectiveness of which hinged upon some contingency occurring (such as borrower's return of documents by a given date), were sent to borrowers. If the contingency did not occur, OLS reconfigured the modification and sent out a new modification agreement to the borrower. Some

borrowers received as many as three different modification packages in six months. OLS did not make clear to the borrowers that these modification packages differed and were not simply duplicates; borrowers would often execute and return to OLS an earlier modification agreement which did not include updated terms. For example, a borrower may have received in March a modification package reflecting monthly payments of $1,200.00, the validity of which was contingent upon the borrower returning all documents to OLS within a certain number of days. When the borrower did not return the documents on time, OLS issued a new modification agreement. By this time, the numbers contained in the initial modification package had changed significantly due to accrued interest, changes in escrow, etc. Therefore, the monthly amount due had increased to possibly $1,275.00. Despite the significant change in numbers contained in the reissued modification agreement, the borrower was not notified by the Servicer to explain the changes. Often unaware that the reissued agreement contained new terms and amounts, a borrower would mistakenly execute and return to OLS the initial package sent months earlier reflecting a lower monthly payment amount, rather than the amount now reflected in OLS's system.

117.    In some other instances, where a modification package had taken three to six months to complete, the servicer's system could contain three to six proposed agreements that had not actually been issued because of the pending completion of the borrower's modification package. A third-party, offshore company handled review of the borrower's completed modification package. This offshore company would select whichever agreement appeared in imaging on the system to send to the borrower for execution, because the employees were untrained as to the distinction between the agreements in the system. As a result, the borrower

often received a modification agreement that was not the current, actual agreement which the Servicer intended the borrower to receive. The borrower would execute and return the modification agreement with the belief he/she was executing the correct modification, when in fact that modification agreement did not include the specific, updated terms contained in OLS's system.

118.   This important information, regarding OLS's unilateral change of the terms and amounts contained in various modification agreements, was never truthfully disclosed to the borrower. Rather than explaining the error to the borrower and correcting the situation, as the Servicer should have done, OLS would execute the incorrect agreement sent in by the borrower. Once the error was realized, employees were instructed to manipulate the terms and numbers in the system, which reflected the correct terms the borrower *should have* received and executed, in order to reconfigure them to get the same terms and payment amount contained in the modification agreement executed by the borrower. Unfortunately, it was impossible to match the exact payment amount contained in the modification agreement executed by the borrower, meaning that the numbers reflected in the OLS system did not reflect what the borrower believed to be their payment amount, and the actual numbers were always higher.

119.   OLS knowingly and deliberately manipulated modification numbers which resulted in a compounding of problems. When the borrower sent in the monthly payment amount specified in the executed documents−for instance $1,200.00, but the actual payment in the system was $1,215−it was deemed "insufficient," because it did not match, exactly, the monthly payment contained in OLS's system. If OLS returned the "insufficient" payment, the borrower might have discovered the discrepancy through a phone call. OLS, however, placed most "insufficient"

payments in a suspension account, and the borrower had no idea that the payment had not been accepted and would likely not find out for several months. At that point, (1) the borrower was considered several months in default; (2) their monthly payments had been placed in a suspense account; (3) they were accruing late charges monthly, and (4) their "default" had been reported to credit bureaus, resulting in a negative hit to their credit report. When the borrower finally discovered the discrepancy, OLS would blame the difference on a routine change in escrow or fees in transaction history rather than admitting its own error. This unlawful manipulation of documents without notification to the borrower, is fraudulent, unfair, deceptive, and abusive to borrowers. Thus, the initial and annual SPA certifications/representations executed by Ocwen, including that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," were false and made with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the information.

### i.    Violations of the CFPB's Continuity of Contact Requirement[109]

120.    Additionally, the CFPB requires servicers to assign designated personnel to a delinquent borrower, in order to timely and accurately respond to borrower inquiries, not later than the 45th day of delinquency.[110] Under this directive, servicers must assign specific and identifiable

---

[109] 12 CFR § 1024.40. The Consumer Financial Protection Bureau adopted this regulation pursuant to its authority under the Real Estate Settlement Procedures Act and the Dodd-Frank Act. *See* https://www.federalregister.gov/articles/2013/02/14/2013-01248/mortgage-servicing-rules-under-the-real-estate-settlement-procedures-act-regulation-x#p-1928 at § 1024.40 (a)(1) (accessed May 10, 2019).
[110] *Id.*

personnel, often known as relationship managers or "single points of contact" ("SPOC"), to each borrower who is applying for assistance through HAMP or other foreclosure-prevention options. The relationship manager, who must be a full-time employee, is responsible for working with the individual borrower throughout the evaluation and modification process.

121.    OLS developed an appointment system in which a borrower was assigned a relationship manager to contact, but by appointment only. The relationship manager was allotted only a restricted amount of time, approximately thirty minutes, for each appointment with a borrower regardless of the borrowers' individual circumstances. The restriction on time, and the appointment requirement, did not allow enough opportunity to address the borrowers' unique situations, as contemplated by the CFPB.

122.    What's more, the phones of employees serving as relationship managers were placed on "dialers," meaning that if they were away from their desks or on another call when the customer called in for their appointment, the customer was re-directed to another available customer service associate. This re-direct was done in order to "keep the appointment," so that OLS could show regulators that they were attempting to comply with the CFPB's mandate; however, the available associate was not the customer's appointed relationship manager, meaning they could not make substantive, material changes to the customer's account. The service associate that the borrower was re-directed to was not able to provide any information or assist the borrower beyond relaying to the borrower the new updates or notes that had been input into the system by the borrower's relationship manager. If there were no new updates or notes contained in the system, the system directed the service associate to tell the customer, simply, that "review is still

in progress." The borrower was then asked to schedule a new appointment and told that their individual relationship manager would return their call at that later date.

123.    Despite rescheduling for the sole purpose of speaking with their individual relationship manager, many borrowers never received the opportunity to address their issues and concerns in a meaningful discussion with the assigned SPOC. When the time came for the borrower's rescheduled appointment, if the individual relationship manager was busy, another service associate phoned the borrower in order to "keep the appointment." Once again, the borrower was unable to make any substantive, material changes to their account based upon their conversation with this individual. They were asked again to reschedule their appointment. This runaround is one of the greatest frustrations expressed by OLS borrowers.

124.    Failure on the part of OLS SPOCs to communicate with borrowers in a timely manner resulted in tremendous detriment to borrowers. Often, borrower communication logs evidenced that several calls had been made by borrower(s) to OLS asking for assistance, but the relevant SPOC would fail to contact borrower(s) for weeks and sometimes months. These delays often caused the borrowers' financial documents to become unacceptably aged by no fault of the borrowers. (Under HAMP, the borrowers' financials expire 90 days from date of receipt.[111]) Often, valuable time was lost in resubmitting documentation, and homes were foreclosed upon. OLS's failure to communicate with borrowers regarding their requested modifications was a common cause of many wrongful foreclosures, all of which constituted knowing violations which were material to the payment decisions of the United States under the False Claims Act.

---

[111] *See* MHA Handbook v4.3 at 4.3, *Evidence of Income*.

125.    OLS relationship managers' failures to timely respond to borrowers directly violated the CFPB mandate and harmed those borrowers seeking assistance.[112] The system established by OLS was not only ineffective and inefficient but was unfair to borrowers and greatly frustrated the modification process. Thus, the initial and annual SPA certifications/representations executed by OLS, including that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," were false and made with actual knowledge, reckless disregard, or deliberate ignorance and were material to the payment decisions of the United States.

### j.    Imparting False, Misleading Information to Borrowers

126.    From at least as early as 2011, and on information and belief from as early as April 16, 2009, OLS employees often imparted false and misleading information to borrowers, resulting in wrongful denials of modification applications and borrowers' inability to receive assistance to which they were entitled. As previously mentioned, borrowers were regularly and falsely told that

---

[112] *See* 12 C.F.R. § 1024.40

(a)      *In general*. A servicer shall maintain policies and procedures that are reasonably designed to achieve the following objectives:

…

(2)      Make available to a delinquent borrower, via telephone, personnel assigned to the borrower as described in paragraph (a)(1) of this section to respond to the borrower's inquiries, and as applicable, assist the borrower with available loss mitigation options until the borrower has made, without incurring a late charge, two consecutive mortgage payments in accordance with the terms of a permanent loss mitigation agreement.

(3)      If a borrower contacts the personnel assigned to the borrower as described in paragraph (a)(1) of this section and **does not immediately receive a live response** from such personnel, **ensure that the servicer can provide a live response in a timely manner**. (emphasis added).

their modification application was denied due to missing documents. In fact, while employed at OLS, MBL observed on numerous occasions that he and other employees were able to access supposedly "missing" documents, whose purported absence had caused the borrower's modification application to be denied, in the servicer's imaging system. This was obviously an unfair, fraudulent and deceptive pretext for denial of the borrower's modification application, and rendered the initial and annual SPA certifications/representations executed by Ocwen, including that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…," false and made with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the information, all of which was material to the payment decisions of the United States.

127.    Similarly, OLS employees regularly misinformed borrowers that they must be delinquent on their home loans in order to qualify for assistance through HAMP. In fact, a borrower did not have to be delinquent in order to qualify, and this false and misleading information resulted in many borrowers abandoning the idea of using a HAMP modification in order to save their homes. What's more, this false information led some borrowers to default on their loan payments in order to qualify. OLS also gave inaccurate information to many borrowers regarding borrower qualifications and how to apply.

128.    OLS additionally failed to inform some borrowers that the investor (the Trust) on their loan did not participate in HAMP, and therefore they weren't eligible for HAMP modifications. OLS misled these borrowers by sending them HAMP modification applications,

and later purporting to approve their HAMP applications and trial payment plans. These borrowers, believing they were eligible for HAMP modifications would make trial payments only to subsequently receive a denial from OLS because the investor didn't participate in HAMP.

129.    In some instances, OLS failed to communicate with the Trustee to ensure proper financials and court documents were obtained in connection with borrowers' requests for modification. For instance, when borrowers are in Chapter 7 or Chapter 13 bankruptcy, they remain eligible for HAMP, but at the servicer's discretion in accordance with the investor guidelines. In addition, servicers must obtain from the Trustee verification of certain financials and the Bankruptcy Court's consent. Experienced and trained SPOCs would have recognized this at the initial review and known the financial documents required to proceed with the modification review. This caused borrowers' modifications to be wrongfully denied and, in some instances, resulted in borrowers losing their homes to foreclosure.

130.    For these additional reasons Ocwen's certifications/representations, that it was "in compliance with "all applicable Federal, state and local laws, regulations . . . requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices" were false and made with actual knowledge, reckless disregard or deliberate indifference to the truth or falsity of the information, all of which was material to the payment decisions of the United States.

### k.    Offshore Loan Review Resulting in Misunderstanding and Confusion

131.    The routing of loan documents to offshore contractors in, for instance, India, who were neither adequately trained nor qualified, resulted in tremendous confusion and serious errors

to the detriment of borrowers. Both Relators J-ME and MBL were aware that approximately 95% of the loan modification process at OLS, including underwriting and the determination of borrower-specific terms, was in many cases unlawfully handled offshore by third-party contractors. While the general review and underwriting of *conventional* loans offshore is not prohibited, it is undoubtedly a violation of federal and state UDAP laws for the review and modification to be completed improperly, resulting in not only confusion but increased delinquencies for borrowers and numerous erroneous denials of modifications.

132.    As an OLS employee, MBL regularly and directly saw documents reflecting that offshore underwriters had input the wrong numbers in the system. For instance, trial plan payments were sometimes set up slightly higher in the servicer's computer system than what the proposed modification agreement reflected. This resulted in borrowers remitting payment amounts that did not match OLS's system, and many times caused a payment shortage to be reflected on the borrower's account. In order to address this type of error, a customer service representative would have to contact the underwriter overseas; however, these third-party contractors are often unresponsive, possibly due to the large time zone differences, and communications go unreturned for as much as several weeks.

133.    Furthermore, offshore underwriters often miss critical red flags in the structuring of loan modifications, resulting in modifications with terms that are highly inappropriate for the individual borrower. *Several hundred times per year* MBL received calls from borrowers confused about loan terms; after review, even MBL—a seasoned professional in the loan modification industry—was sometimes unable to explain the terms because of the offshore contractor's

incompetence. Ocwen's practices and policies creating such error, confusion, inappropriate fees and unnecessary and even unlawful foreclosures violated the Dodd-Frank and state law prohibitions against unfair, abusive or deceptive practices and constituted knowing violations of the False Claims Act, all of which was material to the payment decisions of the United States.

134.    Payments received by the Cashiering Department, *which was also located offshore*, were often misapplied to suspense accounts by offshore employees instead of being properly applied to the unpaid principal balance. This also resulted in borrower "delinquencies" and amounted to an unfair, deceptive and abusive act or practice. For these additional reasons Ocwen's certifications/representations, including that it was "in compliance with "all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," were false and made with actual knowledge, reckless disregard, or deliberate indifference of the truth or falsity of the information, all of which was material to the payment decisions of the United States.

### l.    Forced In-House Modifications

135.    OLS employees also forced borrowers into less attractive modification options and terms than they were qualified to receive. Often, borrowers who qualified for HAMP modifications, and had funds in a suspense account at the time of the HAMP modification review, would be wrongfully denied a HAMP modification and forced to accept an in-house modification instead. This occurred because when OLS applied suspense funds to a trial plan payment, it sent the borrowers statements inaccurately or misleadingly suggesting that the next payment would be a lower amount. When the borrower submitted the lower amount, the payment would be rejected

and set in a suspense account or returned, because it was not the full payment. If the payment was not returned to the borrower as incomplete, which seldom occurred, the borrower received no notice and thus had no knowledge the payment was not applied to the trial plan. Because final approval of a HAMP modification is subject to the borrower's completion of the trial payment plan, the borrower was ultimately sent a letter denying the modification due to the shortage on the trial plan payments. Borrowers would often call to complain about the misleading statement they received, but OLS refused to accept any payment and told borrowers their only options were (1) to accept an in-house modification or (2) proceed to foreclosure. OLS would then utilize the borrower's information, collected in connection with the HAMP modification process, to render a same day decision to the borrower for an in-house modification option. While an in-house modification was potentially better than nothing for the borrower, the terms were materially less favorable than HAMP modifications, and the practices were unfair, deceptive and abusive, all of which was material to the payment decisions of the United States.

136.    OLS employees complained to management about default process issues and on-going violations of servicing standards, but management disregarded the warnings and did nothing to remediate pervasive violations. The Vice President of GSE loans, Robert Hamilton, expressly raised servicing violations to management, but his warnings were disregarded, he was held in disfavor and nothing was done to bring OLS into compliance. This made it clear to other OLS employees and management that known violations or deficiencies regarding loan laws and regulations were not on the table for discussion.

137.    For these additional reasons Ocwen's certifications/representations, including that it was "in compliance with "all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," were false and made with actual knowledge, reckless disregard or deliberate indifference to the truth or falsity of the information, all of which was material to the payment decisions of the United States.

### C.    REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA)

138.    RESPA is a consumer protection statute that provides for certain borrower rights in connection with the servicing of mortgage loans and escrow accounts.[113] Section 2605 states that, prior to a loan servicing transfer, it is the responsibility of the transferor servicer to notify the borrower in writing, fifteen (15) days before the effective date of the transfer.[114] The transferee receiving servicing rights to a loan must also notify the borrower within fifteen (15) days after the effective date of the transfer **("hello letters").** [115]

139.    In addition, RESPA requires that servicer of federally related mortgages may not obtain force-placed hazard insurance; charge fees for responding to certain written requests if they; (1) <u>fail to timely respond to requests to correct certain errors</u>; (2) fail to respond within 10 business days to a request from a borrower to provide information about the owner or assignee of the loan;

---

[113] 12 U.S.C. §§ 2601-2617.
[114] 12 U.S.C. § 2605(a) and § 2605(b)(1)-(2)(A).
[115] 12 U.S.C. § 2605(c)(1)-(2)(A)

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                                81

or (3) fail to comply with any other obligation found by the CFPB to be appropriate to carry out RESPA's consumer protection purposes.[116]

140.    OLS obtained servicing rights in connection with several mergers and/or acquisitions of competitors' loan portfolio. OLS was thus responsible for timely notification of these transfers to borrowers. Additionally, OLS was also required by RESPA to honor all modifications approved by the prior servicer but regularly failed do so. For these additional reasons, the representations/certifications provided by Ocwen to the United States, including that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," were knowingly false, all of which was material to the payment decisions of the United States. These certifications and representations were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 1.    Untimely Transferee/Transferor Letters to Borrowers

141.    Despite RESPA's requirement that the Transferee servicer provide notice to borrowers within 15 days, OLS knowingly failed to timely transmit such notices,[117] from at least as early as 2011, and on information and belief from as early as April 16, 2009. This confused the borrowers who then sent payment to the wrong servicer and thereby became delinquent by no fault of their own. OLS would then improperly charge the unwitting borrower a late fee and send a negative report to the credit reporting agencies at a time when the borrowers were current on their

---

[116] 12 U.S.C. § 2605(k)(1)(A)-(E).
[117] 12 U.S.C. § 2605(a).

loan, although Federal regulations forbid the imposition of late fees or treating a payment as late for any other purposes when the transferor receives payment on or before the due date including grace periods allowed under the loan documents.

142.    In addition, many incomplete files were sent to the transferee and were missing important documents, such as the original mortgage contract or, often, a recently approved modification. OLS failed to timely respond to complaints regarding the misappropriation of mortgage payment funds resulting from the failure to properly notify the borrower of a transfer in a timely manner and confirm the modified terms. For these additional reasons Ocwen's certifications/representations, including that it was "in compliance with "all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," were **false** and made with actual knowledge, reckless disregard or deliberate indifference of the truth or falsity of the information.

### 2.    Additional Violations of RESPA

143.    OLS's course of conduct regarding (1) "In-Flight Modifications" as described *supra,* at 67, is also a violation of RESPA.[118]

144.    A transferee servicer such as OLS must have policies and procedures reasonably designed to ensure that it receives information regarding any loss mitigation discussions with a borrower, including copies of any agreements. Further, the transferee servicer's policies and procedures must address attempting to obtain any missing information or documents from a

---

[118]12 U.S.C. § 1024.38; 12 USC § 2605(k)(1)(C).

transferor servicer before attempting to obtain it from the borrower.[119] **OLS knowingly failed** to implement such policies to assist borrowers in connection with a servicing transfer. This knowing and reckless conduct damaged borrowers as described above. For these additional reasons Ocwen's certifications/representations, that it was "in compliance with "all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices" were **false** and made with actual knowledge, reckless disregard, or deliberate indifference to the truth or falsity of the information, all of which was material to the payment decisions of the United States**.**

### D.      STATE LAWS AND REGULATIONS

145.      Since Ocwen certified that it was in compliance with "all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," **Exhibit 2**, Ocwen *SPA***,** the following state laws are relevant to the falsity of OFC's initial certification to sell the financial instrument to Fannie Mae and each annual re-certification.

146.      OLS has modified Texas home equity loans and purchase money mortgages without complying with Tex. Const. Art. XVI, § 50(a)(6). OLS has sometimes added tens of thousands of dollars to the principal balance—including the principal portions of past due payments, which were already part of the principal and had not been loaned to the borrower an additional time—far in excess of the original notes and of constitutional, reasonable closing

---

[119] 12 U.S.C. § 1024.38(b)(4). See also Official Bureau Interpretations ¶ 38(b)(4)(ii). Compliance with the commentary issued by the BCFP affords protection from liability under § 19(b) of RESPA, 12 U.S.C. 2617(b).

costs.[120] Similarly, OLS imposed new obligations, charging the borrowers interest on interest through the modification process, a burden not imposed by the terms of the **original** note or deed of trust. OFC and OLS pervasively violated Texas constitutional requirements, contained in Article XVI, Section 50(a)(6) of the Texas Constitution, that protect homesteads in Texas, thus making its certification of compliance with state laws and regulations in the initial SPA, and each year thereafter, a false certification to the U.S. regarding a condition of payment, and a fraudulent inducement of the United States to approve and/or continue Ocwen's performance of the SPA, all of which was material to the payment decisions of the United States.

### 1.    Texas Loan-to-Value Ratio

147.    In addition, OLS violates the Texas Constitution by collateralizing the new extensions of credit in contravention of Tex. Const. Art. XVI, § 50(a)(6). To comply with Section 50(a)(6), a new loan/modification which involves a **new extension of credit** must be completed without violating the strict 80% loan-to-value restriction. Tex. Const. Art. XVI, § 50(a)(6)(B). Virtually all OLS's Texas loan modifications violated Texas' 80% loan-to-value restriction as a result of the severe drop in Texas property values during the 2008 national financial crisis and the amounts advanced by OLS. This violation further renders Ocwen's initial and annual SPA certifications/representations, including that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…," **knowingly false,** all of which was material to the payment decisions of the United States**. These certifications were express

---

[120] 7 Tex. Admin. Code § 153.14(2)(B).

conditions of payment under HAMP and material to the government's decision to make HAMP incentive payments.

### 2.    Texas Mandatory Closing Location

148.    In addition, the Texas constitution requires home equity loans involving new extensions of credit to close *in person* and only at the office of a lender, attorney or title company. Tex. Const. Article XVI § 50a(6)(N). All OLS's mortgage modifications unlawfully closed by the borrower executing the documents and sending them to OLS by mail, Federal Express, or another carrier for finalization. The Texas Supreme Court has definitively ruled that the borrower, himself/herself, must attend all closing activities in one of the constitutionally permitted venues. *The Financial Committee of Texas, et al. v. Valerie Norwood, et al.*, No. 10-0121, (Tex. Sup. Ct. Jan. 24, 2014). OLS made no attempt to comply with this Texas Constitutional requirement. Therefore, Ocwen's initial and annual SPA certifications/representations, including that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," were false and made with actual knowledge, reckless disregard or deliberate ignorance of the truth or falsity of the information, all of which was material to the payment decisions of the United States.

### 3.    Texas Notice of Right of Rescission

149.    One of the requirements for home equity loans involving new extensions of credit under the Texas Constitution, like Section 1026.23(a) of Regulation Z, is that the servicer/lender

must provide the borrower(s) with the Notice of the three (3) day Right of Rescission.[121] In Relator MBL's experience and based on the documents he directly reviewed, virtually none of OLS's Texas modification contracts include a Notice of the Right of Rescission—additional violations of state law, rendering Ocwen's initial and annual SPA certifications/representations, including that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," **false** and made with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the information, all of which was material to the payment decisions of the United States**.**

### 4.     Texas Full Amortization

150.    The Texas Constitution, interpreted by *Sims*, provides that home equity loans involving the *Sims* "new extensions of credit" must be fully amortizing at inception (*i.e.*, a steadily downward sloping principal curve that is zero at maturity) and must remain that way. Tex. Const. Art. XVI, § 50(a)(6)(L) and 7 Tex. Admin. Code § 153.11. OLS loan modifications violated these provisions. Thus, Ocwen's initial and annual SPA certifications/representations, including that it was "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," were **false** and made with actual knowledge, reckless disregard or deliberate ignorance of the truth or falsity of the information, all of which was material to the payment decisions of the United States**.**

---

[121] Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii); Reg. Z. 12 C.F.R. § 1026.23(a)-(b).

### E.      FAILURE BY OLS TO SELF-REPORT

151.    As a participant in the government's HAMP Program, OLS had the express, affirmative duty to notify Fannie Mae and Freddie Mac immediately in the event that any of the representations, warranties, or covenants made by Ocwen in the SPA ceased to be "true and correct."[122] Despite this directive, OLS has knowingly failed to notify the government of all violations committed by OLS and its third party contractors of which it was aware. OLS has knowingly violated this obligation to the United States, many thousands of times, when OLS knew of violations that had occurred, which was material to the payment decisions of the United States**.**

152.    Specifically, OLS did not (1) operate in compliance with all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements;[123] (2) perform its services in accordance with high professional standards of care, using qualified individuals with suitable training, education, experience and skills;[124] or (3) responsibly supervise and manage third-party contractors to ensure that services were being performed in accordance with HAMP program requirements.[125] These latter, knowing failures and the knowing failure by OLS to properly report violations to Fannie Mae and Freddie Mac, as required by the SPA, render Ocwen's [time-relevant] certifications/representations, including that it was "in compliance with "all applicable Federal, state and local laws, regulations . . .

---

[122] *See* **Exhibits 2 and 3**, Ocwen's Original and Amended and Restated SPA at Financial Instrument ¶ 5 "In the event that any of the representations, warranties, or covenants made herein ceases to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately."
[123] *Id*. at Financial Instrument ¶ 5(b).
[124] *Id*. at Financial Instrument ¶ 5(d).
[125] *Id*. at Financial Instrument ¶ 6.

requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," were **false** and made with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the information, all of which was material to the payment decisions of the United States**.**

## IX.    EICHNER'S DIRECTLY AND INDEPENDENTLY ACQUIRED KNOWLEDGE OF OCWEN VIOLATIONS

153**.**    As Vice-President of Customer Experience for Ocwen, starting in January 2016 and continuing through mid-May of 2019, J-ME learned of several systemic violations of laws and regulations, as well as unfair, deceptive, and abusive acts and practices. In his capacity as Vice President of Customer Experience, J-ME's role was to improve internal processes that affected consumers and, in light of increased complaint reporting requirements, to decrease the number of complaints. Particular attention was focused on complaints related to CFPB compliance. This required in-depth familiarity with Ocwen consumer complaints as well as knowledge of the internal processes related to the complaints. During his roughly three-and-a-half years in this capacity at Ocwen, complaints decreased from 3-400 per month to about 100 per month.

154.    During J-ME's time at Ocwen, Sherry Goodman was the senior vice president for call center operations in Dallas. Ms. Goodman and J-ME both reported to Scott Anderson, the executive vice-president of loan servicing, who reported to CEO Ron Farris, who was replaced in that position by Glenn Messina in October of 2018. Several employees who reported to J-ME were in India, and J-ME never met them in person.

155.    Among the remedies that were instituted during his tenure in customer experience, was automating firm-wide compliance with regulatory requirements to correct or acknowledge a

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                                                    89

complaint within five days of receiving the complaint. Rather than depending on individuals calendaring and keeping up with compliance with this rule, the iCasework Complaint Management Database, which has been in use since April of 2015, was set up to automatically send a letter acknowledging the receipt of the complaint on the fifth day after receipt of the complaint, if the complaint database did not reflect that the complaint had been resolved or withdrawn. The previous system could not follow complaints in time, and twelve state regulators and CFPB had required Ocwen to institute a system capable of doing so. Real Servicing continued to show the existence of the complaint but not its content; to follow the history and content of a complaint, Ocwen employees would rely on iCasework.

156.    In or about January of 2019, Ocwen was migrating its servicing functions from its notoriously inadequate Real Servicing platform to the MSP platform. Around that time or late 2018, Caroline Medina, who reported to J-ME, reported in a meeting that she had discovered that the Research Group, which researched the loan's history to determine the accuracy of the borrower's written complaint and the cause of any verified problem, and the Ombudsman's .Group, which handled escalated complaints including complaints from CFPB, state attorneys' general, or bankruptcy counsel, were withholding correspondence related to material complaints from the iCasework Complaint Management Database in order to (1) avoid the automatic complaint acknowledgement and ( 2)maintain control they would not have in an automated record-keeping system. Keeping complaints out of the iCasework Complaint Database caused J-ME's Customer Experience Department's complaint reports, prepared quarterly in order to comply with quarterly complaint and compliance reporting requirements to CFPB and twelve states, to be

**incomplete and inaccurate**. J-ME's customer experience group prepared its quarterly reports and submitted them to Denise Ryder or Grant Branum in the compliance department, and subsequently to Michael Hollerick when he became Chief Compliance Officer, who were responsible for preparing final compliance reports to the Government. The reports should have reflected every single complaint but could not do so if complaint records were not stored in the system of record, iCasework. Many thousands of complaints were **not stored** in the system of record which formed the baseline for the reports in order to conceal the volume and quality of complaints.

157.    Additionally, by keeping correspondence out of iCasework, the Research Department and Ombudsman's Office were able to **manipulate information** in the complaint files. J-ME's group determined that Research and Ombudsman were inputting correspondence dates manually into iCasework in order to falsely reflect, for example, compliance with the five-day acknowledgement requirement, as well as with a 30-day complaint resolution requirement. This fraudulent record-keeping included manually backdating acknowledgement letters and resolution letters sent to borrowers.

158. Ms. Medina also reported that a surprising number of complaints were withdrawn from iCasework in a suspicious manner. Complaints should only be withdrawn if they were created in error, or if a complaint was a duplicate. The withdrawn complaints raised questions because there were a surprisingly large number of complaints, and because many withdrawn complaints were followed closely by a new complaint with the same content, with only a more recent initial date, re-starting the clock on deadlines for acknowledgement and resolution. In their audit, J-ME and his customer experience group searched the previous four years—2015-2018—and found

26,000 had been withdrawn, half of which importantly withdrawn by the Research department. These findings clearly suggested that the Research department was falsifying complaint records to hide non-compliance with regulatory requirements. As a result of these false records, Ocwen's **reports to the federal and state governments** regarding complaints were **never correct**.

159.   Additionally, J-ME found that Ocwen's complaint compliance reports were rendered false by Ocwen's practice of withdrawing complaints from the iCasework database whenever a complaint went into litigation, ostensibly because the complaint was now being handled by another business unit, the legal department. It was unnecessary to hide the record of the complaint by removing the complaint from the complaint database when the complaint went into litigation, hiding from regulators information about unresolved complaints. Doing so allowed Ocwen to **hide not merely the volume of complaints but the seriousness**, as the most serious complaints—those resulting in litigation—were **effectively hidden from the regulators**.

160.   Withdrawn complaints also seriously injured borrowers whose accounts were on a foreclosure track, as the foreclosure was required to be placed on a 30-day hold upon the borrower's notice of error or other qualified written complaint. **If the complaint was withdrawn** from the iCasework database, however, **the 30-day hold was not triggered** and the foreclosure proceeded, **resulting in some cases in a wrongful foreclosure.**

161.   Ms. Goodman made the decision that Research would not migrate its complaint correspondence to the new platform and use the iCasework Complaint Management Database, despite several conversations and e-mails regarding the subject between her and J-ME. The Ombudsman's office initially used iCasework automatic acknowledgement letters, but

subsequently moved backward to manual acknowledgement correspondence; Caroline Medina determined that, in fact, the Ombudsman's office maintained its own database of letters, which were not in iCasework or in Real Servicing which is where known records resided.

162.    J-ME, Caroline Medina, and other members of her audit/survey team reviewed the two groups' recent audit letters and prepared a report dated January 9, 2019 regarding what was found. This audit disclosed that some acknowledgement letters were sent late, and some were not sent at all. Relator brought this information to the attention of his immediate supervisor, Scott Anderson. Anderson advised that he would bring the issues to the attention of R. Kaltenbach. Shortly afterward, in February of 2019, J-ME was advised that he was being laid off, effective in May of 2019; he never was provided any further information on whether the fraudulent conduct was ended.

163.    The Ombudsman's separate database was maintained in Waterloo, Iowa, by Collin Hoffman, who reported to Kaltenbach.   the database extensively with his successor, Christine Seeger, who was in the company's Mt. Laurel New Jersey offices, prior to his departure from Ocwen in mid-May 2019. J-ME also asked Hoffman to shut down the separate Waterloo, Iowa database, but got no response. Although Ms. Medina found the database in February of 2019, neither she nor J-ME or his department was given access to the Ombudsman's **secret, separate, unaudited database** of complaint-related correspondence. To the best of J-ME's knowledge, Kaltenbach and Anderson, who work closely together, have **not shut down** the separate, secret, unaudited Waterloo database.

164.    In addition to Ocwen's knowing failure to fulfill its reporting obligations and to falsely conceal and minimize complaint records, J-ME observed many other violations of laws, regulations and consent agreements, which rendered false all of Ocwen's certifications of compliance, whether express or implied.

165.    For instance, 44 loans in California went to foreclosure without the required consideration for an alternative solution such as a deed-in-lieu of foreclosure ("DIL"), even though each of the borrowers had in fact expressly requested consideration for a DIL. This occurred because of Ocwen's confusing procedures on a request for DIL. Ocwen required that the borrower first request a modification and could only consider a borrower for a DIL if the modification was denied. Ocwen thus sent the borrowers a form to submit, which included the options of requesting a modification or a DIL *without* clearly instructing that the borrower must not apply for a DIL unless first denied a modification. The borrowers would be denied the DIL and run out of time to prevent foreclosure. When Ocwen recognized this error, it should have rescinded the foreclosures, but instead paid the affected borrowers $2,000.00 for the wrongful loss of their homes. This was far better for Ocwen, financially, than rescinding the foreclosure, which would cost the company the cost of the property, rather than merely $2,000.00. Moreover, the Research department was motivated to forward the loan to foreclosure to get any complaints off its own books and let the foreclosure department deal with any problems.

166.    Ocwen had **motives to foreclose** rather than work out problem loans. Once the property is foreclosed upon, complaints on that loan are no longer active as **the loan is no longer being serviced.** This ironically *improved* Ocwen's appearance in its consumer complaint reports

to the regulators. Additionally, in a foreclosure, the servicer's expenses, such as funds advanced for escrows or property preservation, **were all repaid** and the servicer received higher fees than for modifying a troubled loan, giving Ocwen additional incentives to wrongfully or carelessly foreclose rather than providing an alternative to foreclosure.

167.    In some instances, monies owed to borrowers whose loans were no longer being serviced by Ocwen (such as paid-off loans or loans that have been foreclosed upon) **were never paid and were retained by Ocwen** when it could no longer, after its own delays, locate the borrower. Additionally, in cases in which Ocwen discovered it had undercharged a borrower, it would tack the charge onto the end of the loan for payoff at loan maturity, with **no notice** to the borrower.

168.    In other instances, Ocwen sent borrowers confusing or contradictory information. For instances, in some instances, the last correspondence sent to borrowers before the loan was placed in foreclosure was a letter stating that the loan was not in foreclosure. This letter, called the **MADNR letter** shows the amount owed, the previous six-months history, says whether the loan is in a loan modification process, and whether the loan is in foreclosure. These letters became **notorious for containing incorrect information**, numbers that did not make sense or add up, and other issues. **Ocwen did nothing** to correct or re-send the letters with correct information. J-ME was able to determine that **at least 627 borrowers** were affected by this issue in the past three (3) years; however, the problem may have existed much longer and many more borrowers may have been provided incorrect information, making it impossible for them to take corrective action immediately when their loans were in foreclosure.

169.     **State and federal regulators** who audited Ocwen did not know about the Ombudsman's secret database, nor did Relator J-ME until early 2019. Instead, the auditors believed they were being shown complete and accurate information by Ocwen which knew this was untrue.

170.     In 2017, Ocwen discovered it had **overcharged borrowers for a payoff quote fee** from **2006 through 2016**. It was further admitted in a remediation working group meeting that the company had **wrongfully capitalized late fees,** which thus accrued interest charges, which were wrongfully included in the final payoff amount.

171.     In December of 2017, **8,000 borrowers'** homeowner's insurance was cancelled by the insurers because the appropriate Ocwen failed to pay the premiums due from the borrowers' escrow accounts. Ocwen subsequently got some policies reinstated and replaced some with new policies, without notifying the borrowers. Ocwen did not research the question of whether any borrower had an insurance claim denied as a result of the cancellation for nonpayment.

172.     Borrowers were also harmed by Ocwen's **intentional understaffing**. When the Government rolled out its Making Home Affordable programs in the wake of the Residential Mortgage Backed Securities ("RMBS") collapse and the Great Recession of 2008, many residential mortgage loan servicers were overwhelmed and understaffed for the volume of borrowers requesting modifications and other foreclosure alternatives, along with the volume of borrower defaults and foreclosures. Later, when Ocwen's number of loans serviced decreased, it chose to reduce staffing proportionally to the decrease in the number of loans serviced rather than keep the staff to address the remaining workload to improve prompt and accurate servicing; Ocwen

chose to remain at the same ratio of employees to loans being serviced, cutting staffing every quarter to **maintain its inadequate staffing levels**.

173.    This understaffing resulted not merely in long telephone wait times for borrowers, but even **unnecessary foreclosures** in some instances. For instance, pursuant to regulatory requirements, Ocwen assigned borrowers a single point of contact ("SPOC")—a single individual to talk with the borrower, become familiar with his complaint and attendant circumstances, so the borrower did not have to start from scratch to explain the problem to whoever took the call. Ocwen used an appointment model requiring borrowers to schedule appointments to speak with their SPOC. About a third to half of the time, however, the SPOC was unavailable for the appointment when the borrower called as scheduled. The borrower's call was transferred to another person, unfamiliar with the loan, who would not attempt to address the borrower's problem, but instead scheduled another appointment. The new appointment typically could not be scheduled for sooner than **10-11 days**. On a tight foreclosure schedule, a borrower who was unable to talk to the SPOC, or anyone else who might discuss errors, complaints, or potential loss mitigation, instead had the **clock run out and the loan moved into foreclosure.**

174.    Between October of 2017 and March of 2018, a major fax number that was disseminated to borrowers in numerous correspondence pieces and the Request for Mortgage Assistance form (used for all types of assistance such as modifications, deed-in-lieu of foreclosure, shot sales) as the number to use to send their documents to Ocwen, was **deactivated without notice to borrowers** . Subsequently, the IT department delayed the renegotiation of the contract for the fax provider, which then allocated less bandwidth for all Ocwen fax numbers, which **caused**

**bottlenecks and many documents to never be received**, although customers would think their fax went through just fine. Customers were told by customer service to resend their documents, sometimes repeatedly. As a result, **borrowers were unable** to promptly send written complaints or documentation to Ocwen.

175.    In July of 2017, Ocwen made incorrect modification decisions based on its erroneous attribution of incorrect characteristics of the loan, such as treating an adjustable loan as a fixed-rate loan. At least 85 borrowers were harmed by wrongful denial of their modification applications. The problem may have occurred over a much longer time and may have injured many more borrowers.

176.    In May of 2017, Ocwen incorrectly offered modifications that were **not allowed**. It rescinded the loan modifications and offered no remedy to the affected borrowers. This may have occurred over a longer period and injured many more borrowers.

177.    Between October of 2016 and April of 2017, Ocwen sent 1,589 letters to customers containing incorrect unpaid principal balances. This may have occurred over a longer period and affected a larger number of borrowers.

178.    Between November of 2016 and January of 2017, Ocwen gave employees defective training on the calculation of the trial payment amount for a loan modification. At least 62 borrowers were affected by this error. This may have occurred over a longer period, however, and affected a larger number of borrowers.

179.    In November of 2015, incorrect calculations of self-employment income, resulting from a failure to account for a one-hour time-zone difference, caused self-employed borrowers'

income to be understated (because of dividing by 91 days rather than 90) and loan modifications to be denied. **Ocwen offered no remedy** to affected borrowers when it determined the error.

180.    Between July of **2013** and April of **2018**, **many loans went into foreclosure** because of **delayed loan modification decisions** on loans with escalated complaints. This was because Ocwen chose to issue an **escalation report only once a week rather than daily**. Once the escalation report was issued, it typically took at least a week for Ocwen to investigate the borrower's escalated complaint. During this time, although **foreclosure proceedings** should have been put on hold for 30 days, **this was not done** until the escalation report was issued, and in the interim, no modification was processed, and loans were foreclosed upon. **Not until April of 2018** did Ocwen take the obvious and simple step of reporting on escalations in a timely manner.

181.    Between **2012 and 2018**, Ocwen failed to process principal forgiveness on HAMP loans. Principal forgiveness was the HAMP program's incentive to borrowers for making timely payments. Under the program, the principal payment was made to the servicer to be distributed to the investor, the borrower was supposed to benefit by a reduction in loan principal balance. Thus, countless borrowers **did not receive the benefit of the money paid** to the investors under the HAMP program for their benefit. It is unclear whether the funds remained with Ocwen or were paid to Trustees for the benefit of Trusts. In addition, Ocwen determined that 24 loans went into **foreclosure** as a result. Ocwen has not accounted for this significant sum of missing money.

X.      PRINCIPAL LIABILITY UNDER AGENCY LAW

182.    It is long and well established "[t]hat for acts done by the agents of a corporation, either *in contractu* or *in delicto [contract or tort]*, in the course of its business and of their employment, the corporation is responsible as an individual is responsible under similar circumstances." *Washington Gas Light Co. v. Lansden,* 172 U.S. 534, 543-544 (1899) (quoting *Philadelphia, Wilmington & Baltimore Railroad v. Quigley,* 21 How. 202, 210).

183.    In *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp*., 456 U.S. 556 (1982) ("ASME"), the Supreme Court held that principals can be liable for treble damages under antitrust laws for acts committed by their agents with only *apparent* authority, as the treble damages under the civil antitrust provisions are not punitive. *Id.* at 565-566. Principals are liable when their agents commit fraud with apparent authority even though the agent acts solely to benefit himself. *Id.* at 565-566. The principal is likewise liable for its agent's misrepresentations that cause pecuniary loss to another, when the agent acts within his apparent authority. *Id.* at 565-566. *See also United States ex rel. Vavra v. Kellogg Brown & Root, Inc.,* 727 F.3d 343, 349-353 (5th Cir. 2013) (principal liable for agents' violations of the Anti-Kickback Statute within agent's *apparent* authority). Mortgage loan Servicers may be agents of the Trustee of individual or securitized loans, and as such, the Trustee may be liable for the conduct of the Servicer. *See, e.g., Fogg v. Ocwen Loan Servicing, LLC,* 2015 U.S. Dist. LEXIS 45642 (D. Me. Apr. 8, 2015) (Master Servicer Bank of America and Trustee Mellon Bank may be liable for acts of Subservicer Ocwen; Bank of America was acting under authority of and as agent for Mellon and Ocwen as agent of both Bank of America and Mellon); *Harris v. LNV Corp*., 2014 U.S. Dist. LEXIS 90298 (M.D. Tenn. June 12, 2014);

*Charest v. Fannie Mae,* 9 F. Supp. 3d 114, 127 (D. Mass. 2014) ("Typically, a mortgage servicer acts as the agent of the mortgagee to effect collection of payments on the mortgage loan." (quoting *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 187 (1st Cir. 2006) (internal bracket omitted)) (holding Fannie Mae as owner of mortgage liable for acts of servicer GMAC); *N. K. Parrish, Inc. v. Southwest Beef Industries Corp.*, 638 F.2d 1366, 1370-1371 (5th Cir. 1981); *Ishee v. Fannie Mae,* 2016 U.S. App. LEXIS 4726 (5th Cir. Mar. 14, 2016) (fact issue existed as to whether owner of loan, Fannie Mae, was liable for servicer's failure to apply insurance proceeds to mortgagor's account); *BAC Home Loans Servicing, L.P. v. Cowin,* 544 Fed. Appx. 288 (5th Cir. 2013) (servicer BAC, as agent, pursuant to pooling and servicing agreements, of holders of mortgages affected by fraudulent scheme that deprived trusts of superior lien status thus injuring BAC's ability to service mortgages, suffered injury in fact and had standing to sue); *Reynolds v. Xerox Educ. Servs.,* 2014 U.S. Dist. LEXIS 125490, 18-20 (N.D.N.Y Sept. 9, 2014) (*allegation that a party acted as a loan servicer may support an inference that the creditor exercised control over the servicer and is therefore liable as a principal for the servicer's torts)* (citing *Warden v. PHH Mortg. Corp.*, No. 10-CV-75, 2010 U.S. Dist. LEXIS 98545, 2010 WL 3720128, at *4-5 (N.D. W. Va. Sept. 16, 2010) (plaintiffs sufficiently pleaded principal/agent relationship between co-defendants based on allegation that co-defendants were servicer and owner of loan, respectively); *In re Residential Capital, LLC,* No. 12-12020, 2014 Bankr. LEXIS 1617, 2014 WL 1410310, at *3 (Bankr. S.D.N.Y. Apr. 14, 2014) ("loan servicers typically are authorized to act as the agent for the owner of the note"); *LFJ Realty Co. v. Bank of N.Y.*, 31 Misc. 3d 1217(A), 929 N.Y.S.2d 200, 2011 N.Y. Misc. LEXIS 1865, *30 (Sup. Ct. Apr. 7, 2011) ("[C]ourts have either found [mortgage loan

servicers] to be agents of the banks as a matter of law or held that factual issues were raised regarding the existence of an agency relationship."); *cf. In re Kline*, 420 B.R. 541, 548 (Bankr. D.N.M. 2009) (knowledge of loan servicer can be imputed to lender based on agency theory))**;** *Benner v. Bank of Am., N.A.*, 917 F. Supp. 2d 338 (E.D. Pa. 2013) ("As a loan servicer, [defendant] acts as an agent for the owner of the loan."); *Cenat v. U.S. Bank, N.A.,* 930 F. Supp. 2d 1347 (S.D. Fla. 2013) (servicer acts as <u>agent of assignee as well as of original creditor)</u>.

184.    Pursuant to PSAs, BONY as successor-trustee of J.P. Morgan Chase Bank, N.A acted as Trustee for securitized mortgage loans as to which Ocwen acted as its Servicing Agent and as such, the agent of BONY in its capacity as Trustee, standing in the shoes of the Trusts, under the agreements and applicable federal common law.[126] Ocwen's violations of state and federal law and regulations and its false or fraudulent claims, statements, records, and fraudulent inducement of contracts and payments were within the scope of its agency, and done with actual or apparent authority and its position as agent facilitated its fraud.

185.    Pursuant to PSAs, Wells Fargo Bank, N.A acted as Trustee for pools of securitized mortgage loans (Trusts) as to which Ocwen acted as its Servicing Agent and as such, the agent of Wells Fargo Bank in its capacity as Trustee, standing in the shoes of the Trusts, under the agreements and applicable federal common law.[127] Ocwen's violations of state and federal law and regulations and its false or fraudulent claims, statements, records, and fraudulent inducement

---

[126] *See supra* at 24-25.
[127] *See supra* at 25.

of contracts and payments were within the scope of its agency, and done with actual or apparent authority and its position as agent facilitated its fraud.[128]

186.    Pursuant to PSAs, Deutsche acted as Trustee for pools of securitized mortgage loans (Trusts) as to which Ocwen acted as its Servicing Agent and as such, the agent of Deutsche in its capacity as Trustee, standing in the shoes of the Trusts, under the agreements and applicable federal common law.[129] Ocwen's violations of state and federal law and regulations and its false or fraudulent claims, statements, records, and fraudulent inducement of contracts and payments were within the scope of its agency, and done with actual or apparent authority and its position as agent facilitated its fraud.[130]

187.    Pursuant to PSAs, U.S. Bank acted as Trustee for pools pf securitized mortgage loans (Trusts) as to which Ocwen acted as Servicer and as such, the agent of U.S. Bank in its capacity as Trustee, standing in the shoes of the Trusts, under the agreements and applicable federal common law.[131] Ocwen's violations of state and federal law and regulations and its false or fraudulent claims, statements, records, and fraudulent inducement of contracts and payments were within the scope of its agency, and done with actual or apparent authority and its position as agent facilitated its fraud.[132]

---

[128] *See supra* at 25.
[129] *See supra* at 23.
[130] *See supra* at 23.
[131] *See supra* at 20-23.
[132] *See supra* at 20-23.

188.     The Trust Defendants, respectively, through the Trustee Defendants Wells, BONY, Deutsche, and U.S. Bank are therefore **vicariously liable** for the wrongful acts of their agent, Ocwen, and the resulting damages under the False Claims Act as alleged herein.

A.     **Trustee Defendant Specific Case Law**

1.     **The Bank of New York**

189.     In the *Carson v. Ocwen Loan Servicing LLC* case, homeowners in Maine sought a modification from Litton, the loan servicer, in 2010. Prior to that, in 2009, BONY took the assignment of the Note and Mortgage from Chase. Then, in 2011, Ocwen took over servicing rights of the loan and refused to honor Litton's modification commitment. The court states that, "[b]ecause it is undisputed that Bank of New York was a disclosed principal, while Litton and Ocwen were only its agents, the breach of contract and promissory estoppel claims can lie only against Bank of New York."[133]

190.     *Pugh v. Bank of America* involves another family that was unsuccessful in attempting to obtain a modification from their mortgage servicer, Bank of America. This case is notable because it recognizes that, "[c]ourts in this circuit have concluded that substitute trustees (or loan servicers) can be authorized to pursue foreclosure proceedings as agents for secured creditors. *See In re Smoak*, No. 09-30421, 461 B.R. 510, 2011 Bankr. LEXIS 3621, at *14 (Bankr. S.D. Ohio 2011) ("Ocwen can enforce the note because it acts as the agent for the Bank of New York Mellon.")."[134]

---

[133] *Carson v. Ocwen Loan Servicing LLC*, No. 2:15-CV-514-DBH, 2017 U.S. Dist. LEXIS 49263, at *18 (D. Me. Mar. 29, 2017).
[134] *Pugh v. Bank of Am.*, No. 13-2020, 2013 U.S. Dist. LEXIS 92959, at *50-51 (W.D. Tenn. July 2, 2013).

191.    *In re Smoak* is a bankruptcy case in which the Debtors scheduled Ocwen as having a claim secured by their real property, but BONY filed a claim stating that it owned the claim in its capacity as Trustee on Behalf of the Registered Certificate holders of GSAMP Trust 2004. SEA2 Mortgage Pass-Through Certificates, Series 2004 - SEA2 Mortgage Services Inc.[135]

192.    The court discussed the effect of the PSA upon the standing of BONY, which was in possession of the Smoaks's mortgage note, an asset of the previously mentioned trust, to enforce it through its proof of claim. The court determined that BONY, Trustee, "being in physical possession of the note with an affixed endorsement in blank, is the holder of a negotiable instrument under the Ohio Uniform Commercial Code and, therefore, *had standing to file a proof of claim* and is the real party in interest."[136]

193.    It is also noteworthy that a September 2009 allonge filed in the Smoaks's bankruptcy case, "reflects that the [Smoaks's] Note was transferred on three separate occasions: 1) from Bank One N.A. to JP Morgan Chase Bank; 2) from JP Morgan Chase Bank to The Bank of New York; and ultimately 3) from Bank of New York to Bank of New York Mellon, as Trustee for the Securitization…[and] the evidence shows Ocwen had the authority to act as agent to file the proof of claim on behalf of Bank of New York Mellon and to service the loan on behalf of Bank of NY Mellon."[137] The court further states that, under Ohio law, Ocwen can enforce the note because it acts as the agent for the Bank of New York Mellon.[138]

---

[135] *In re Smoak*, 461 B.R. 510 (Bankr. S.D. Ohio 2011) (emphasis added).
[136] *Id*. at 513.
[137] *Id*. at 515.
[138] *Id.* at 518.

194. In the *Anthony* case, the court decided a Motion to Dismiss filed by the defendant Ocwen, "which described itself as the "Servicing Agent for The Bank of New York, as Successor-in-Interest to JPMorgan Chase Bank, N.A., as Trustee, Successor-in-Interest to Bank One, N.A., as Trustee of the Amortizing Residential Collateral Trust, 2002-BC1…"[139] This proves that Ocwen considered itself an agent of the Trustee, and also provides an example of the successor trustee relationship between BONY and Chase.

## 2.       U.S. Bank, National Association

195.    An April 11, 2018 PRNewswire article announced a $3,582,000 jury verdict for plaintiff Monette Saccameno, against defendants-Ocwen Loan Servicing LLC-and U.S. Bank as Trustee, for violations of several consumer protection statutes and common law in connection with its servicing of a mortgage loan, owned by U.S. Bank.[140]

196.    In *Bainbridge v. Ocwen Loan Servicing,* Plaintiffs sued (among others) U.S. Bank, as Trustee, and Ocwen Loan Servicing, LLC for violations of the Fair Debt Collections Practices Act ("FDCPA") and the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").[141] Plaintiffs' Complaint identified the following PSA under which U.S. Bank is identified as Trustee and Ocwen as Servicer: The C-BASS Mortgage Loan Trust Asset-Back Certificates, Series 2007-CB6.[142]

---

[139] *Anthony v. Ocwen Loan Servicing, LLC (In re Anthony)*, Nos. 07-33275 HCD, 09-3140, 2011 Bankr. LEXIS 3190, at *1 (Bankr. N.D. Ind. Aug. 23, 2011).
[140] *See* https://www.prnewswire.com/news-releases/monette-saccameno-wins-three-post-trial-motions-300819098.html accessed May 10, 2019.
[141] No. 3:16-CV-0411, 2017 U.S. Dist. LEXIS 48032 (M.D. Pa. Mar. 30, 2017).
[142] *Id*. at *1.

197.    The Complaint alleged that U.S. Bank acted through authorized agents and employees including but not limited to co-defendant Ocwen; the validity of the agency allegations against U.S. Bank appears to have been undisputed in connection with the Court's decision.[143]

198.    In *Frazier v. US Bank Nat'l Ass'n*, the plaintiff filed a class action against U.S. Bank as "Trustee for the C-Bass Mortgage Loan Asset-Backed Certificates, Series 2006-CB1**,"** Ocwen Financial Corporation, LP ("Ocwen Financial"), and others alleging violations of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*., and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 *et seq*., as well as common law conversion and trespass to land and chattels claims.[144] The Complaint alleged, generally, that U.S. Bank, with its agents, including Ocwen, wrongfully foreclosed and evicted plaintiff and his family from their home without notice.[145]

199.    Addressing whether agency was adequately pleaded, the Court wrote:

"Agency is a consensual, fiduciary relationship between two legal entities created by law, where the *principal has the right to control the activities of the agent, and the agent has the power to conduct legal transactions in the name of the principal.*" *Rawoof v. Texor Petroleum Co., Inc*., 521 F.3d 750, 758 (7th Cir. 2008) (applying Illinois law); *Chemtool, Inc. v. Lubrication Techs., Inc*., 148 F.3d 742, 745 (7th Cir. 1998) ("The test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal.") "*To plead the existence of an agency relationship, a plaintiff must allege a factual predicate to create the inference of agency.*" *Whitley v. Taylor Bean & Whittaker Mortg. Corp*., 607 F. Supp. 2d 885, 895 (N.D. Ill. 2009); *Sefton v. Toyota Motor Sales U.S.A.,* No. 09 C 3787, 2010 U.S. Dist. LEXIS 37036, 2010 WL 1506709, at *3 (N.D. Ill. Apr. 14, 2010) ( "[P]leading the existence of an agency relationship requires more than a general statement that such a relationship exists"). "The

---

[143] *Id*. at *4.
[144] No. 11 C 8775, 2013 U.S. Dist. LEXIS 45330, at *2 (N.D. Ill. Mar. 29, 2013).
[145] *Id*. at *5.

question of whether an agency relationship exists is normally a question of fact." *See Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011).

Here, Plaintiff has alleged sufficient factual predicates for agency relationships. *Plaintiff's allegations involve three sets of agency relationships: (1) Defendants Ocwen and Litton as agents of US Bank; . . . .* Specifically, Plaintiff has alleged that "Litton and *Ocwen provided servicing for US Bank*" . . . *Plaintiff's allegations also raise a plausible inference that Defendants controlled the method or manner of their respective agents' tasks.* Plaintiff, for example, alleges that US Bank, Ocwen, and Litton authorized Applebrook and the Doe Defendants to provide property services specifically "during delinquency or default periods and during the judicial foreclosure process."

Furthermore, Litton and Ocwen "track Plaintiff's and other borrower loans assigned to delinquency, default, and/or foreclosure status *en masse."* (Id. ¶ 25.) Finally, Plaintiff alleges that US Bank, Ocwen, and Litton "have systematized their process of foreclosing on properties like [Plaintiff's]" and "have failed to have in place safeguards and adequate means to prevent premature possession of properties in foreclosure."

In particular, Defendants "established a policy and practice, whereby . . . 'property servicers' are automatically tasked with the job of performing [property services] when Plaintiff and Class Members become delinquent on their loan payments." (Id. ¶ 62.) Viewing these allegations in the light most favorable to Plaintiff, Plaintiff has alleged sufficient facts to support that Defendants controlled the method of the work of their respective agents and that those agents could affect the legal relations of their principals. *See Sindles v. Saxon Mortg. Servs., Inc.*, No. 11 C 7224, 2012 U.S. Dist. LEXIS 72682, 2012 WL 1899401, at *9 (N.D. Ill. May 22, 2012) (agency allegations insufficient that were inconsistent with the complaint and lacked a factual predicate); *Whitley*, 607 F. Supp. 2d at 895-96 (*agency allegations sufficient when broker utilized various materials of lender to process loans and both parties shared benefit of premiums*). Plaintiff's agency allegations, therefore, do not fail for lack of specificity. (emphasis added).[146]

200.    In *Arrington*, Plaintiff sought and obtained a Temporary Restraining Order (and

other relief) restraining defendant Ocwen, as servicer for U.S. Bank and defendant U.S. Bank, as

trustee under the Pooling and Servicing Agreement dated as of May 1, 2006, GSAMP Trust 2006-

---

[146] *Id*. at *12-16 (emphasis added).

HE3, Mortgage Pass-Through Certificates, Series 2006-HE3 (the "MBS Trust"), from foreclosing

the mortgage encumbering her home.[147] The Court also seems to assume Ocwen was an agent of

US Bank with authority to foreclose on the bank's behalf:

> For the reasons set forth herein and on the record of the TRO Hearing, it is ORDERED, ADJUDGED, and DECREED as follows:
>
> A. Temporary Restraining Order. *Ocwen, as servicer for U.S. Bank*, as trustee for the MBS Trust; U.S. Bank, as trustee for the MBS Trust; ***and any other servicer, trustee, custodian, or other agent*** authorized to foreclose the Mortgaged Property on behalf of the MBS Trust is enjoined from commencing or continuing proceedings to foreclose the Mortgaged Property pending the conclusion of the below referenced Preliminary Injunction Hearing. Without limiting the foregoing, neither Ocwen, nor U.S. Bank, nor Foreclosure Counsel may conduct, postpone, or continue the October 3rd Foreclosure Sale.[148]

### 3.    Deutsche Bank National Trust Company

201.    The Appeals Court in *Trehuba v. Am. Home Mortg. Servicing Inc.*,[149] described

the relationship between Ocwen and Deutsche in the following way:

> Fidelity had been appointed trustee by Defendant-Appellee Ocwen Loan Servicing, LLC ("Ocwen"), acting as agent of the loan beneficiary, Deutsche Bank National Trust Company ("Deutsche Bank").[150]

202.    In *Reid*, the Court concluded that Deutsche Bank, "is in privity with Ocwen, the

defendant named in that suit…[b]ecause Ocwen was the loan servicer for Deutsche Bank on

Johnson's loan, the Court reasoned, the entities share a mutuality of interest with respect to the

Property.[151]

---

[147] Nos. 12-70435-JHH13, 17-70029-JHH, 2017 Bankr. LEXIS 3228, at *2 (Bankr. N.D. Ala. Sep. 22, 2017).
[148] *Id*. at *15 (emphasis added).
[149] 694 F. App'x 547 (9th Cir. 2017).
[150] *Id.*, at 547.
[151] *Reid v. New Century Mortg. Corp.*, No. PX-18-233, 2018 U.S. Dist. LEXIS 161561, at *12 (D. Md. Sep. 20, 2018)

203.   The Court states that "Ocwen may, however, have rights and obligations that are relevant under Count I to the extent that Ocwen '**acts on behalf of the owner of the debt**.'" The owner of the debt in this case is **Deutsche Bank as Trustee**.

204.   In its Opinion on Motion to Dismiss, the Court recognized the following:

> The fact that Ocwen, the loan servicer, did not hold the Deed or Note when it acted as Deutsche Bank's agent in the foreclosure process is immaterial. "This Court has recognized that it is 'of no consequence who actually sends the notice [of foreclosure], and that task may properly be delegated to a servicing agent[.]'" *Vieira v. CitiGroup, Inc*., No. 1:12-CV-1636-TWT, 2013 U.S. Dist. LEXIS 9329, at *13 (N.D. Ga. Jan. 23, 2013) (quoting *Stubbs v. Bank of Am.*, 844 F. Supp. 2d 1267, 1271 (N.D. Ga. 2012)). The Notice of Sale Under Power sent to Plaintiff identified Deutsche Bank as the entity that held the Security Deed with the authority to exercise the Power of Sale contained in the Security Deed, and it further identified Ocwen as 'the entity who shall have *full authority to* negotiate, amend and modify all terms of the mortgage with the debtor,' as required by O.C.G.A. § 44-14-162.2(a).[152]

### 4.   Wells Fargo Bank, N.A.

205.   In *Madrid v. Wells Fargo Bank, N.A.*, Plaintiffs claimed that Ocwen and Wells Fargo violated 12 U.S.C. § 2605(e)-(m) and other laws by failing to properly respond to their error correction letter ("ECL") and Qualified Written Request ("QWR") by "failing to correct loan servicing errors and by failing to credit Plaintiffs for all payments they made on the mortgage."[153] The defendants argued that Wells Fargo could not be held liable for allegedly failing to respond to a QWR or error notice under RESPA. Specifically, they

---

[152] *Pritchett v. Ocwen Loan Servicing, LLC,* Civil Action No. 2:18-CV-00018-RWS-JCF, 2018 U.S. Dist. LEXIS 133653, at *2 (N.D. Ga. May 16, 2018) (emphasis added).
[153] *Madrid v. Wells Fargo Bank, N.A.*, No. EP-14-CV-00152-DCG, 2017 U.S. Dist. LEXIS 221452, at *14-15 (W.D. Tex. Mar. 17, 2017).

"posit that RESPA imposes obligations solely upon loan servicers, not upon loan holders and point out that Plaintiffs do not allege that Wells Fargo is a loan servicer."[154]

> The Court agrees with Defendants that Wells Fargo cannot be held *directly* liable for any failure to respond to a QWR or error notice. *Defendants, however, "overlook that Plaintiffs seek to hold Wells Fargo **vicariously liable** on an agency theory of liability* for Ocwen or Homeward's alleged violations of RESPA. ("Plaintiffs . . . file this their Supplemental Complaint . . . against Defendants OCWEN . . . and WELLS FARGO, . . . to the extent it is co-liable with OCWEN."); ("In all of the foregoing particulars of this First Amended Supplemental Complaint, OCWEN acted as the authorized agent of WELLS FARGO . . . ."); (**"A loan servicer acts as the authorized agent for the loan holder**, **when performing servicer functions such as responding to an ECL.**"). *See also* Resp. at 22 ("WELLS FARGO as the principal is also bound by the acts of the servicer as its agent."). *Cf. Hawk v. Carrington Mort. Servs., LLC*, No. 3:14-CV-1044, 2016 U.S .Dist. LEXIS 109307, 2016 WL 4433665, at *2 & n. 2 (M.D. Pa. Aug. 17, 2016) (on a motion for summary judgement, noting that "[t]here is nothing in the language of RESPA that may be read to extend statutory liability to the passive mortgage holder . . . ," but reaching the merits of the plaintiffs' arguments, "[a]ssuming that **vicarious liability** [under an agency theory of liability] applies to claims under RESPA")." The Court states that the parties have not adequately briefed the issue of Wells Fargo's potential liability under an agency theory of liability, so it Denies Defendants' Motion for Partial Summary Judgment on the Pleadings.[155]

206.    In the *Coleman-Reed* case, the Court discussed the relationship between Ocwen, as agent, and Wells Fargo, as principal, in its decision on a Motion to Compel Arbitration. The Court stated that "Ocwen moves to compel arbitration of all of Coleman-Reed's claims, including those against Wells Fargo as Trustee. It is clear that Coleman-Reed's claims against Wells Fargo as Trustee are also subject to the Arbitration Agreement and accordingly must also be resolved in arbitration." [156]

---

[154] *Id*. at *17-18 (emphasis added).
[155] *Id*. at *18-169 (emphasis added).
[156] *Coleman-Reed v. Ocwen Loan Servicing LLC*, 2016 U.S. Dist. LEXIS 149539, at *22 (S.D. W. Va. Oct. 28, 2016).

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                          111

207.    The Court cites the following from the Arbitration Agreement:

"Lender" under the Arbitration Agreement is defined as "the lender under the Loan Agreement and/or any assignee of the Loan Agreement, including any subsequent assignees, together with each of such lender's and/or assignee's parents, subsidiaries, affiliates, successors or predecessors, and any past or present officers, directors and employees thereof."

Ocwen claims, and Coleman-Reed does not dispute that, "'Lender' is defined to include Ocwen. **Presumably, Ocwen, as the current servicer of the loan, is an agent of Wells Fargo as Trustee.**[157]

208.    The Coleman-Reed mortgage loan was assigned to Wells Fargo Bank as Trustee for Morgan Stanley ABS Capital I Inc. Trust, and stated:

This assignment of deed of trust from Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for Decision One Mortgage Company, LLC, . . . its successors and assigns, ("Assignor) to Wells Fargo Bank, National Association, As Trustee for the Pooling and Servicing Agreement Dated as of August 1, 2005 Morgan Stanley ABS Capital I Inc. Trust 2005-HE4 Mortgage Pass-Through Certificates, Series 2005-HE4, whose address is c/o Ocwen Loan Servicing, LLC, . . . (Assignee) all its rights, title and interest in and to a certain mortgage duly recorded in the Office of the County Recorder of Fayette County, State of West Virginia.[158]

209.    Based upon the foregoing, the Court stated that Wells Fargo was an assignee of the loan and claims against it were covered under the Arbitration Agreement, and even though Wells Fargo did not move to compel arbitration (its agent, Ocwen did), it confirmed in a teleconference with the Court that it wanted to go to arbitration.[159] Ultimately, the Court agreed with Ocwen and compelled arbitration.[160]

---

[157] *Id*. at *23.
[158] *Id*. at *24.
[159] *Id*. at *24-25.
[160] *Id*. at *26.

210.    The Court in the *252 Wolfrock Rd.* case found that a mailed notice of sale to the borrowers and properly advertised the foreclosure was valid, and, "the servicer, as a lender's agent, acquired all the rights that the lender possessed, including the right to exercise the power of sale. Therefore, under Rhode Island law, an agent of a lender may initiate and complete foreclosure."[161]

211.    In its Memorandum Opinion, the U.S. District Court for Virginia granted plaintiff's motion for partial summary judgment against the defendants. It stated that, "**[b]y attempting to collect payments from Plaintiff on behalf of Wells Fargo, Ocwen acted as Wells Fargo's agent** …[and] the undisputed facts in this case demonstrate that Ocwen continued to behave in all respects towards Plaintiff **as Wells Fargo's agent** after the March 18, 2011 settlement agreement…"[162]

212.    The Court also stated that even though the defendants argued that Wells Fargo shouldn't be held liable for Ocwen's violations, "**Ocwen's actions at the center of this case constituted collection efforts** in connection with the **same mortgage loan debt for which Ocwen had been assigned to service**…[t]hus…**Ocwen continued to act as Wells Fargo's agent** . . . .[163]

## XI.    FALSE CLAIMS ACT

213.    This is an action alleging violations of the FCA, 31 U.S.C. §§ 3729-32 and seeking damages, civil penalties and other statutory relief on behalf of the United States and the Relators as a result of Ocwen's false records, statements, and claims.

---

[161] *252 Wolfrock Rd. Realty Redemption Co. v. Wells Fargo Bank N.A.*, No. 16-126M, 2016 U.S. Dist. LEXIS 91191, at *3-4 (D.R.I. July 11, 2016).
[162] *Yarney v. Ocwen Loan Servicing, LLC*, 929 F. Supp. 2d 569, 580 (W.D. Va. 2013).
[163] *Id.* at footnote 11.

214.    The FCA generally provides, *inter alia*, that any person who (i) knowingly presents or causes to be presented to the United States for payment or approval a false or fraudulent claim, (ii) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim, and (iii) is liable to the Government for a civil penalty of not less than $10,957 and not more than $21,563 (amounts adjusted pursuant to FCA) for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim. Additionally, and alternatively, the Ocwen Defendants as well as the Trust Defendants, respectively, through the Trustee Defendants, are liable for overpay obligations for failure to repay all funds they have received because of Ocwen's unlawful servicing conduct complained of above. **31 U.S.C. §§ 3729(a)(1)(G)** . . . (2) knowingly conceals or knowingly and improperly avoids **or** (3) decreases an obligation to pay or transmit money or property to the Government. In addition, the Ocwen Defendants are liable from and after February 17, 2017, through the present for damages and relief due under the False Claims Act. The Trust Defendants/Principals, through the Trustee Defendants. are **vicariously liable** for damages and relief due under the False Claims Act to the United States and arising from Ocwen's wrongful conduct from and after 2009 while Ocwen was engaged as a servicing agent for such Principals, respectively.

215.    The FCA allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for himself and for the United States Government and to share in any statutory recovery as authorized by 31 U.S.C. § 3730(d). Relators claim entitlement to a fair and reasonable statutory portion of any recovery obtained by the United States as they are to the best of their knowledge, the **first to file** and are (to the extent OLS proffers

any qualifying public disclosures) **original sources**, as defined by the FCA, for the information on which the allegations or transactions herein are based.

216.    Based on these provisions, Relators, on behalf of the United States, seek through this action to recover damages, civil penalties and other statutory costs and fees available from the Ocwen Defendants, as appropriate, and from the Trust Defendants (through the Trustee Defendants), because of Ocwen's submission of false and/or fraudulent claims for approval and/or payment and Ocwen's use of false records or statements that would be material to a decision of the United States to pay OLS's requests for payment. The United States has suffered significant actual damages as a result of Ocwen's false and fraudulent claims and its use of false records or statements material to false or fraudulent claims. The Ocwen Defendants are liable, as appropriate, and the Trust Defendants/Principals (through the Trustee Defendants) are **vicariously liable** for damages and relief due under the False Claims Act to the United States and based upon Ocwen's wrongful conduct while engaged as a servicing agent for its Principals, respectively.

217.    As required under the FCA, Relators have provided the Attorney General of the United States and the United States Attorney for the Eastern District of Texas a disclosure statement of material evidence and information related to and supporting the allegations in this Complaint before the filing of the Complaint.

218.    OFC falsely certified/represented in its original, standard form SPA on or around April 16, 2009, **Exhibit 2** at p. 1, that it was in full compliance with all relevant laws, including but not limited to TILA, at the time of its execution of the SPA and Financial Instruments. OLS *falsely certified, again*, on or about September 9, 2010, and annually thereafter, that they were in

full compliance with all relevant laws, including but not limited to TILA, at the time of their execution of the Amended and Restated Commitment to Purchase Financial Instrument and SPAs. **Exhibit 2**, Ocwen *SPA*. By these individual materially false certifications and false statements, OFC **fraudulently induced** the United States, through its Financial Agent Fannie Mae, to enter the SPA Agreement and to purchase the Financial Instrument. OLS made false Subsequent Certifications of Compliance to the United States **annually**, on or about June 1, 2010, June 1, 2011, June 1, 2012, and June 1, 2013 in the form set forth in the SPA, that it had [past] and would [future] comply with all relevant laws, including but not limited to TILA and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices, when it had not done so. OLS has, among other violations, knowingly failed to provide required TILA/Reg. Z notices of right of rescission to borrowers for the secured additional advances, both in and out of the HAMP program, and failed to comply with the state laws set forth above. The Ocwen Defendants are liable, as appropriate, and the Trust Defendants/Principals (through the Trustee Defendants) are **vicariously liable** for damages and relief due under the False Claims Act to the United States and based upon Ocwen's wrongful conduct while engaged as a servicing agent for its Principals, respectively.

219.    OLS also **falsely certified/represented** to the FHA that it was in compliance with all FHA and HUD regulations, with actual knowledge, reckless disregard, or deliberate ignorance of the falsity of the representations. By these individual materially false certifications and false statements, OLS fraudulently induced the United States to authorize insurance claim payments from the FHA insurance fund, based upon the belief that OLS's certifications/representations of

compliance with all FHA and HUD regulations were true when they were, in fact, false. The Ocwen Defendants are liable, as appropriate, and the Trust Defendants/Principals (through the Trustee Defendants) are **vicariously liable** for damages and relief due under the False Claims Act to the United States and based upon Ocwen's wrongful conduct as a servicing agent for its Principals, respectively.

220.     In addition to the HAMP incentive payments which were unlawfully obtained by Ocwen as a result of (1) its fraudulent inducement and (2) its material false, certifications, statements and records made, used or caused to be made or used material to OFC and OLS' false claims submitted to the United States, the Government is entitled to recover under the FCA similar relief for the FHA and VA insurance payments unlawfully requested by OLS and obtained as a result of Ocwen's **fraudulent inducement** and **fraudulent certifications and statements**. Similarly, OFC and OLS violated the FCA by making false certifications and statements that it "in compliance with all applicable Federal, state and local laws, regulations . . . requirements . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," such false statements were made with actual knowledge, reckless disregard or deliberate ignorance of their truth or falsity, which was material to the payment decisions of the United States and material to the decision of the United States to pay FHA and VA insurance payments requested by OLS.

## XII.   CAUSES OF ACTION

### A.      First Cause of Action -False Claims 31 U.S.C. § 3729(a)(1)(A)

221.    Relators incorporate here the allegations in all the previous paragraphs. As set forth in the preceding paragraphs, OFC and OLS, as agents of BONY, Wells, U.S. Bank, and Deutsche, acting within the scope of their agency and with actual or apparent authority with their position as agents facilitating their fraud, have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. 3729(a)(1)(A). The Ocwen Defendants are liable, as appropriate, and the Trust Defendants/Principals (through the Trustee Defendants, are **vicariously liable** for damages and relief due under the False Claims Act to the United States and arising from Ocwen's wrongful conduct while engaged as a servicing agent for its Principals, respectively.

### B.      Second Cause of Action-False Claims Arising from Implied False Certifications 31 U.S.C. § 3729(a)(1)(A)

222.    Relators incorporate here the allegations in all the previous paragraphs. As set forth in the preceding paragraphs, OFC and OLS, as agents of BONY, Wells, U.S. Bank, and Deutsche, acting within the scope of their agency and with actual or apparent authority with their position as agents facilitating their fraud, knowingly, falsely, impliedly certified compliance with applicable laws and regulations by submitting claims for payment to the U.S. Compliance with the applicable laws and regulations was material to the United States and an express condition of payment. As such, Ocwen's **implied false certifications** rendered each claim for payment a false of fraudulent claim in violation of 31 U.S.C. 3729(a)(1)(A). The Ocwen Defendants are liable, as appropriate, and the Trust Defendants/Principals (through the Trustee Defendants) are **vicariously liable** for

damages, **payable from the Trusts' assets**, and relief due under the False Claims Act to the United States and arising from Ocwen's wrongful conduct while engaged as a servicing agent for its Principals respectively,.

     **C.**     **Third Cause of Action - False Statements or Records 31 U.S.C. § 3729(a)(1)(B)**

     223.     Relators incorporate here the allegations in all the previous paragraphs. As set forth in the preceding paragraphs, OFC and OLS, as agents of BONY, Wells, Deutsche and U.S. Bank, acting within the scope of their agency and with actual or apparent authority with their position as agents facilitating their fraud, have knowingly made, used or caused to be made or used a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B). The Ocwen Defendants are liable, as appropriate, and the Trust Defendants/Principals (through the Trustee Defendants) are **vicariously liable** for damages and relief due under the False Claims Act to the United States and arising from Ocwen's wrongful conduct while engaged as a servicing agent for its Principals, respectively.

     **D.**     **Fourth Cause of Action -- False Claims by Fraudulent Inducement 31 U.S.C. § 3729(a)(1)(A)**

     224.     Relators incorporate here the allegations in all the previous paragraphs. As set forth in the preceding paragraphs, OFC and OLS, as agents of BONY, Wells, Deutsche and U.S. Bank, acting within the scope of their agency and with actual or apparent authority with their position as agents facilitating their fraud, have knowingly made, used or caused to be made or used a false record or statement material to a false or fraudulent claim in violation of **31 U.S.C. § 3729(a)(1)(B).** The Ocwen Defendants are liable, as appropriate and the Trust Defendants/Principals (through the Trustee Defendants) are **vicariously liable** for damages and

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                         119

relief due under the False Claims Act to the United States and arising from Ocwen's wrongful conduct while engaged as a servicing agent for its Principals, respectively.

225.     These false statements and certifications were knowingly made in the Ocwen SPA and Amended and Restated SPA to **<u>fraudulently induce</u>** the U.S. to enter the Ocwen SPA and Amended and Restated SPA;, to induce the U.S. (1) to purchase Ocwen's Financial Instrument and (2) to induce the United States to pay FHA and VA insurance payments. These false statements and certifications were, **likewise**, knowingly made in the **annual certifications** subsequent to the Ocwen SPA and Amended and Restated SPA to **fraudulently induce** the U.S. to extend the SPA and Amended and Restated SPA and continue to make purchase payments under Ocwen's Financial Instrument and to pay FHA and VA insurance payments. These instances of **fraudulent inducement** rendered every request for payment thereafter made by Ocwen under the **fraudulently induced** SPA, the Amended and Restated SPA and the Annual Certifications a false claim for payment. The Ocwen Defendants are liable, as appropriate, and the Trust Defendants/Principals, respectively, (through the Trustee Defendants) are **vicariously liable** for damages incurred by the Government and the associated relief due under the False Claims Act to the United States arising from Ocwen's wrongful conduct while engaged as their servicing agent.

226.     Moreover, and subject to additional damages theories and methodologies, as the benefit to the United States was **intangible**, the best estimate of the damages is the amounts paid to OFC and OLS for distribution to themselves and Trustee Defendants for the benefit of the Trust Defendants, under the HAMP agreements (SPAs and Financial Instruments). Traditional damages

models do not apply in the Fifth Circuit where FCA damages flow from Government contracts providing the U.S. only **intangible benefits**.

### E.  Fifth Cause of Action -- False Record, Statement, Concealment, Avoidance or Decreasing Obligation to Pay the United States 31 U.S.C. § 3729(a)(1)(G)

227.    Relators incorporate here the allegations in all the previous paragraphs. As set forth in the preceding paragraphs, OFC and OLS, as agents of BONY, Wells, Deutsche and U.S. Bank, acting within the scope of their agency and with actual or apparent authority with their position as agents facilitating their fraud, have knowingly made or used or caused to be made or used a false record or statement an obligation to pay or transmit money or property to the Government, and knowingly concealed or knowingly and improperly avoided or decreased obligations to pay or transmit money or property to the Government in violation of **31 U.S.C. § 3729(a)(1)(G).**

228.    The  Ocwen  Defendants  are  liable,  as  appropriate  and  the  Trust Defendants/Principals, respectively, (through the Trustee Defendants) are **vicariously liable** for damages and relief due under the False Claims Act to the United States and arising from Ocwen's wrongful conduct while engaged as a servicing agent for its Principals, respectively.

## XIII.  PRAYER AND REQUEST FOR RELIEF

229.    On behalf of the United States, Relators seek to recover all relief available under the FCA. Relators seeks on behalf of the United States and Relators, monetary damages equal to three (3) times the damages suffered by the United States, including all payments made by the United States as a result of Ocwen's **fraudulent inducement** of the SPA and Amended and Restated SPA and Annual Certifications. In addition, Relators seek to recover all mandatory civil penalties and other relief on behalf of the United States Government and the Relators in accordance

with the FCA. The Ocwen Defendants are liable, as appropriate and the Trust Defendants (through the Trustee Defendants), respectively, are **vicariously liable** for damages and relief due under the False Claims Act to the United States and arising from Ocwen's wrongful conduct while engaged as a servicing agent for its Principals, respectively.

230.     Relators should, for their contribution to the Government's investigation and recovery, be awarded a fair and reasonable Relators' share pursuant to the FCA, 31 U.S.C. § 3730(d). Relators also seek to be awarded all reasonable statutory attorneys' fees, expenses, court costs and any available pre-judgment or post-judgment interest at the highest rate allowed by law.

WHEREFORE, premises considered, Relators pray that this District Court enter judgment on behalf of the United States and against the Ocwen Defendants, as appropriate, all of the Defendant Trusts, by and through the Defendant Trustees, respectively, for damages arising from Ocwen's violations of the False Claims Act for the following:

a.     damages in the amount of three (3) times the FCA damages suffered by the United States, **including** all payments made by the United States as a result of (1) Ocwen's **"promisory frauds"** or **fraudulent inducements of the SPA and Amended and Restated SPA; (2) the "promissory frauds"** or **fraudulent inducements** for each false and fraudulent HAMP Annual Certification executed thereafter **,** and (3) the United States' cumulative payments for **intangibles** under of the SPA and Amended and Restated SPA, and all statutory penalties arising from the unlawful conduct of Ocwen, which violated the FCA;

b.     a Relators' Share from the recoveries in an amount in the statutory range which is fair and reasonable under the circumstances;

c.       Relators' statutory attorneys' fees, expenses, and costs of court;

d.       pre-judgment and post-judgment interest, at the highest rate allowed by law; and

e.       all other relief to which Relators and/or the United States may be justly entitled, whether at law or inequity, and which the District Court deems just and proper.

Dated: July 15, 2019

UNITED STATES OF AMERICA, *ex rel.* Jean-Marc Eichner and Brandon Loyd

Respectfully submitted:

By: _/s/ Samuel L. Boyd_____
Samuel L. Boyd
Texas SBN: 02777500
sboyd@boydfirm.com
Catherine C. Jobe
Texas SBN: 10668280
cjobe@boydfirm.com
BOYD & ASSOCIATES
6440 North Central Expressway, Suite 600
Dallas, Texas 75206-4101
Tel (214) 696-2300
Fax (214) 363-6856


By: _/s/ Jeff Bragalone_____
Jeff Bragalone
Texas SBN: 02855775
jbragalone@bcpc-law.comPatrick Conroy
pconroy@bcpc-law.com
Bragalone Conroy, P.C.
2200 Ross Ave., Suite 4500W
Chase Tower
Dallas, TX 75201-7924
Main: 214-785-6670
Direct: 214-785-6671

***Counsel for Qui Tam Plaintiffs/Relators***

By:  /s/ *Roger D. Sanders*
Roger D. Sanders
TX SBN 17604700
rsanders@somlaw.net
J. Michael Young
TX SBN 00786465
myoung@somlaw.com
Sanders, Motley Young, & Gallardo, PLLC
III South Travis
Sherman, TX 75090
(903) 892-9133 (Tel.)
(903 892-4300 (Fax)

*Local Counsel for Qui Tam Plaintiffs/Relators*

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                     124

## CERTIFICATE OF SERVICE AND DISCLOSURE

The undersigned certifies that the forgoing Complaint was filed in accordance with the Local Rules of the United States District Court for the Eastern District of Texas and the Federal Rules of Civil procedure.

Relator MBL served a Disclosure Statement and substantially all information he possessed on June 14, 2016 and Supplemental Disclosure Statement on February 23, 2017 to John Black, Trial Counsel, Department of Justice, Washington, DC and Assistant U.S. Attorneys Josh M. Russ and James Gillingham for the Eastern District of Texas, Sherman Division.

Further disclosure of substantially all information possessed by Relator MBL was done on or before February 21, 2017 to the DOJ and AUSAs and a teleconference among counsel for Relator and the DOJ attorneys and the AUSAs was conducted on February 28, 2017.

Relator MBL served a Supplemental Disclosure Statement on January 23, 2019 to James Gillingham, AUSA for the United States District Court for the Eastern District of Texas, Sherman Division.

Disclosure of this proposed Complaint and substantially all information possessed by Relators J-ME and MBL was done on February 1, 2019, and again on April 22, 2019. On July 13, 2019, disclosure including the proposed complaint was made upon Assistant U.S. Attorney James Gillingham. On July 14, 2019, disclosure of the proposed amended complaint was made on Kelly Phipps, Trial Attorney with the U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Fraud Section, and further disclosure and service pursuant to Rule 4 and False Claims Act was made on July 15, 2019 to the DOJ and AUSAs.

_/s/ *Samuel L. Boyd*_____
Samuel L. Boyd

Relators' Complaint Pursuant to 31 U.S.C §§ 3729-3732
(Federal False Claims Act)                                                         125