**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. JEAN-MARC EICHNER and BRANDON LOYD and JEAN-MARC EICHNER AND BRANDON LOYD, Individually, <br><br>     Relators, <br><br> v. <br><br> OCWEN LOAN SERVICING, LLC, ET AL., <br><br>     Defendants. | **PUBLIC VERSION** <br><br> Civil Action No. 4:19-cv-00524-ALM <br><br> **JURY TRIAL DEMANDED** |

**RELATORS' RESPONSE IN OPPOSITION TO OCWEN'S MOTION FOR SUMMARY
JUDGMENT BASED ON THE FALSE CLAIMS ACT'S ALLEGED FAILURE TO
<u>CONFER DISCRETIONARY AUTHORITY ON RELATORS</u>**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 1

II. COUNTER-STATEMENT OF THE ISSUE.......................................................... 2

III. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ......................... 2

IV. ARGUMENTS AND AUTHORITIES..................................................................... 6

    A.   FIFTH CIRCUIT PRECEDENT IS DISPOSITIVE OF OCWEN'S MOTION FOR SUMMARY JUDGMENT. ....................................................................................................... 6

    B.   THE *QUI TAM* PROVISIONS OF THE FCA ARE CONSTITUTIONAL UNDER ARTICLE II. ........... 8

    C.   OCWEN'S CASES ARE DISTINGUISHABLE........................................................... 12

    D.   DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT......................... 14

V. CONCLUSION................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*Big Red Freight Sys., Inc. v. Laney,*
No. 4:19-CV-00846-RWS, 2020 WL 10316657 (E.D. Tex. Feb. 18, 2020) .............................. *9*

*CFPB v. Ocwen,*
No. 9:17-CV-80495, 2019 WL 1119788 (S.D. Fla. Mar. 12, 2019) ........................................ 15

*Giesewein v. Salmonson,*
No.5:22-cv-92-RWS-JBB, 2024 WL 3648231 (E.D. Tex. Feb. 12, 2024) ................................ 1

*Heckler v. Chaney,*
470 U.S. 821 (1985) ............................................................................................................. 11

*In re Bonvillian Marine Serv., Inc.,*
19 F.4th 787 (5th Cir. 2021) .................................................................................................. 1

*Morrison v. Olson,*
487 U.S. 654, 696 (1988) ..................................................................................................... 11

*National Horsemen's Benevolent & Protective Association v. Black,*
107 F.4th 415 (5th Cir. 2024) ................................................................................................. 7

*Proctor v. Wound Care Mgmt., LLC,*
No. 18-4234, 2025 WL 2444133 (E.D. La. Aug. 25, 2025) ....................................................... 7

*Riley v. St. Luke's Episcopal Hospital,*
252 F.3d 749 (5th Cir. 2001) ...................................................................................... 1, 7, 9, 10

*Texas v. Black,*
No. 24-465, 145 S. Ct. 2835 (2025) ......................................................................................... 7

*United States ex rel. Adams v. Chattanooga Hamilton Cnty. Hosp. Auth.,*
No. 1:21-cv-84, 2024 WL 4784372 (E.D. Tenn. Nov. 7, 2024) .................................................. 8

*United States ex rel. Fallon v. Bell Transit Corp.,*
No. 16:-cv-06994-PJH, 2021 WL 965379 (N.D. Cal. Mar. 15, 2021) ...................................... 13

*United States ex rel. Gomez v. Koman Constr., LLC,*
--- F. Supp. 3d ----, 2025 WL 2437197 (W.D. Tex. Aug. 22, 2025) ......................................... 8

*United States ex rel. Hughes v. Cook,*
498 F. Supp. 784 (S.D. Miss. 1980) ........................................................................................ 13

*United States ex rel. Jehl v. GGNSC Southaven, LLC,*
No. 3:19-cv-091-NBB-JMV, 2022 WL 983644 (N.D. Miss. Mar. 30, 2022) ............................ 13

*United States ex rel. Kelly v. Boeing Co.,*
9 F.3d 743 (9th Cir. 1993) ................................................................................................ 8

*United States ex rel. Polansky v. Exec. Health Res., Inc.,*
599 U.S. 419 (2023) ........................................................................................................ 10

*United States ex rel. Shahbabian v. TriHealth, Inc.,*
No. 1:20-cv-67, 2025 WL 2108197 (S.D. Ohio July 28, 2025) .................................... 9

*United States ex rel. Siewick v. Jamieson Science & Engineering, Inc.,*
214 F.3d 1372 (D.C. Cir. 2000) ..................................................................................... 12

*United States ex rel. Stone v. Rockwell Int'l Corp.,*
282 F.3d 787 (10th Cir. 2002) ......................................................................................... 8

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.,*
41 F.3d 1032 (6th Cir. 1994) ........................................................................................... 8

*United States ex rel. Taylor v. Healthcare Assoc. of Tex., LLC,*
No. 3:19-CV-02486-N, 2025 WL 1885642 (N.D. Tex. July 8, 2025) ............................ 8

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
125 F.3d 899 (5th Cir. 1997) ......................................................................................... 12

*United States ex rel. Zafirov v. Florida Medical Associates, LLC,*
751 F. Supp. 3d 1293 (M.D. Fla. 2024) .......................................................................... 8

*United States v. Texas,*
599 U.S. 670 (2023) ........................................................................................................ 11

*Universal Health Services, Inc. v. United States ex rel. Escobar,*
579 U.S. 176 (2016) ........................................................................................................ 13

*Vermont Agency of Nat. Res. v. Stevens,*
529 U.S. 765 (2000) .......................................................................................................... 9

**Statutes**

31 U.S.C. § 3730(a) ............................................................................................................. 10

31 U.S.C. § 3730(b) ............................................................................................................. 10

31 U.S.C. § 3730(c) ....................................................................................................... 10, 11

**Rules**

Federal Rule of Civil Procedure 41(a)(2) ............................................................................ 10

## I.  INTRODUCTION

Following in the misguided footsteps of the Trust Defendants, Ocwen seeks dismissal of this lawsuit, alleging that the *qui tam* provisions of the False Claims Act ("FCA") violate Article II of the Constitution. But this issue was decided long ago by the Fifth Circuit in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001) (en banc), which held that the FCA's *qui tam* provisions do not violate Article II. Remarkably, Ocwen does not even address *Riley* in its brief, let alone explain why *Riley* does not control.[1] Even if it had, it is clear that the Court is bound by *Riley* and that it is not free to deviate from that precedent. *See* Dkt. 241 at 1–2 (citing, *e.g.*, *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 789–90 (5th Cir. 2021); *Giesewein v. Salmonson*, No. 5:22-cv-92-RWS-JBB, 2024 WL 3648231, at *3 (E.D. Tex. Feb. 12, 2024), *adopted by* 2024 WL 3647641 (E.D. Tex. Aug. 2, 2024)).

Even if the Court were not bound by *Riley*, it should nevertheless reject Ocwen's arguments for the reasons articulated in Relators' opposition to the Trust Defendants' Motion for Judgment on the Pleadings and the related briefing. *See generally* Dkts. 234, 241. Ocwen's arguments ignore (1) the substantial weight of authority, (2) the history underlying the FCA, and (3) the unique features of the FCA that make it distinguishable from other statutes that have run afoul of Article II.

With respect to the Take Care Clause, in particular, Ocwen's argument focuses on the alleged inaction by the Treasury with respect to Ocwen as a basis for claiming that this lawsuit interferes with the Executive's authority to decide whether and when to exercise its discretion to bring suit. While Relators dispute many of the alleged "undisputed" facts underlying Ocwen's argument, the government nevertheless retains significant control over FCA cases pursued by *qui*

---

[1] Because Ocwen did not address this obvious issue in its opening brief, it should be precluded from making the argument for the first time in reply.

*tam* relators, even when it decides not to intervene, which makes the *qui tam* provisions of the FCA constitutional under Article II. *See* Dkt. 234 at 25–27; Dkt. 237 at 8–13; *see also* Dkt. 179 at 2 (stating that a *qui tam* relator's "right to conduct the action is always subject to the Government's rights"). Accordingly, the Court should deny Ocwen's motion for summary judgment.

## II.    COUNTER-STATEMENT OF THE ISSUE

1.    Should the Court ignore the Fifth Circuit's *en banc* decision in *Riley* and hold that the *qui tam* provisions of the FCA violate the Appointments Clause and the Take Care Clause of Article II of the Constitution, when those provisions were enacted in 1863, have been invoked in thousands of cases, and have been repeatedly upheld by other federal courts, and there are significant disputes of material fact regarding what the government knew about Ocwen's misconduct? **Answer: No.**

## III.    RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

Relators provide the following responses to Ocwen's statement of purportedly "undisputed" material facts ("RSOUMF").

1.    As a servicer and administrator of mortgages, Ocwen also acted as an agent of investors (the Trusts). *See* Ex. V (Pawlowski Expert Report, June 30, 2025) at 86–111;[2] *see also, e.g.*, Ex. W (Eichner-USB-000015480) at 64 ("For and on behalf of the Certificateholders … the Servicer shall service and administer the Mortgage Loans ….").

2.    Relators allege that Ocwen falsely certified, on an annual basis after February 17, 2017, that it was "in material compliance with" and "that all Services have been materially performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements," including, for example, the Real Estate

---

[2] Exhibits are attached to the Declaration of Mark. M.R. Douglass submitted herewith.

Settlement Procedures Act. *See, e.g.*, Dkt. 268 (Second Amended Complaint) ¶¶ 40-45, 140–48; Dkt. 271-2, Ex. B, Amended SPA, Financial Instrument § 5(b). Relators also allege that Ocwen made false certifications to the FHA on an annual basis that it was in compliance with all FHA regulations necessary to maintain HUD-FHA approval. *See* Dkt. 268 ¶¶ 69–73. Ocwen's servicing practices failed to comply with the laws, rules, regulations, and guidelines applicable to servicing HAMP and FHA-HAMP loans. *See, e.g.*, Ex. V at 13–22, 62–85, 113–19 (Pawlowski Report, June 30, 2025); Exs. A–N (RWG Closure reports cited in Mr. Pawlowski's June 30, 2025 Report).

3.      The Amended SPA specifically reserved the Government's right to withhold, deduct, or demand back incentives from servicers. *See* Dkt. 271-2, Ex. B, Amended SPA §§ 4.H, 6.B(1)– (2).

4.      The Amended SPA included other remedies to address "false, misleading or incomplete" certifications, such as "reduc[ing] the amounts payable to Servicer under Section 4." *See id.*, Ex. B, Amended SPA § 6.B(2). These other remedies were not limited to the services that were impacted by the event of default. *See id.* While Fannie Mae had discretion to "take any, all, or none" of the listed remedies in response to discovering an event of default, the Amended SPA stated that the "[f]ailure on the part of Fannie Mae to insist upon strict compliance with any of the terms hereof shall not be deemed a waiver …. No failure by Fannie Mae to exercise any right, remedy, or power hereunder will operate as a waiver thereof." *See id.*, Ex. B, Amended SPA § 11.D. By withholding critical information related to its extensive noncompliance, Ocwen prevented Fannie Mae from knowing about Ocwen's default, such that Fannie Mae was unable to pursue any remedies under the Amended SPA. *See* Ex. V at 13.

5.      In the event of default, Fannie Mae had the ability to reduce servicer payments and

obtain repayment of prior payments made to servicers under the SPA. *See* Dkt. 271-2, Ex. B, Amended SPA § 6.B. In addition, Fannie Mae had remedies against investors. *See id.*, Ex. B, Amended SPA §§ 6.C–D. In the event an investor "commits a grossly negligent, willful, intentional, or reckless act (including, but not limited to, misrepresentation or fraud) in connection with any of the Programs," Fannie Mae may "(i) reduce the amounts payable to Servicer for the credit, or account of, the [investor] under Section 4; and/or (ii) obtain repayment of prior repayments made to or for the credit or account of the [investor]." *See id.*, Ex. B, Amended SPA §§ 6.C–D(2). The Trust Defendants were



*See* Ex. V at 86–111; Ex. S (                    ), Ex. T (Deposition of Wells Fargo, February 19, 2025) at 155:25–166:8 (                    ). The Trust Defendants'                    *See* Ex. V at 111.

10.   Treasury did not have extensive, actual knowledge of Ocwen's failure to comply with the laws, rules, regulations, and guidelines applicable to mortgage servicing after February 17, 2017. For example, Treasury did not have knowledge of Ocwen's improper practice of withdrawing and resubmitting borrower complaints, which was discovered by Jean-Marc Eichner, or many of the issues discussed in the Remediation Working Group ("RWG") Closure Reports. *See, e.g.*, Ex. V at 13–22 (                    ), 76–81 (                    ); *see also, e.g.*, Exs. A–

N; Declaration of Jean-Marc Eichner (June 24, 2022) ¶¶ 9–11, 22, 25–28, 31–32; Dkts. 207-14–207-47; Ex. V at 13–22, 62–85. Ocwen intentionally attempted to conceal its non-compliance from government regulators by instructing its employees to discuss violations only in the context of RWG meetings, ███████████████████████████████████████████

███████████████████████████████████████. *See* Ex. U at 92:19–94:24, 221:2–224:9. *Compare* Ex. E (July 2018 RWG Report) at 22–23, *with* Ex. O (2017 SPA Certification) at App'x A. *Compare* Ex. B (January 2018 RWG Report) at 24, 28, 49, *with* Ex. P (2018 SPA Certification) at App'x A.[3] *Compare* Ex. C (February 2019 RWG Report) at 5, *with* Ex. Q (2019 SPA Certification) at App'x A.[4] Indeed Ocwen ███████████

██████████████████████████████████. *See* Ex. V at 13–14. *Compare* Dkt. 207-6, *with* Dkt. 207-7. Further, SIGTARP specifically noted in its quarterly report to Congress that Treasury was ***unaware of the full scope of violations*** by servicers and the immense harm caused by servicers' non-compliance. *See* Dkt. 271-9 at 66 ("However, Treasury's compliance group only looks on a small sample basis of 150 homeowner files per quarter, and does not know the full extent of the problem.") (emphasis added).

11. Admitted.

12. Relators dispute that "SIGTARP issued no adverse findings against Ocwen." SIGTARP specifically stated that "Ocwen is the largest recipient of federal TARP dollars, but also has one of the worst track records in foreclosure mitigation, including HAMP," and made a recommendation that Treasury "permanently withhold TARP dollars related to the time period

---

[3] In fact, Ocwen █████████████████████████████. *See* Ex. P at App'x A–D.

[4] Ocwen █████████████████████████████

██████████████████████████. *See* Ex. M.



that servicers failed to perform at an acceptable level."[5] *See* Dkt. 271-9 at 65, 67–68.



12 (repeated). Treasury's ███████████████████████

███████████████████████████████████████████

███████. *See id.* at 66; Ex. V at 13–22. Relators have ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███. *See, e.g.,* Declaration of Jean-Marc Eichner (January 22, 2025) ¶ 7; Ex. V at 13–22, 62–85. *Compare* Dkt. 207-6, *with* Dkt. 207-7. *Compare* Dkt. 207-8, *with* Dkt. 207-9. Indeed,

Treasury ███████████████████████████████████

███████████████████████████████████████████

███████. *See* Dkt. 271-2 ¶ 26; Dkt. 271-9 at 66.

## IV.    ARGUMENTS AND AUTHORITIES

### A.  Fifth Circuit Precedent Is Dispositive of Ocwen's Motion for Summary Judgment.

Ocwen's challenge to the constitutionality of the FCA's *qui tam* provisions was definitively resolved by *Riley. See* 252 F.3d at 757–58 ("[T]he qui tam portions of the FCA do not violate the constitutional doctrine of separation of powers by impinging upon the Executive's constitutional duty to take care that the laws are faithfully executed under Article II of the Constitution. … [W]e are persuaded that the FCA's qui tam provisions do not violate the Appointments Clause."). Ocwen does not address *Riley,* much less explain why it does not control in this case. *See generally*

---

[5] SIGTARP's statement that Ocwen "has one of the worst track records in foreclosure mitigations" shows the unmistakable motive for Ocwen to attempt to cover-up as many servicing violations as possible from the government due to its ongoing and significant regulatory scrutiny particularly due to its potential to lose hundreds of millions of dollars should the government become aware of the totality of Ocwen's noncompliance. *See* Dkt 271-9 at 67; *see also* Dkt 297-3 at 13 ██████

██████████████████████████

Dkt. 271. Even if Ocwen argues (like the Trust Defendants) that *Riley* has been implicitly overruled by later Supreme Court precedent, the Court is bound to follow *Riley* with respect to these questions and should not deviate from *Riley's* ruling. *See Bonvillian*, 19 F.4th at 789–90 ("The district court was not free to overturn the rule we announced in *Eckstein*. … The district court here correctly found itself bound by the rule we set forth in *Eckstein* and restated in *RLB Contracting* …."); *see also* Dkt. 241 at 1–3.

If there were any doubt about whether the Court should follow *Riley*, it should be resolved by the Fifth Circuit's recent decisions in *Montcrief*, where both the panel majority and the concurrence acknowledged that the appellant's challenge was foreclosed by *Riley*, and *National Horsemen's Benevolent & Protective Association v. Black*, 107 F.4th 415 (5th Cir. 2024), *vacated on other grounds by Texas v. Black*, No. 24-465, 145 S. Ct. 2835 (2025), where the Fifth Circuit cited *Riley* favorably in analyzing a different law. *See Montcrief*, 133 F.4th at 403 n.3 (declining to consider the constitutionality of the FCA's qui tam provisions under Article II because the issue is "foreclosed at this juncture by our decision in *Riley*"), 410 (Duncan, J., concurring) (recognizing that *Riley* "prevents us from addressing" the constitutionality of the FCA's *qui tam* provisions under Article II); *Black*, 107 F.4th at 434 n.19. The Fifth Circuit's holding in *Montcrief* that *Riley* forecloses any challenge to the constitutionality of the FCA's *qui tam* provisions under Article II is itself subject to the rule of orderliness and should be followed by the Court.

Indeed, multiple courts in this Circuit have rejected recent challenges to the FCA's *qui tam* provisions under Article II in light of existing Fifth Circuit precedent. *See Proctor v. Wound Care Mgmt., LLC*, No. 18-4234, 2025 WL 2444133, at *2–3 (E.D. La. Aug. 25, 2025) (rejecting challenge to FCA's *qui tam* provisions under the Appointments Clause, Take Care Clause, and Vesting Clause in light of *Riley*); *United States ex rel. Gomez v. Koman Constr., LLC*, --- F. Supp.

7

3d ----, 2025 WL 2437197, at *21–22 (W.D. Tex. Aug. 22, 2025) (rejecting challenge to FCA's *qui tam* provisions under the Appointments Clause in light of *Riley*, *Bonvillian*, and *Montcrief*); *United States ex rel. Taylor v. Healthcare Assoc. of Tex., LLC*, No. 3:19-CV-02486-N, 2025 WL 1885642, at *6 (N.D. Tex. July 8, 2025) ("HCAT now also reasserts the argument that the FCA's qui tam provisions are unconstitutional. The Court views that these arguments are foreclosed by binding Fifth Circuit precedent.") (citations omitted).

**B.  The *Qui Tam* Provisions of the FCA Are Constitutional Under Article II.**

As thoroughly explained in Relators' opposition to the Trust Defendants' motion for judgment on the pleadings, the Fifth Circuit's holding in *Riley* that the *qui tam* provisions of the FCA are constitutional under Article II is supported by the great weight of authority. *See, e.g.*, *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804–07 (10th Cir. 2002); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749–59 (9th Cir. 1993). Although one district court in the Middle District of Florida ruled otherwise in *United States ex rel. Zafirov v. Florida Medical Associates, LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024), that decision has been widely criticized by other courts because it (like Ocwen)[6] "relies chiefly on selections of dissents, concurrences, and law review articles" and "whistles past precedent." *See United States ex rel. Adams v. Chattanooga Hamilton Cnty. Hosp. Auth.*, No. 1:21-cv-84, 2024 WL 4784372, at *2–3 (E.D. Tenn. Nov. 7, 2024); *see also* Dkt. 234 at 14–16 (citing numerous cases rejecting *Zafirov* and/or supporting the constitutionality of the FCA's *qui tam* provisions under Article II); Dkt. 241 at 7–8. Ocwen cites no new decision joining *Zafirov*,[7] and Relators are aware of none.

---

[6] *See* Dkt. 271 at 7 n.5.

[7] Even *United States ex rel. Shahbabian v. TriHealth, Inc.*, No. 1:20-cv-67, 2025 WL 2108197,

The constitutionality of the *qui tam* provisions under Article II is also supported by the history of the FCA. *See* Dkt. 234 at 16–19; Dkt. 241 at 8. The Founding Fathers and the First Congress enacted numerous statutes authorizing *qui tam* and informer actions, and others followed in subsequent years. *See* Dkt. 234 at 16–17 & nn.7–10; *see also Vermont Agency of Nat. Res. v. Stevens*, 529 U.S. 765, 777 & nn.5–7 (2000). But there is no evidence that a single Framer, early President, or a single member of the early Supreme Court ever questioned the constitutionality of these statutes under Article II. *See* Dkt. 234 at 17–18. Given this history, "it is logically inescapable that the same history that was conclusive on the Article III question in *Stevens* with respect to qui tam lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning this statute." *Riley*, 252 F.3d at 752.

Indeed, it appears that Ocwen has abandoned the argument that the FCA's *qui tam* provisions violate the Appointments Clause.[8] *See generally* Dkt. 271. Instead, it focuses its argument on the Take Care Clause. *See* Dkt. 271 at 6. But the fact that Congress has established an alternative mechanism of fraud enforcement via the FCA "does not [] mean that the Executive's functions to control such litigation are necessarily impinged." *See Riley*, 252 F.3d at 753. In fact, "the Executive retains significant control over litigation pursued under the FCA by a qui tam relator." *Id.* To initiate a *qui tam* action, a relator must file the complaint under seal, serve it on the

---

at *5–7 (S.D. Ohio July 28, 2025), refused to declare the *qui tam* provisions of the FCA unconstitutional under Article II. While that court certified the question for interlocutory appeal, Ocwen has not requested such relief in this case, likely because the Fifth Circuit in *Montcrief* rejected the notion that *Riley* is not controlling precedent.

[8] Except for a quotation in a parenthetical describing a different case, Ocwen does not mention the Appointments Clause in its motion for summary judgment. Such a passing reference fails to preserve the argument. *See Big Red Freight Sys., Inc. v. Laney*, No. 4:19-CV-00846-RWS, 2020 WL 10316657, at *6 n.2 (E.D. Tex. Feb. 18, 2020). Even if Ocwen had raised an Appointments Clause challenge, it would fail for the reasons explained in Relators' opposition to the Trust Defendants' motion for judgment on the pleadings. *See* Dkt. 234 at 20–25; Dkt. 241 at 8–10.

government, and then must wait for the government to investigate the relator's claims. 31 U.S.C. § 3730(b)(2). The relator makes no decision about whether the government should proceed with the action. On the contrary, the government has total control. It decides whether to interview the relator and witnesses, whether to seek documents and issue civil investigative demands, how long to investigate, and whether to intervene.

The government may intervene and proceed with the litigation, may decline to intervene and let the relator proceed with litigating the case, or it may intervene and dismiss. The relator has no choice in the matter. Even when the government declines to intervene, "there is little doubt that the Executive retains [significant] control" over the action. *Riley*, 252 F.3d at 753. The government has a number of control mechanisms. *See id.* It may veto settlements by the relator, may intervene after the seal period upon a showing of good cause, and may dismiss an action over the *qui tam* relator's objections simply by filing a notice of dismissal (before the defendant files an answer or summary-judgment motion) or by seeking an order of dismissal under the lenient standard of Rule 41(a)(2) after that date. *See id.*; *see also United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 437–38 (2023). Alternatively, the government may seek to intervene and assert additional claims in the case, bring a separate civil action under 31 U.S.C. § 3730(a) to assert additional claims, or elect to pursue different claims through any alternate remedy available to the government, including an administrative proceeding to determine a civil money penalty under 31 U.S.C. § 3730(c)(5).

The particular facts of this case do not change any of that. If the government agreed with Ocwen that Relators' post-February 17, 2017 claims against Defendants were meritless in light of the Treasury's prior investigations of Ocwen, failure to withhold incentives from Ocwen, or failure to terminate Ocwen's SPA, then the government had (and still has) the ability to dismiss this

lawsuit. Indeed, if the government determines that a *qui tam* relator's case lacks merit or otherwise burdens the government, it may seek to limit the *qui tam* relator's participation under 31 U.S.C. §§ 3730(c)(2)(C) and (c)(4). Or it may take a more drastic measure. It may seek to intervene and request dismissal of the case under *Polansky*. This power effectively allows the government to "remove" the *qui tam* relator for good cause, which is a critical factor under Supreme Court precedent. *See Morrison v. Olson*, 487 U.S. 654, 696 (1988) ("Most importantly, the Attorney General retains the power to remove the counsel for 'good cause,' a power that we have already concluded provides the Executive with substantial ability to ensure that the laws are 'faithfully executed' by an independent counsel.").

But tellingly, the government has ***not*** moved to dismiss Relators' post-February 17, 2017 claims against Defendants. It specifically moved to dismiss only Relators' *Fisher* period claims and has allowed Relators to proceed with their post-February 17, 2017 claims. Thus, the government — not Relators — has made the ultimate determination that this case should proceed despite the Treasury's prior actions (and inactions) with respect to Ocwen's participation in HAMP and FHA-HAMP.[9] Relators have not usurped any Executive authority by filing or continuing to litigate this case.

Moreover, the SPA specifically states that Ocwen could be subject to liability under the FCA if it provided false or misleading information to the Treasury (which it did). *See* Dkt. 271-2, Ex. B, Amended SPA, Financial Instrument § 5(f). It also states that any alleged failure to act by

---

[9] Ocwen's reliance on *United States v. Texas*, 599 U.S. 670, 678–79 (2023), is misplaced. That case involved a state's lawsuit challenging the Executive's policies related to immigration enforcement. It did not involve a challenge under the Take Care Clause. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), is also distinguishable. That case involved a private action to compel a government agency to take enforcement action. It does not stand for the proposition that a government agency's decision not to take enforcement action precludes the government from later allowing a relator to bring and prosecute an FCA claim.

Treasury cannot be seen as a waiver of the government's right to exercise a remedy under the Amended SPA. *See, e.g.*, Dkt. 271-2, Ex. B, Amended SPA §11.D. Thus, the SPA specifically contemplated FCA actions such as this one based on facts that Treasury did not understand at the time of the program. Accordingly, Relators are not undermining Treasury's prior actions; they are acting consistently with the terms of the SPA.

## C.  Ocwen's Cases Are Distinguishable.

Contrary to Ocwen's suggestion, *United States ex rel. Siewick v. Jamieson Science & Engineering, Inc.*, 214 F.3d 1372 (D.C. Cir. 2000), is distinguishable. It is also not binding on this Court, and, to the extent it suggests that the FCA's *qui tam* provisions are unconstitutional, it conflicts with *Riley*. In that case, the relator asserted two theories of liability based on the defendants' submission of vouchers pursuant to a government contract: (1) that the vouchers submitted by defendants made an implicit false certification that the defendants had not violated a criminal statute; and (2) that, because the defendants had allegedly violated the criminal statute, they knowingly misrepresented the validity of the contract by submitting the vouchers. *See id.* at 463–65. Importantly, unlike Ocwen's annual false certifications to Treasury, which certified that Ocwen was "in material compliance with" and "that all Services have been materially performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements," the vouchers in *Siewick* did ***not*** include any express certifications of compliance with any laws. *See id.*

Further, unlike the relator in *Siewick*, Relators do ***not*** argue that Ocwen's violations necessarily ***invalidated*** the SPA. *See id.* at 465. Instead, Relators argue that Ocwen made express and implied false certifications of compliance with the mortgage servicing laws in order to induce payment from the government. These types of false certifications are clearly actionable under the FCA. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903

(5th Cir. 1997) ("[F]alse certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit. Thus, where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation."); *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 186–87 (2016) ("[T]he implied false certification theory can, at least in some circumstances, provide a basis for liability. … When, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided.").

*United States ex rel. Jehl v. GGNSC Southaven, LLC*, No. 3:19-cv-091-NBB-JMV, 2022 WL 983644, at *6 (N.D. Miss. Mar. 30, 2022), is also distinguishable. In that case, the relator failed to demonstrate that the defendant's employment of a nurse who allegedly lacked a valid multistate credential violated the government's regulations and interpretative guidance to which the defendant certified, and the relator failed to demonstrate that the alleged violation was material to the government's payment decisions. In contrast, the evidence shows that Ocwen violated numerous laws, rules, and regulations applicable to mortgage servicing, that Ocwen failed to disclose those violations in its annual certifications, and there is ample evidence that these violations were material based on Ocwen's attempt to conceal these violations from the government with the RWG, ███████████████████████████████████████

███████████████████████████████████████████████████████████ [10] *See*

---

[10] *United States ex rel. Hughes v. Cook*, 498 F. Supp. 784, 787–88 (S.D. Miss. 1980), is distinguishable because there was no evidence that the defendants acted with the necessary

Ex. V at 13–15 ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

### D. Disputed Issues of Material Fact Preclude Summary Judgment.

Even if the facts truly mattered to Ocwen's challenge to the constitutionality of the FCA's *qui tam* provisions under the Take Care Clause (and they do not), there are numerous disputes of material fact that preclude summary judgment, including disputes related to the falsity of Ocwen's annual certifications, the materiality of Ocwen's servicing violations to the government, and Ocwen's statement of mind (scienter). Importantly, the parties dispute what the government knew and when. *See* RSOUMF ¶¶ 1–12.

While Ocwen claims that the government was fully aware of Ocwen's violations,[11] the evidence shows that Ocwen failed to disclose material violations in each of its annual certifications, rendering those certifications false. *See, e.g.*, Ex. V at 13–22 (████████████████████

████████████████████████████████████████████████████

████████████████████████████). Ocwen even conceded in internal communications that ██████████████████████████████████████████████ *See* Ex. R at OCW-EI-07014350. Yet Ocwen ████████████████████████████████████

scienter. In *United States ex rel. Fallon v. Bell Transit Corp.*, No. 16:-cv-06994-PJH, 2021 WL 965379, at *2, 8 (N.D. Cal. Mar. 15, 2021), there is no indication that the defendants made any false certifications to the government. Instead, like *Siewick*, the relator argued that certain contracts were void because they did not meet certain requirements imposed by California law.

[11] Ocwen ████████████████████████████████████████████████ . *See, e.g.*, Exs. O, P, Q.

14

██████████ . *See* Ex. P.

Notably, there is also no indication that the government was aware of the specific post-February 2017 violations uncovered by Relators, including Ocwen's improper practice of withdrawing and resubmitting borrower complaints and the servicing violations detailed in Ocwen's RWG Closure Reports. *See, e.g.,* Declaration of Jean-Marc Eichner (June 24, 2022) ¶¶ 9–11, 22, 25–28, 31–32; *see also* Ex. V at 13–22, 74–81; Exs. A–N. Indeed, Ocwen ***refused to produce*** and ultimately concealed the RWG Closure Reports from the CFPB based on a specious and now withdrawn claim of privilege in the *CFPB* case. *Compare* Dkt. 207-6, *with* Dkt. 207-7. *See CFPB v. Ocwen*, No. 9:17-CV-80495, 2019 WL 1119788, at *4 (S.D. Fla. Mar. 12, 2019).

Ocwen's generic declarations from Treasury only demonstrate that there are material fact disputes. *See generally* Dkt. 272-2–272-3. Indeed, SIGTARP admitted that MHA-C's testing failed to show the full extent of servicers' noncompliance with HAMP. *See* Dkt. 271-9 at 66; *see also* Ex. V at 13 ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Further, the evidence indicates that, had Treasury been made aware of the full extent of the servicing violations committed by Ocwen, there are certainly fact issues as to whether it would have, or should have, withheld and demanded back incentive payments made to Ocwen. *See* Ex. V at 13, 111–19; *see also* Dkt. 271-9 at 66.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Ocwen's motion for summary judgment based on the FCA's alleged failure to confer discretionary authority on Relators.

15

Dated: September 26, 2025

Respectfully submitted,

Roger D. Sanders
Texas Bar No. 17604700
LAW OFFICES OF ROGER SANDERS
300 N. Travis Street
Sherman, Texas 75090
Tel: (903) 892-9133
Fax: (903) 892-4302
roger.sanders@somlaw.net

/s/ Jeffrey R. Bragalone
Jeffrey R. Bragalone
Texas Bar No. 02855775
Daniel F. Olejko
Texas Bar No. 24108897
Mark M.R. Douglass
Texas Bar No. 24131184
Abby D. Merrill
Texas Bar No. 24130865
BRAGALONE OLEJKO SAAD PC
901 Main St., Ste. 3800
Dallas, TX 75202
Tel: (214) 785-6670
Fax: (214) 785-6680
jbragalone@bosfirm.com
dolejko@bosfirm.com
mdouglass@bosfirm.com
amerrill@bosfirm.com

**Counsel for Relator/Qui Tam Relators**
**Jean-Marc Eichner and Brandon Loyd**

16

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

The undersigned hereby certifies that the foregoing document is authorized to be filed under seal pursuant to the Court's Amended Protective Order (Dkt. 117), as amended and/or supplemented, in compliance with Local Rule CV 5(a)(7)(B).

*/s/ Jeffrey R. Bragalone*
Jeffrey R. Bragalone


**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(d) and (e), all counsel of record were served with a true and correct copy of the foregoing by email on September 26, 2025.

*/s/ Jeffrey R. Bragalone*
Jeffrey R. Bragalone

17