UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. JEAN-MARC EICHNER and BRANDON LOYD and JEAN-MARC EICHNER AND BRANDON LOYD, Individually,<br><br>          Relators,<br><br>v.<br><br>OCWEN LOAN SERVICING, LLC; OCWEN FINANCIAL CORPORATION, U.S. BANK, NATIONAL ASSOCIATION, *as Trustee* ON BEHALF OF 457 RESIDENTIAL MORTGAGE BACKED SECURITIES TRUST DEFENDANTS; DEUTSCHE BANK NATIONAL TRUST COMPANY, *as Trustee*, ON BEHALF OF 617 RESIDENTIAL MORTGAGE BACKED SECURITIES TRUST DEFENDANTS; THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. f/k/a THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION, THE BANK OF NEW YORK MELLON f/k/a THE BANK OF NEW YORK, and THE BANK OF NEW YORK MELLON CORPORATION f/k/a THE BANK OF NEW YORK COMPANY, INC. *as Successor-Trustees* to J.P. MORGAN CHASE BANK, N.A., ON BEHALF OF 329 RESIDENTIAL MORTGAGE BACKED SECURITIES, TRUST DEFENDANTS; WELLS FARGO BANK, N.A., *as Trustee*, ON BEHALF OF 194 RESIDENTIAL MORTGAGE BACKED SECURITIES TRUST DEFENDANTS,<br><br>          Defendants. | Civil Action No. 4:19-cv-00524-ALM<br><br>**JURY TRIAL DEMANDED** |

**DECLARATION OF JEAN-MARC EICHNER**

1.      My name is Jean-Marc Eichner. I am more than twenty-one years of age, under no legal disability, and am capable of making this declaration. I have personal knowledge of the facts stated herein, except to the extent I have noted otherwise, and such facts are true and correct to the best of my knowledge.

2.      I am a Relator in this action, having brought it on behalf of the United States pursuant to the *qui tam* provisions of the False Claims Act and its protections.

3.      I learned the information, allegations, and transactions upon which this lawsuit is based directly, in the course of my employment with Ocwen. I am an original source of the allegations regarding violations as described herein.

4.      I was employed at Ocwen from January 18, 2016 through May 10, 2019, and witnessed many knowing and material violations reflected in Ocwen's business records from 2015 through May of 2019. I learned of several systemic violations of laws and regulations, as well as unfair, deceptive, and abusive acts and practices.

5.      As Vice President of Customer Experience, I managed the customer complaints processes, database, and reporting, so I had first-hand knowledge of all dysfunctions reflected in the customer complaints. My role was to investigate the root cause of all major complaints and trigger remediation projects. Additionally, my role was to improve internal processes that affected consumers and, in light of increased complaint reporting requirements, to decrease the number of complaints. Particular attention was focused on complaints related to Consumer Financial Protection Bureau (CFPB) compliance. This required in-depth familiarity with Ocwen consumer complaints as well as knowledge of the internal processes related to the complaints. During my roughly three-and-a-half years in this capacity at Ocwen, complaints appeared to decrease from 300-400 per month to about 100 per month. Nonetheless, I discovered that Ocwen executives

**DECLARATION OF JEAN-MARC EICHNER**                                                          **2**

intentionally hid or destroyed complaint information and created methods of avoiding remedies to consumer complaints instead of using the remedies to correct consumer problems and avoid consumer harm including, but not limited to, avoidable foreclosures.

6. Among the remedies that were instituted under my direction during my tenure in customer experience, was automating firm-wide compliance with regulatory requirements to correct or at a minimum acknowledge a complaint within five days of receiving the complaint. Rather than depending on individuals calendaring and keeping up with compliance with this rule, the iCasework Complaint Management Database was set in April of 2015 to automatically send a letter acknowledging the receipt of the complaint on the fifth day after it was received if the complaint database did not reflect that the complaint had been either resolved or withdrawn. The previous system could not follow complaints in real time, and twelve state regulators and CFPB had required Ocwen to institute a system capable of doing so. Ocwen's Real Servicing platform continued to show the existence of the complaint but not its content. To follow the history and content of a complaint, Ocwen employees would rely on iCasework.

7. In or about January of 2019, Ocwen was migrating its servicing functions from its notoriously inadequate and poorly functioning Real Servicing platform to the MSP platform. Around that time or late 2018, I learned, through work I assigned to my staff, that the Research Group, which researched the loan's history to determine (1) the accuracy of the borrower's written complaint and (2) the cause of any verified problem, and the Ombudsman's Group, which handled escalated complaints including complaints from CFPB, state attorneys general, or bankruptcy counsel, were withholding correspondence related to material complaints from the iCasework Complaint Management Database in order to (1) avoid the automatic complaint acknowledgement and (2) maintain control they would not have in an automated record-keeping system. Keeping

**DECLARATION OF JEAN-MARC EICHNER** **3**

complaints out of the iCasework Complaint Database caused my Customer Experience Department's complaint reports, prepared quarterly to comply with quarterly complaint and compliance reporting requirements to CFPB and twelve states, to be (unknown to my Customer Experience Department and to me) incomplete and inaccurate false records. My customer experience group prepared its quarterly reports and submitted them to the compliance department, and subsequently to the Chief Compliance Officer, who were responsible for preparing final compliance reports to the Government. The reports should have reflected every single complaint but could not do so if complaint records were not stored in the system of record, iCasework. Thousands of complaints were not stored in the iCasework system of record, which formed the baseline for the reports, in order to conceal the volume and quality of complaints.

8.      Additionally, by keeping correspondence out of iCasework, the Research Department and Ombudsman's Office were able to manipulate information in the complaint files. My group determined that Research and Ombudsman were inputting correspondence dates manually into iCasework to falsely reflect, for example, compliance with the five-day acknowledgement requirement, as well as with a 30-day complaint resolution requirement. This fraudulent record-keeping included manually backdating acknowledgement letters and resolution letters sent to borrowers.

9. I learned, through work I assigned to my staff, that a surprising number of complaints were "*withdrawn*" from iCasework in a suspicious manner. Complaints should only be withdrawn if they were created in error, or if a complaint was a duplicate. *i.e.,* a remedied complaint should remain in iCasework with all the relevant records reflecting the resolution of the Complaint—it should not be removed from the database. The withdrawn complaints raised questions because there were a surprisingly large number of such complaints, and because many withdrawn

**DECLARATION OF JEAN-MARC EICHNER**                                                                     **4**

complaints were followed closely by a new complaint with the same content, with only a more recent initial date, *re-starting the clock on deadlines for acknowledgement and resolution*. During our audit of this issue, my customer experience group searched the previous four years—2015-2018—and found 26,000 complaints had been withdrawn, half of which were withdrawn by the Research department. These findings clearly suggested that the Research department was falsifying complaint records to hide non-compliance with regulatory requirements. As a result of these false records, Ocwen's reports to the federal and state governments regarding complaints were never true. To my knowledge, these violations were never self-reported to the government as required.

10. I also found that Ocwen's complaint compliance reports were rendered false by Ocwen's practice of withdrawing complaints from the iCasework database whenever a complaint went into litigation, ostensibly because the complaint was now being handled by another business unit, the legal department. It was unnecessary and improper to hide the record of the complaint by removing the complaint from the complaint database when the complaint went into litigation, thus hiding from regulators information about unresolved complaints. Doing so allowed Ocwen to hide not merely the volume of complaints but the seriousness, as the most serious complaints—those resulting in litigation—were hidden from the regulators.

11. Withdrawn complaints also seriously injured borrowers whose accounts were on a foreclosure track, as the foreclosure was required to be placed on a 30-day hold upon the borrower's notice of error or other qualified written complaint. If the complaint was withdrawn from the iCasework database, however, the 30-day hold was not triggered and the foreclosure proceeded, resulting in some cases in a wrongful foreclosure.

**DECLARATION OF JEAN-MARC EICHNER** 5

12.     A management decision was made, without disclosure to me and my Customer Experience Group that Research would not migrate its complaint correspondence to the iCasework Complaint Management Database, notwithstanding several conversations and e-mails regarding the subject. The Ombudsman's office initially used iCasework automatic acknowledgement letters, but subsequently moved back to manual acknowledgement correspondence. In fact, the Ombudsman's office maintained its own database of letters, which were not in iCasework *or* in Real Servicing which is where the known records resided.

13.     With the assistance of other members of our audit/survey team, I reviewed the two groups' recent audit letters and prepared a report dated January 9, 2019, regarding what we found. This audit revealed that some acknowledgement letters were sent late, and some were not sent at all. I brought this information to the attention of my immediate supervisor and shortly afterward, in February of 2019, I was advised that I was being laid off, effective in May of 2019. I was never provided any further information on whether the fraudulent conduct had ended.

14.     The Ombudsman's separate database was maintained in Waterloo, Iowa. Prior to my departure from Ocwen in mid-May 2019, I requested that they shut down the separate Waterloo, Iowa database, but got no response. Although the database was discovered in February of 2019, neither I nor my department was given access to the Ombudsman's secret, separate, unaudited database of complaint-related correspondence. I am unaware of any evidence that Ocwen's management ever shut down the separate, secret, unaudited Waterloo database.

15.     State and federal regulators who audited Ocwen did not know about the Ombudsman's secret database, nor did I until early 2019. Instead, the state and federal auditors believed they were being shown complete and accurate information by Ocwen which knew this was untrue.

**DECLARATION OF JEAN-MARC EICHNER**                                                                                  **6**

16. In addition to Ocwen's knowing, fraudulently concealed and artificially minimized complaint records and its corresponding knowing failures to fulfill its reporting obligations, I observed many other knowing violations of laws, regulations, and consent agreements, which rendered false all of Ocwen's annual certifications, whether express or implied, regarding compliance with federal or state laws, regulations and rules.

17. For instance, 44 loans in California went to foreclosure without the required consideration of an alternative solution such as a deed-in-lieu of foreclosure ("DIL"), even though each of the borrowers had expressly requested consideration for a DIL. This occurred because of Ocwen's confusing procedures on a request for DIL. Ocwen required that the borrower first request a modification, and it would only consider a borrower for a DIL if the modification was denied. Ocwen thus sent the borrowers a form to submit, which included the options of requesting a modification or a DIL *without* clearly instructing that the borrower must not apply for a DIL unless first denied a modification. The borrowers would be denied the DIL and run out of time to prevent foreclosure. This confusing procedure was consistent with, the Research department's motivation to forward the loan to foreclosure to get any complaints off its own books and let the foreclosure department deal with or "bury" any problems. When Ocwen recognized this error, it should have rescinded the foreclosures, but instead it paid the affected borrowers a mere $2,000.00 for the wrongful loss of their homes. This obviously benefitted Ocwen, as rescinding the foreclosure could also have cost the company legal fees and damages significantly more than $2,000.00, all to the detriment of the misled borrowers.

18. Ocwen had motives to foreclose rather than work out problem loans. Once the property is foreclosed upon, complaints on that loan are no longer active as the loan is no longer being serviced. This ironically *improved* Ocwen's appearance in its consumer complaint reports

**DECLARATION OF JEAN-MARC EICHNER** 7

to the regulators. Additionally, in a foreclosure, the servicer's expenses, such as funds advanced for escrows or property preservation, were all repaid by the owner/investors and the servicer received higher fees than for modifying a troubled loan, giving Ocwen additional incentives to wrongfully foreclose rather than providing the required alternatives to foreclosure.

19. In some instances, monies owed to borrowers whose loans were no longer being serviced by Ocwen (such as paid-off loans or loans that have been foreclosed upon) were never paid and were retained by Ocwen when it could no longer, after its own delays, "locate the borrower." Additionally, in cases in which Ocwen discovered it had undercharged a borrower, it would tack the charge onto the end of the loan for payoff at loan maturity, with no reasonable notice to the borrower.

20. In other instances, Ocwen sent borrowers confusing or contradictory information. For instance, the last correspondence sent to borrowers before the loan was placed in foreclosure was a letter stating that the loan was not in foreclosure. This letter, called the MADNR letter shows the amount owed, the previous six-months history, says whether the loan is in a loan modification process, and whether the loan is in foreclosure. These letters became notorious for containing incorrect information, numbers that did not make sense or add up, and other issues. Ocwen did nothing to correct or re-send the letters with correct information. I was able to determine that at least 627 borrowers were affected by this issue; however, the problem may have existed much longer, and many more borrowers may have been provided incorrect information, making it impossible for the borrowers to take corrective action immediately when their loans were put in line for foreclosure.

**DECLARATION OF JEAN-MARC EICHNER**                                                           **8**

21.     In 2017, Ocwen discovered it had overcharged borrowers for a payoff quote fee from 2006 through 2016. It was further admitted in a remediation working group meeting that the company had wrongfully capitalized late fees, which thus accrued interest charges, which were wrongfully included in the final payoff amount.

`       22.     In December of 2017, 8,000 borrowers' homeowner's insurance was cancelled by the insurers because Ocwen failed to pay the premiums due from the borrowers' escrow accounts. Ocwen subsequently got some policies reinstated and replaced some with new policies, without notifying the borrowers. Ocwen did not research the question of whether any borrower had an insurance claim denied as a result of the cancellation for nonpayment.

2.      Borrowers were also harmed by Ocwen's intentional understaffing. When the Government rolled out its Making Home Affordable programs in the wake of the Residential Mortgage-Backed Securities ("RMBS") collapse and the Great Recession of 2008, many residential mortgage loan servicers were overwhelmed and understaffed for the volume of borrowers requesting modifications and other foreclosure alternatives, along with the volume of borrower defaults and foreclosures. Later, when Ocwen's number of loans serviced decreased, it chose to reduce staffing proportionally to the decrease in the number of loans serviced rather than keeping sufficient staff to address the remaining and to improve prompt and accurate servicing; Ocwen chose to remain at the same ratio of employees to loans being serviced, cutting staffing every quarter to maintain its inadequate staffing levels.

24.     This understaffing resulted in unnecessarily long and harassing telephone wait times for borrowers. For instance, pursuant to regulatory requirements, Ocwen assigned borrowers a single point of contact ("SPOC")—a single, assigned individual to talk with the borrower, become familiar with his complaint and attendant circumstances, so the borrower did not have to

**DECLARATION OF JEAN-MARC EICHNER**                                    **9**

start from scratch to explain the problem to whoever took the call. Ocwen used an appointment model requiring borrowers to schedule appointments to speak with their SPOC. About a third to half of the time, however, the SPOC was unavailable for the appointment when the borrower called as scheduled. The borrower's call was transferred to another person, unfamiliar with the loan, who would not attempt to address the borrower's problem, but instead scheduled another appointment. The new appointment typically could not be scheduled for sooner than 10-11 days. On a tight foreclosure schedule, a borrower who was unable to talk to the SPOC, or anyone else who might discuss errors, complaints, or potential loss mitigation, instead had the clock run out and the loan moved into foreclosure.

25.    Between October of 2017 and March of 2018, a major fax number that was disseminated to borrowers in numerous correspondence pieces and the Request for Mortgage Assistance Form (used for all types of assistance such as modifications, deed-in-lieu of foreclosure, short sales) as *the* number to use to send their documents to Ocwen, was deactivated without notice to borrowers. Subsequently, the IT department delayed the renegotiation of the contract for the fax provider, which then allocated less bandwidth for all Ocwen fax numbers, which caused bottlenecks and many documents to never be received, although customers would think their fax went through. Customers were told by customer service to resend their documents, sometimes repeatedly. As a result, trusting borrowers were unable to promptly send written complaints or documentation to Ocwen as instructed by Ocwen.

26.    In July of 2017, Ocwen made incorrect modification decisions based on its erroneous attribution of incorrect characteristics of the loan, such as treating an adjustable loan as a fixed-rate loan. At least 85 borrowers were harmed by wrongful denial of their modification

**DECLARATION OF JEAN-MARC EICHNER**                                                    **10**

applications. The problem may have occurred over a much longer time and may have injured many more borrowers than those identified.

27.     In May of 2017, Ocwen incorrectly offered modifications that were not allowed. It rescinded the loan modifications and offered no remedy to the affected borrowers. I saw no evidence that this was an isolated set of instances, and the violations may well have occurred over a longer period of time and injured many more borrowers.

28.     Between October of 2016 and April of 2017, Ocwen sent 1,589 letters to customers containing incorrect unpaid principal balances. This may have occurred over a longer period and affected a larger number of borrowers.

29.     Between November of 2016 and January of 2017, Ocwen gave employees defective training on the calculation of the trial payment amount for a loan modification. At least 62 borrowers were affected by this error. This may have occurred over a longer period, however, and affected a larger number of borrowers.

30.     In November of 2015, incorrect calculations of self-employment income, resulting from a failure to account for a one-hour time-zone difference, caused self-employed borrowers' income to be understated (because of dividing by 91 days rather than 90) and loan modifications to be denied. Ocwen offered no remedy and made no disclosures of its errors to affected borrowers.

31.     Between July of 2013 and April of 2018, many loans went into foreclosure because of delayed loan modification decisions on loans with escalated complaints. This was because Ocwen chose to issue an escalation report only once a week rather than daily. Once the escalation report was issued, it typically took at least a week for Ocwen to investigate the borrower's escalated complaint. During this time, although foreclosure proceedings should have been put on hold for 30 days, this was not done until the escalation report was issued, and in the interim, no

**DECLARATION OF JEAN-MARC EICHNER**                                        **11**

modification was processed, and loans were foreclosed upon. Not until April of 2018 did Ocwen take the obvious and simple step of reporting on escalations in a timely manner, all of which was never disclosed to affected borrowers.

32.     Between 2012 and 2018, Ocwen failed to process principal forgiveness on HAMP loans. Principal forgiveness was the HAMP program's incentive to borrowers for making timely payments. Under the program, the principal payment was made to the servicer to be distributed to the investor, and the borrower was supposed to benefit by a reduction in the loan's principal balance. Thus, countless borrowers did not receive the benefit of the money paid to the investors under the HAMP program for their benefit. It is unclear whether the funds remained with Ocwen or were paid to Trustees for the benefit of Trusts, respectively. In addition, Ocwen determined that, at least, 24 loans went into foreclosure as a result. Ocwen has not accounted for this significant sum of missing money to the borrowers or the government.

33.     During my employment, I was aware that the mortgage servicing agents, such as AHMSI (Homeward Residential) and Ocwen, provided collection services for investors/Trusts (owners of the mortgages). I knew that the servicer relationships were governed by pooling and servicing agreements under which the servicer collected borrowers' monthly mortgage payments and escrows as well as providing other services for the Trusts.

34.     The HAMP program provided a protocol for the modification of troubled mortgages by the servicers so that qualified borrowers across the country could avoid foreclosure and remain in their homes. I learned that there were fees shared by the servicers and the investors. One of the reasons that I filed this case was for the government to recover substantial incentive fees paid to the investors through Ocwen's submissions of false claims to the government for HAMP incentive fees. I believe that the cumulative sums owed to the government are very large.

**DECLARATION OF JEAN-MARC EICHNER**                                                                          **12**

35.     When I was laid off in May of 2019, Ocwen offered me a separation agreement, which included a payment of $125,000 in exchange for a release of claims. At the time, I understood from the language of the release that it did *not* include FCA claims brought on behalf of the United States government. Further, the government agencies responsible for paying Ocwen did not have full knowledge of my allegations at the time I signed the separation agreement. The language of the agreement indicated that it was never intended to cover FCA claims brought on behalf of the government. At the time, I needed the money provided by the severance package because I was losing my job at Ocwen. I did not have a lawyer review the separation agreement before signing it because Ocwen did not leave any room for negotiation of the terms of the separation agreement.   If I wanted the money, I had to sign the document.

36.     I learned information, allegations, and transactions upon which this lawsuit is based independently of the legal decisions referred to in Defendants' Rule 12(b)(1)/12(b)(6)/Rule 56 Motions to Dismiss, which I understand are:

> *United States ex rel. Fisher v. Ocwen Loan Servicing, LLC and Ocwen Financial Corp.,* Case No. 4: 12-cv-543 (E.D. Tex.) (together with 4:12-cv-461 the "Fisher cases");

> *United States ex rel. Fisher v. Homeward Residential, Inc.,* Case No. 4:12-cv-461 (E.D. Tex.) (together with 4:12-cv-543, the "Fisher-cases");

> *CFPB v. Ocwen Fin. Corp.*, No. 9:17-cv-80495-KAM (S.D. Fla.) ("CFPB case"); and

> Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") investigation.

37.     On February 1, 2019. April 22, 2019, and July 13, 14, and 15, 2019, I disclosed to the U.S. Attorney for the Eastern District of Texas substantially all information I possessed regarding the allegations I subsequently made in my Complaint in this action. I have supplemented these disclosures whenever I received new information.

**DECLARATION OF JEAN-MARC EICHNER**                                                              **13**

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 24th day of June 2022.

_____
Jean-Marc Eichner

**DECLARATION OF JEAN-MARC EICHNER** 14